**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL MERSON, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br>                    Defendants. | Case No. 1:21-cv-8752-PAC<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL |

THIS DOCUMENT RELATES TO:

      1:21-cv-08618-PAC
      1:21-cv-08413-PAC
      1:21-cv-08897-PAC
      1:21-cv-10286-PAC
      1:21-cv-10791-PAC
      1:22-cv-00169-PAC

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

JURISDICTION AND VENUE ............................................................................. 11

PARTIES AND RELEVANT NON-PARTIES ..................................................... 12

SUBSTANTIVE ALLEGATIONS ....................................................................... 16

I.      BACKGROUND ON PRIME BROKERAGE AND BLOCK TRADING ...................... 16

      A.      Prime Brokerage ................................................................. 16

            i.      A Short Overview of Prime Brokerage .................................... 16

            ii.      A History of Prime Brokerage ................................................. 18

            iii.      Margin Lending: A Detailed Explanation ............................... 19

      B.      Synthetic Financing: Total Return Swaps ........................................... 21

      C.      Block Trading ............................................................................. 23

      D.      Front Running And Tipping ........................................................ 25

      E.      The Morgan Stanley Fade .......................................................... 26

II.      ARCHEGOS'S MARKET MANIPULATION SCHEME .................................. 35

      A.      Archegos Rises out of Tiger Asia Fund's Ashes .......................... 35

      B.      Archegos's Initial "Vanilla" Investment Strategy ................................. 37

      C.      Archegos's Confidential Counterparty Relationships .......................... 41

      D.      Archegos Dramatically Changes Its Investment Strategy ................... 43

            i.      The COVID-19 Pandemic: A Turning Point for Archegos ..................... 43

            ii.      Archegos Changes the Composition of Its Top 10 Holdings Away from Blue Chip Technology Companies to Smaller Chinese Companies ......... 48

      E.      Archegos Exerted Dominance over Its Top 10 Holdings ..................... 49

      F.      Archegos Engaged in Manipulative Trading ....................................... 55

      G.      In 2020, Defendants Morgan Stanley and Goldman Sachs, and the Other Counterparties, See Red Flags Alerting Them to Archegos's Misconduct ......... 60

i.      Defendants Morgan Stanley and Goldman Sachs, and the Other
        Counterparties, Had Full Visibility of Archegos's Manipulative Trading
        Patterns in Each of Their Respective Margin Account ............................ 60

ii.     Archegos Often Reached and Surpassed Counterparties', including
        Defendants Morgan Stanley and Goldman Sachs's, Imposed Limits ....... 61

iii.    Defendants Morgan Stanley and Goldman Sachs, and the other
        Counterparties, Increase Required Long/Short Ratio to 50% .................. 62

iv.     Defendants Morgan Stanley and Goldman Sachs, and the other
        Counterparties, Regularly Interact with Archegos .................................... 65

        a.      Discussions Regarding the Concentration of Archegos's Portfolio
                .................................................................................................. 66

        b.      Discussions Regarding the Liquidity of Archegos's Portfolio ..... 69

        c.      Discussions Regarding the Composition of Archegos's Portfolio 72

H.      In the Week of March 22, 2021, Archegos Told Defendants Morgan Stanley and
        Goldman Sachs That Its Scheme Was Going to Collapse, Which Would
        Inevitably Cause the Price of Affected Stocks to Plummet ................................ 75

i.      ViacomCBS's Secondary Public Offering ................................................ 75

ii.     Archegos Scrambles to Cover Margin Calls and Desperately Spends
        Remaining Cash and Excess Margin Trying to Prop Up Positions .......... 75

iii.    By March 24, 2021, Archegos Begins Notifying Its Counterparties that It
        Would Not Be Able to Meet Margins Calls of Over $10 Billion Due Next
        Day ............................................................................................................ 76

iv.     Archegos Reaches Out to Defendants Morgan Stanley and Goldman Sachs
        in an Attempt to Prevent Large Scale Liquidation ................................... 78

III.    THE FALLOUT ............................................................................................................ 83

IV.     DEFENDANTS MORGAN STANLEY AND GOLDMAN SACHS'S ILLICIT INSIDER
        TRADING ..................................................................................................................... 106

A.      Defendants Morgan Stanley and Goldman Sachs Owed Duties to Archegos –
        Misappropriation ............................................................................................... 106

B.      Defendants Morgan Stanley and Goldman Sachs Owed Duties To Shareholders –
        Tipper/Tippee ..................................................................................................... 109

C.      Defendants Morgan Stanley and Goldman Sachs Obtained MNPI ................... 111

D.      Defendants Morgan Stanley and Goldman Sachs Traded On And Exploited MNPI
In Breach of Duties Owed to Archegos and Shareholders of the Issuers ........... 114

SCIENTER .................................................................................................................... 118

V.      DEFENDANTS MORGAN STANLEY AND GOLDMAN SACHS AND MANY OF
THEIR HEDGE FUND CLIENTS HAD TREMENDOUS EXPOSURE TO
ARCHEGOS'S PORTFOLIO ......................................................................... 121

VI.     DEFENDANTS MORGAN STANLEY AND GOLDMAN SACHS KNEW FROM
EXPERIENCE THAT THEIR TRADING WOULD CAUSE THE PRICE OF THE
STOCK TO "FADE" JUST PRIOR TO THE INFORMATION BECOMING
PUBLIC ........................................................................................................... 122

VII.    ARCHEGOS EXPRESSLY INFORMED DEFENDANTS MORGAN STANLEY AND
GOLDMAN SACHS OF ITS TROUBLED POSITION BEFORE THE INFORMATION
WAS MADE PUBLIC....................................................................................... 122

LOSS CAUSATION........................................................................................................ 124

RELIANCE..................................................................................................................... 124

DEFENDANTS MORGAN STANLEY AND GOLDMAN SACHS'S UNLAWFUL
GAINS ........................................................................................................................... 125

CONTEMPORANEOUS PURCHASES AND SALES.......................................................... 125

CLASS ACTION ALLEGATIONS ................................................................................... 126

CLAIMS FOR RELIEF ................................................................................................... 129

FIRST CLAIM............................................................................................................... 129

SECOND CLAIM............................................................................................................ 131

THIRD CLAIM .............................................................................................................. 133

PRAYER FOR RELIEF ................................................................................................... 134

JURY TRIAL DEMANDED ............................................................................................. 134

Lead Plaintiff Zhang Zhenming and Named Plaintiff Kai Chen in Case No. 1:21-cv-8752-PAC ("Tencent Plaintiffs"), individually and on behalf of a class of investors in Tencent Music Entertainment Group securities (as further defined below, the "Tencent Investor Class") allege the following based upon personal knowledge, as to themselves and their own acts, and upon information and belief, as to all other matters. Such information and belief is based on, *inter alia*, the investigation conducted by and through Tencent Plaintiffs' attorneys in the above-captioned cases, which included, among other things, a review of Defendant Morgan Stanley and Defendant Goldman Sachs Group, Inc. ("Goldman Sachs") press releases, Securities and Exchange Commission ("SEC") Complaint, filings, analyst reports, media reports, trading records and other publicly disclosed reports and information about Defendants Morgan Stanley and Goldman Sachs, United States Department of Justice ("DOJ") unsealed indictment, U.S. Commodity Futures Trading Commission ("CFTC") Complaint for Injunctive and Other Equitable Relief and for Civil Monetary Penalties, unsealed guilty pleas of William Tomita and Scott Becker and Special Committee of Credit Suisse's Board of Directors Report on Archegos Capital Management. Tencent Plaintiffs believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **INTRODUCTION**

1.      This is one of seven coordinated putative securities class actions (the "Archegos Cases"), arising out of the same illicit insider trading by Defendants Morgan Stanley and Goldman Sachs ahead of the March 2021 collapse of Archegos Capital Management, LP ("Archegos"). Plaintiffs allege that by late March 2021, Defendants Morgan Stanley and Goldman Sachs received material non-public information ("MNPI") from Archegos in the course of their confidential prime brokerage relationship. Most glaring, they learned that Archegos had engaged in a massive market

manipulation scheme that was on the brink of collapse and that would certainly devastate the share price of the manipulated stocks. Defendants Morgan Stanley and Goldman Sachs fully exploited their receipt of MNPI by selling billions of dollars in the affected stocks before the market learned of the issues with Archegos.

2.      Defendants Morgan Stanley and Goldman Sachs served as prime brokers for Archegos, servicing its trades and lending capital through margin accounts, acting as counterparties on derivative "total return swaps", and thereby enabling Archegos to acquire large, non-public positions in each of the seven issuers that are the subject of the Archegos Cases - Gaotu Techedu Inc., formerly known as GSX Techedu Inc., ("Gaotu"), Vipshop Holdings Ltd. ("Vipshop"), Tencent Music Entertainment Group ("Tencent"), ViacomCBS, Inc. ("ViacomCBS"), IQIYI, Inc. ("IQIYI"), Baidu, Inc. ("Baidu"), and Discovery, Inc. ("Discovery"; collectively, the "Issuers").

3.      A total return swap, or TRS, is a derivative contract based on an underlying asset pursuant to which a party ("Party A") makes payments based on a set rate, either fixed or variable, while the counterparty ("Party B") makes payments based on the return of an underlying asset (here, shares of the Issuers). If the value of the asset increases, Party B may be required to make payments to Party A, but if the value of the asset decreases, the Party A may be required to post "collateral."

4.      As Defendants Morgan Stanley and Goldman Sachs knew, Archegos's undisclosed stake across the Issuers was enormous, concentrated and highly leveraged. Archegos had structured these undisclosed positions through a total return swap strategy meant to evade the reporting requirements of the Exchange Act. The exposure and risk posed by Archegos's undisclosed positions was exacerbated by Defendants Morgan Stanley and Goldman Sachs's own

non-public market-neutral hedging strategies.  Further, the exposure and risk posed by Archegos's massive and highly leveraged, but non-public, positions had increased dramatically into and across the first months of calendar 2021.  And as later detailed across an array criminal indictments, guilty pleas, and regulatory enforcement actions, Archegos had built its undisclosed, massive, highly leveraged positions by means of tell-tale "market manipulation and fraud, with far-reaching consequences for other participants in the United States securities markets," particularly for Tencent Plaintiffs and other ordinary investors in the "companies whose stock prices [Archegos] manipulated" (here, the Issuers).

5.      By late March 2021, Defendants Morgan Stanley and Goldman Sachs were aware of all of the foregoing.  As indicated in the *Report on Archegos Capital Management* prepared by Credit Suisse, one of Archegos's other prime brokers, there were numerous "red flags relating to the size, concentration, and liquidity of Archegos's portfolio."  The report further revealed that Credit Suisse knew that Archegos "had additional concentrated exposure to the same single-name positions across the Street", *i.e.,* namely with Defendants Morgan Stanley and Goldman Sachs.  In fact, Credit Suisse agreed to give up the contractual provision whereby Archegos was required "to represent, in connection with any trade, that it did not hold beneficial ownership (whether in stock or through swaps) amounting to 10% of the outstanding shares of an issuer," and instead accepted that Archegos merely represent that it did not hold beneficial ownership amounting to 20% of the outstanding shares of an issuer.

6.      Critically, in late March 2021, Defendants Morgan Stanley and Goldman Sachs also had learned from Archegos that its highly leveraged house of cards built on market manipulation and fraud was about to collapse, with dire consequences for members of the Archegos Cases, *i.e.,* ordinary public shareholders of the Issuers.  Specifically, by early January

2021, after repeated breaches of exposure limits, the ballooning risk posed by Archegos's positions led Defendants Morgan Stanley and Goldman Sachs to issue a series of escalating margin calls, demanding hundreds of millions of dollars in additional collateral from Archegos.  By the week of March 22, 2021, Archegos's ability to cover these margin calls was all but exhausted when further declines across several of its significant long positions exacerbated its exposure, leading Defendants Morgan Stanley and Goldman Sachs, and its other prime brokers, to demand billions of dollars in additional collateral.  Because it was already tapped out, Archegos informed Defendants Morgan Stanley and Goldman Sachs, and its other prime brokers, that it did not have the liquidity to meet any of their margin calls.

7.      Archegos thus convened a series of calls with its prime brokers, including Defendants Morgan Stanley and Goldman Sachs, informing them that while its equity had declined *to less than $10 billion*, its aggregate *exposure had ballooned to $120 billion*, and proposing that its prime brokers enter into a collective standstill, forbearance, managed liquidation, or similar agreement.  In response to this MNPI, Defendants Morgan Stanley and Goldman Sachs, and other prime brokers, also held a series of calls and meetings discussing the possibility of a managed liquidation, whereby they would send their positions for review to an independent counsel, government regulator, or other independent third party, who would freeze holdings for the entire consortium when the aggregate concentration reached particular levels, and give the lenders a percentage range within which they would be permitted to liquidate their overlapping positions. Counsel for all the banks were engaged and attended these calls to work through regulatory and legal challenges, and legal counsel for Defendants Morgan Stanley and Goldman Sachs, and for other prime brokers, further held calls among themselves, acknowledging confidentiality and that, among other things, no prime broker was permitted to disclose Archegos-related positions.

8.      But at the same time as Archegos and its prime brokers were engaged in this ostensibly good faith, private negotiation toward an orderly liquidation Defendants Morgan Stanley and Goldman Sachs – two of its largest prime brokers – were unloading billions of dollars of their proprietary hedged holdings via block trades and other transactions across the very same underlying issuers jeopardized by the imminent collapse of Archegos's massive market manipulation house scheme. For example, as was later reported in an article published by *CNBC.com* on April 6, 2021, "before the Archegos story burst into public view . . . the fund's biggest prime broker quietly unloaded some of its risky positions. . . . Morgan Stanley sold about $5 billion in shares from Archegos's doomed bets . . . late Thursday, March 25." These and other illicit insider sales allowed Defendants Morgan Stanley and Goldman Sachs to avoid billions in losses on the basis of MNPI related to Archegos's market manipulation scheme, undisclosed beneficial ownership stakes, inability to cover, and impending liquidation.

9.      The ensuing fallout caused severe harm to ordinary investors. When it was publicly reported that Archegos had failed to cover and that Archegos and its prime brokers were liquidating their leveraged equity positions, the artificially inflated market prices for shares of the Issuers collapsed, causing over $100 billion in market losses to Tencent Plaintiffs and other ordinary public shareholders who traded contemporaneously with Defendants Morgan Stanley and Goldman Sachs.

10.     The fallout did not end there. Over the months since, a firehose of public reports revealed an array of open government and regulatory civil and criminal investigations that have been expanded, or accelerated, notably targeting the block trading and other Archegos-related activity of Defendants Morgan Stanley and Goldman Sachs. Public reports have named particular Defendants Morgan Stanley and Goldman Sachs employees and hedge fund clients implicated in

the underlying misconduct alleged in these cases, including Pawan Passi ("Passi"), the long-time head of Defendant Morgan Stanley's block trading business, who was placed on leave in November 2021 amid regulatory investigations into his possible tipping of Defendant Morgan Stanley hedge fund clients - such as Surveyor Capital, Element Capital Management, CaaS Capital Management, Islet Management - ahead of Archegos-related block trades.  Other bankers swept up in these investigations include Michael Daum of Defendant Goldman Sachs, Michael Lewis, formerly of Defendant Morgan Stanley, and Felipe Portillo of Credit Suisse.  Reports later surfaced that Passi had been formally replaced at Defendant Morgan Stanley and may be cooperating with government investigators, and that Defendants Morgan Stanley and Goldman Sachs are pursuing quick settlements with Archegos in an effort to keep, as-of-yet non-public facts out of reach from the DOJ and other government and private investigators and litigants.

11.     Then, on April 27, 2022, the DOJ announced the unsealing of an indictment charging Sung Kook (Bill) Hwang ("Hwang"), Archegos's founder, and Patrick Halligan ("Halligan"), Archegos's former Chief Financial Officer, with racketeering, conspiracy, securities fraud, and wire fraud offenses in connection with interrelated schemes to unlawfully manipulate the prices of publicly traded securities in Archegos's portfolio, including in particular the shares of each of the Issuers at issue in the Archegos Cases.  The DOJ also announced the unsealing of Scott V. Becker's ("Becker"), Archegos's former Chief Risk Officer, and William Tomita's ("Tomita"), Archegos's former head trader, guilty pleas in connection with their participation in the Archegos market manipulation scheme.

12.     The DOJ indictment specifically states that "in order to avoid public disclosure of its positions, once Archegos neared 5% ownership of the outstanding shares of a stock . . . [Hwang] . . . required that any additional exposure be through a financial agreement known as a total return

swap." The indictment also sets forth the various trading schemes employed by Archegos to attain its objective of "control[ling] the price and artificially increase[ing] the value of securities in [its] portfolio," *i.e.*, to establish significant market influence in the securities it held in its portfolio and to utilize trading strategies to artificially affect the market price of these securities.

13.    Also on April 27, 2022, the SEC and the CFTC each filed parallel civil actions related to the Archegos collapse. Both complaints detail Archegos's "brazen scheme to manipulate the market for the securities of the issuers that represented Archegos's top 10 holdings . . ., both through purchases of the issuer's securities and entry into [security-based swaps] referencing those issuers." However, all things considered, Archegos "was a house of cards that was one bad week away from ruin", and ultimately "the weight of [its] fraudulent and manipulative scheme was too much for [it] to bear, and over the course of less than a week in late March 2021, the house of cards collapsed."

14.    While other prime brokers suffered billions in losses following Archegos's blowout, Defendants Morgan Stanley and Goldman Sachs remained relatively unscathed. All told, Defendants Morgan Stanley and Goldman Sachs misappropriated MNPI that had confidentially obtained from Archegos, selling billions of dollars of shares across the Issuers underlying Archegos's doomed bets and market manipulation scheme, ***before*** the Archegos story reached the public, sending the corresponding Issuers' stocks into a complete tailspin. As a result of these sales, Defendants Morgan Stanley and Goldman Sachs ***avoided billions in losses.***

15.    This particular action is brought on behalf of all persons who purchased or otherwise acquired Tencent shares contemporaneously with Defendants' unlawful trades from March 22, 2021 through and including March 29, 2021 (the "Class Period"), pursuant to §§20A, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78t-

1, 78j(b), and 78t(a).  As detailed below, Defendants Morgan Stanley and Goldman Sachs sold a large amount of Tencent shares during the week of March 22, 2021 while in possession of MNPI. Defendants Morgan Stanley and Goldman Sachs's illicit insider sales were part of a manipulative and deceptive device, scheme, and artifice to defraud that operated as a fraud and deceit by means of Defendants Morgan Stanley and Goldman Sachs directly trading in the securities of Tencent while in possession of MNPI obtained from Archegos and in breach of duties owed both to Archegos and to the shareholders of Tencent.

16.    The MNPI that Defendants Morgan Stanley and Goldman Sachs possessed while trading in breach of their duties owed to Archegos and to ***the shareholders of*** the Issuers concerned Archegos's massive market manipulation scheme, its likely insolvency as a result of its enormous losses, its inability to satisfy its lenders' margin calls, and the imminent liquidation of massive amounts of securities underlying its holdings.  More specifically, the MNPI possessed by Defendants Morgan Stanley and Goldman Sachs includes but is not limited to:

- Archegos had massive, highly leveraged beneficial ownership positions in each of the Issuers, in excess of both the 5% beneficial ownership thresholds of Section 13 and the 10% beneficial ownership thresholds of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder;

- Archegos had built and structured its investments in these companies pursuant to a total return swap strategy specifically as a plan or scheme to evade the beneficial ownership reporting requirements of Sections 13 and 16 of the Exchange Act;

- By means of these non-public, massive, highly leveraged positions, Archegos had engaged rampant market manipulation to distort, inflate, and otherwise manipulate the market prices of shares issued by the Issuers;

- As a result of Archegos's market manipulation scheme, the public share prices of the Issuers had been massively distorted, inflated, and otherwise manipulated, such that the public prices for these shares did not reflect and were not the product of natural market forces of supply and demand, but rather were the artificial product of Archegos's manipulative trading and deceptive conduct;

- The exposure and significant risk posed by Archegos's massive and highly leveraged, total return swap positions in each of the Issuers was exacerbated by Defendants Morgan Stanley and Goldman Sachs's hedging strategies, pursuant to which they purchased on their own behalf additional shares of the Issuers corresponding to Archegos's total return swap positions;

- The exposure and significant risk posed by Archegos's highly leveraged, non-public, positions in each of the Issuers had increased dramatically during the first quarter of calendar 2021;

- By early January 2021, after repeated breaches of exposure limits, the ballooning risk posed by Archegos's positions led Defendants Morgan Stanley and Goldman Sachs, and other prime brokers to issue a series of escalating margin calls, demanding hundreds of millions of dollars in additional collateral from Archegos;

- By the week of March 22, 2021, Archegos's ability to cover was all but exhausted when further declines across several of its significant long positions exacerbated its exposure, leading Defendants Morgan Stanley and Goldman Sachs, and its other prime brokers to demand billions of dollars in additional collateral from Archegos;

- Facing massive escalating margin calls it could not meet and a consequent and catastrophic liquidity crisis, Archegos informed Defendants Morgan Stanley and Goldman Sachs, and its other prime brokers that it did not have the liquidity to meet any of their margin calls, and that its massive position (and the manipulation price distortion created thereby) was about to be abruptly unwound, thus posing severe risk to the public share prices of the Issuers;

- Archegos had convened a series of calls, at least from March 25, 2021 through March 26, 2021, with the prime brokers, including Defendants Morgan Stanley and Goldman Sachs, informing them that while its equity had declined to less than $10 billion its aggregate exposure had ballooned to over $120 billion, and proposing that its prime brokers enter into a collective standstill, forbearance, managed liquidation, or similar agreement; and

- Defendants Morgan Stanley and Goldman Sachs and Archegos's other prime brokers also held a series of calls and meetings to discuss the possibility of an orderly managed liquidation, whereby the prime brokers would send their positions for review to an independent counsel, government regulator, or other independent third party, who would freeze holdings for the entire consortium when the aggregate concentration reached particular levels, and provide the

brokers with a percentage range within which they would be permitted to liquidate their overlapping positions;

Defendants Morgan Stanley and Goldman Sachs knew, or were reckless in not knowing, that they were prohibited from trading based on this confidential market-moving information, but traded anyway, disposing to Tencent Plaintiffs and other shareholders of Tencent their proprietary holdings in Tencent before the news about Archegos was announced and the share price plummeted.

17.     As a result of Defendants Morgan Stanley and Goldman Sachs's illicit insider trading misconduct, Tencent Plaintiffs and other members of Tencent Investor Class suffered severe losses while Defendants Morgan Stanley and Goldman Sachs realized billions of dollars in losses avoided and other unjust enrichment.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under §§10(b), 20A, and 20(a) of the Exchange Act, 15 U.S.C. §§78j, 78t-1, and 78t(a).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

20.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Defendants Morgan Stanley and Goldman Sachs are both based in this District.

21.     In connection with the acts, conduct, and other wrongs alleged in this Amended Class Action Complaint, Defendants Morgan Stanley and Goldman Sachs, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone and data communications and facilities of the national securities exchange.

11

## PARTIES AND RELEVANT NON-PARTIES

22.     As set forth in the previously filed Certification (Case No. 1:21-cv-8752-PAC, ECF No. 28-3), Lead Plaintiff Zhang Zhenming and acquired Tencent ADS (TME) during the Class Period and was damaged when the MNPI was publicly disclosed at the end of the Class Period, and the price of Tencent ADS declined as a result.

23.     As set forth in the previously filed Certification (Case No. 1:21-cv-09564-PAC, ECF No 1), Named Plaintiff Kai Chen acquired Tencent ADS (TME) during the Class Period and was damaged when the MNPI was publicly disclosed at the end of the Class Period, and the price of Tencent ADS declined as a result.

24.     Defendant Goldman Sachs is a global financial services institution.  Goldman Sachs served as one of Archegos's prime brokers, helping it make trades and lending it capital in the form of margin lending.  Goldman Sachs is incorporated under the laws of Delaware and maintains its headquarters at 200 West Street, New York, New York 10282.

25.     Defendant Morgan Stanley is a global financial services institution.  Defendant Morgan Stanley served as one of Archegos's prime brokers, helping it make trades and lending it capital in the form of margin lending.  Defendant Morgan Stanley is incorporated under the laws of Delaware and maintains its headquarters at 1585 Broadway, New York, New York 10036.

26.     Archegos was a family office headquartered in New York, NY exempt from registration as an investment adviser under Rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940.  As of March 2021, Archegos managed over $36 billion in invested capital.  In late March 2021, Archegos defaulted on a number of significant margin calls, causing the family office's closure shortly thereafter. Archegos is not currently active.

27.     Archegos Fund, LP ("Archegos Fund") was a limited partnership formed in Delaware and having its principal place of business in New York, NY.  Pursuant to the Amended

and Restated Investment Management Agreement ("Investment Management Agreement") between Archegos and Archegos Fund dated June 30, 2014, Archegos was the Investment Manager of Archegos Fund. Archegos had broad authority to act on behalf of Archegos Fund, including authority to deal in commodity contracts, securities and swaps, conduct margin accounts with brokers, and "act for [Archegos] . . . in all other matters."

28.     Archegos and Archegos Fund shared an office and were each wholly owned and controlled by its founder, Hwang for the common purpose of managing and investing the assets of Hwang and the Hwang's family.  At all relevant times to the present action, Hwang, Halligan, Tomita and Becker were leaders of Archegos.

29.     Hwang served as the managing member of Archegos Fund's general partner and the principal of Archegos and signed the Investment Management Agreement on behalf of both Archegos and Archegos Fund.  Hwang was the founder and manager of Archegos, and was solely responsible for all investment decisions made by Archegos or on its behalf.  Hwang is a resident of Tenafly, NJ.

30.     Hwang began his career at Hyundai Securities in New York, following which he worked at the now defunct Peregrine.  At Peregrine, he met renowned hedge fund investor Julian Robertson ("Robertson") and subsequently went to work for Robertson's Tiger Management Corp., one of the largest hedge fund sponsors in the world in the late 1990s.  Robertson closed his hedge fund in 2000.

31.     In 2001, Hwang founded Tiger Asia Management, LLC and Tiger Asia Partners, LLC (collectively, "Tiger Asia") with funding from Robertson. Tiger Asia was one of the so-called "Tiger Cub" funds, a group of hedge funds that were spun off from Tiger Management Corp. At its peak, Tiger Asia grew to over $5 billion.

32.    In 2012, Hwang plead guilty to criminal insider trading charges on behalf of Tiger Asia and both he and Tiger Asia settled civil charges brought by the SEC, as more fully detailed below.

33.    In 2012, Tiger Asia entered into a settlement with the SEC concerning allegations of insider trading and attempted stock manipulation. It also plead guilty to criminal wire fraud in an action brought by DOJ and admitted to facts similar to those set forth in the SEC settlement. As a result of the above, Tiger Asia closed shop after forfeiting more than $16 million in illegal profits and paying $44 million in disgorgement and penalties. As for Hwang, he was banned from managing money on behalf of clients for at least five years, returned all outside investor capital and deregistered Tiger Asia as an investment adviser. By 2013, Hwang had retuned all investor capital and subsequently converted Tiger Asia into Archegos.

34.    In April 2021, Hwang was charged by the SEC with racketeering conspiracy, securities fraud, market manipulation and wire fraud offenses "in connection with interrelated schemes to unlawfully manipulate the prices of publicly traded securities in Archegos's portfolio."

35.    Halligan served as the Chief Financial Officer of Archegos. In that role, Halligan reported to Hwang and oversaw the accounting, cash management, and operations functions of Archegos. Prior to joining Archegos in 2001, Halligan worked in forensic accounting within Arthur Andersen's fraud investigation team. His prior work experience includes management consulting and audit projects within PricewaterhouseCoopers' business advisory services group. Halligan is a resident of Syosset, NY.

36.    In April 2021, Halligan was also charged by the SEC with racketeering conspiracy, securities fraud, market manipulation and wire fraud offenses.

37.    Tomita served as the head trader of Archegos.  Tomita reported to Hwang and executed Hwang's trading instructions; Tomita had no investment discretion himself.  Tomita also supervised a trading team, which included one other senior trader and two junior traders, and he was a primary point of contact for certain investment banks, brokerages and primes brokerages' (each a "Counterparty"; collectively the "Counterparties") personnel, including regarding trading. Prior to joining Archegos in 2008, Tomita traded equities for major hedge fund clients at Lehman Brothers, spending time working in and traveling to New York, Tokyo and Hong Kong as part of the global Prime Brokerage build out.  Tomita was also previously employed by Tiger Asia. Tomita is a resident of Palm Beach, FL.

38.    In April 2021, Tomita pleaded guilty in connection with his participation in Hwang's racketeering conspiracy, securities fraud, market manipulation and wire fraud.

39.    Becker served as the Chief Risk Officer of Archegos.  Becker served as the primary point of contact within Archegos for the Counterparties' credit risk personnel, who would assess the risk associated with their business relationship with the Archegos.  In this role, Becker reported directly to Halligan.  Becker also oversaw an operations team that booked trades and interacted with the Archegos's fund administrator and auditors.  Prior to joining Archegos, Becker worked on the operations team at Tiger Asia in 2007 with Hwang.  Becker is a resident of Port Jervis, NY.

40.    In April 2021, Becker also pleaded guilty in connection with his participation in Hwang's racketeering conspiracy, securities fraud and wire fraud.

41.    Both Tomita and Becker are now cooperating with the DOJ and agreed to work with the CFTC which, along with the SEC, filed charges against several current and former Archegos executives.

42.     Passi served as the head of the U.S. equity syndicate desk at Defendant Morgan Stanley. In this role, he communicated with investors for equity transactions.  Passi is a resident of New York, NY.

43.     Passi played a central role in overseeing Defendant Morgan Stanley's block trades and in what is referred to as the "Morgan Stanley Fade" – a stock price dropping just ahead of a block trade.  Passi is now the subject of a probe into how Defendant Morgan Stanley handled such trades.  This probe is part of a vast investigation on how investment bankers, including Defendants Morgan Stanley and Goldman Sachs, worked closely with hedge funds to privately carry out large block trades which then sent stock prices tumbling.

44.     Tao Li ("Li") is the founder and head of Teng Yue Partners, a New York based headquartered management firm focused on equity investments in China. Li is a close friend of Hwang's and worked together with him at Tiger Asia.

## SUBSTANTIVE ALLEGATIONS

### I.     BACKGROUND ON PRIME BROKERAGE AND BLOCK TRADING

#### A.     Prime Brokerage

##### i.     A Short Overview of Prime Brokerage

45.     Prime brokerage is key to the operation and success of hedge funds and other large investment clients.  Under a prime brokerage agreement, large clients – such as hedge funds – enter into relationships with prime brokers wherein the brokers provide services in exchange for prime brokerage fees.  Clients then rely on their prime brokers to provide a large bundle of services including securities lending, capital introduction, clearing, derivatives clearing, consulting/advising, and risk management.  Prime brokerage is intended to be a low-risk business, thus prime brokerages aim to mitigate counterparty risk through margining and market risk through hedging.

46.     One core prime brokerage service is margin lending, in which a brokerage lends a client money to invest in the market.  Indeed, prime brokers are a primary source of financing for hedge fund leverage.  In a margin lending arrangement, the prime broker lends a client capital to purchase stock and then holds that stock as collateral to protect the loan.  The loan from the prime broker covers up to a specified percentage of the security's cost, calculated based on a variety of factors including counterparty risk.  The remainder of the cost, called the "margin," is paid by the client and serves as further protection for the prime broker.  The synthetic version of this lending vehicle is known as a TRS – defined above as a total return swap – whereby the prime broker provides up to a certain amount of the cost of a security and the rest is provided by the client.  As in classical margin lending, any increases or decreases in the value of the purchased instrument inure to the client. However, in this synthetic version, ownership interest in the purchased instrument is retained by the prime broker.  Under both arrangements, prime brokers and clients can benefit: the prime broker earns revenue in the form of fees or interest payments and the client is able to gain exposure to financial instruments valued significantly higher than its posted capital. Both classical and synthetic margin lending are discussed in more detail *infra*, Section B.

47.     Corresponding to the significance of prime brokerage to funds, the prime brokerage space is highly competitive and dominated by bulge-bracket banks.  For example, in 2020, the two leading prime brokers servicing hedge funds were Defendants Morgan Stanley and Goldman Sachs who respectively controlled 34% and 32% of the prime brokerage market.

48.     Prime brokerage is also highly lucrative.  For example, prime services generated $15.2 billion in revenue for the largest global investment banks in 2020 despite a decline from the previous year's total attributable to the COVID-19 pandemic.  In fact, the relative significance of

prime services to bank revenue has increased over the past decade, leading Defendant Morgan Stanley to refer to prime in 2019 as a "sort of center of the [equity] machine."

### ii. A History of Prime Brokerage

49.    In 1949, Alfred Winslow Jones, an Australian investor and sociologist, created what is widely regarded to have been the first modern hedge fund, combining short-selling and leveraging to limit market risk. Jones's success led to the proliferation of hedge funds in the ensuing decades.

50.    In the early years of hedge funds – which are investment vehicles that combine short-selling and leveraging to limit market risk, money managers generally kept track of all their own trades across brokerages and exchanges, conducting their own calculations and adjustments. Prime brokerages gained prominence in the 1970s, thanks to pioneering broker-dealer Furman Selz, as a means of increasing money management efficiency by providing a hub for all trades and, eventually, providing a wide array of centralized financial services including custodial, financing, clearing, and advisory services. Selz initially brought his idea for a prime brokerage service to Defendant Morgan Stanley, which adopted it to serve investors including Julian Robertson and George Soros. Defendant Goldman Sachs and other firms followed suit, launching similar brokerage services soon afterward.

51.    Though prime brokerage initially developed, in part, to consolidate fund trading across exchanges, rapid growth in the hedge fund industry in the 1990s and early 2000s led to a shift in the fund-broker dynamic. A significant trend developed toward a multiple-broker model, with large hedge funds employing as many as ten prime brokers each. Utilizing multiple prime brokerages was advantageous because it gave hedge funds access to varying inventories of lendable securities, enabled optimal financing through competitive pricing, and mitigated risks. In

18

fact, one investment services provider predicted in 2007 that a main competitive differentiator moving forward would be a prime broker's ability to enable multiple prime broker relationships.

52.    In 2008, the prime broker Lehman Brothers declared bankruptcy, creating significant challenges for its clients whose assets became unreachable and precipitating a global financial crisis.  In the aftermath of the Lehman bankruptcy, the multiple prime broker model gained momentum and quickly became considered industry best practice.  Today, hedge funds with assets under management over $5 billion have over five prime brokers, on average.  While the multiple prime broker model protects hedge funds from risks like the bankruptcy of one prime broker, it can also make it more difficult for any given prime broker to assess a client's exposures, particularly for family office clients exempted from the regulatory requirements of the Investment Advisors Act.

### iii.    Margin Lending: A Detailed Explanation

53.    Amongst the essential capabilities of a prime broker is margin lending.  In a traditional prime broker margin lending arrangement, the prime broker lends a client capital to purchase an asset.  The prime broker then retains a collateral interest in that asset while for the entire time the client's position is open in order to protect against risk.  The leverage provided by the prime broker is capped at a specified percentage of the asset's value, which is calculated by the prime broker based on factors including counterparty risk and total portfolio risk, and the client is responsible for the remainder.  This remainder, *i.e.*, the margin, serves to further mitigate against market and credit risks, including swings in the market itself and delays in the ability of the client to meet a margin call.  Prime brokerages earn revenue from these financing activities by taking the spread on their clients' net margins.

54.    The basic margin lending arrangement can be illustrated with a simple example. Suppose a client wishes to obtain a $100,000 position in a particular stock.  The client approaches

a prime broker to negotiate a margin-lending arrangement. Taking into consideration market factors as well as risks specific to the client and its portfolio, the prime broker calculates a requisite margin percentage of 25%. If the prime broker and client reach an agreement, the prime broker will lend the client up to $75,000 toward the purchase of the asset. The client will then purchase the asset using the $75,000 leverage and $25,000 of its own capital. These $25,000 are referred to as the margin. The asset is owned by the client, but the prime broker retains a collateral interest in the asset for as long as the client's position is open.

55.    In a static margin model, margin is calculated based on the notional value of a transaction at the time it is entered into and remains at the same nominal value for the duration of the arrangement. In a dynamic margin model, by contrast, the margin adjusts over the life of the trade in response to stimuli. The factors affecting changes to the margin in a dynamic model can vary by agreement. These factors can include elements relating to the market, the client's portfolio, and any other relevant inputs. If a client's posted margin drops below the level indicated by the dynamic margin model at any point, the prime broker may issue a "margin call" demanding the difference.

56.    Continuing with the above example, suppose that a year after the lending arrangement is made, the value of the $100,000 asset has appreciated to $125,000. Assuming a static margin model, the client's margin remains at the nominal $25,000, reflecting 25% of the notional value at the time the arrangement began. Now, however, the margin is equal to only 20% of the asset's current notional value. Assuming, instead, a dynamic margin model that accounts for asset appreciation, the client will be required to post an additional $6,250 bringing the nominal value of the margin up to $31,250 and the percentage value relative to the asset's current notional

value back up to 25%. Thus, a dynamic margin model is a more effective risk mitigator for the broker than a static model.

**B.    Synthetic Financing: Total Return Swaps**

57.    As an alternative to classical margin lending, brokers and funds sometimes engage in synthetic arrangements with similar aims. In such an arrangement, a client can gain exposure to the asset without actually purchasing it. One such synthetic model is the TRS – defined above as a total return swap. A TRS is a derivative contract based on an underlying asset. As such, in a TRS, the client acquires the benefits of owning an asset with no actual purchase. The prime broker, meanwhile, benefits by earning periodic revenue in the form of interest payments, which are often tethered to an interest rate benchmark such as LIBOR.

58.    The economics of TRSs are very similar to traditional margin lending. As in margin lending, TRS financing requires the client to produce a marginal percentage of the value of the asset being acquired, and, as in margin lending, this percentage is calculated based upon risk factors assessed by the prime broker. The remainder of the asset's cost is covered by the prime broker. Likewise, in both arrangements, the client gets the benefit of or pays the price for any changes in the value of the underlying asset.

59.    The key difference between traditional margin lending and a TRS lies in the ownership interests created. In a traditional margin lending arrangement, the asset underlying the transaction is owned by the client, and the prime broker retains only a collateral interest in it. In a TRS, by contrast, the client never owns the asset, at all. Instead, the client, in essence, leases the asset from the broker, thereby gaining exposure to the asset without actually purchasing it. But, as in margin lending, the TRS arrangement provides that the client still gets the benefit of any increases in the asset's value and pays the price for any declines. As such, if the asset appreciates, the prime broker, referred to as the "payer," will pay the client, or "receiver," the value of the

appreciation.  In the inverse, if the asset depreciates, the receiver will compensate the prime payer in the amount of the depreciation in addition to the regular interest payments.  These payments are referred to as "variation margin." Thus, a TRS requires two kinds of margins: the "initial margin," calculated at the outset of the transaction, and the "variation" margin, which is adjusted to cover a party's exposure to its counterparty based on variations in the asset value of over the life of the TRS.

60.     One particularly risky subcategory of TRS is the "bullet swap."  A bullet swap is a TRS with a term longer than a year, a static initial margin, and no periodic reset based on fluctuation in asset value.  Clients sometimes prefer bullet swaps in order to avoid intermediate taxation events.  However, bullet swaps expose prime brokers to significant risk of market erosion over the life of the swap because of the possibility that the underlying assets will appreciate significantly over the swaps' lengthy terms, such that the relative value of the margins will erode substantially.

61.     TRSs can be attractive options to both prime brokers and their clients for several reasons.  As above, certain TRS arrangements can have tax benefits for clients.  Further, a TRS does not require any transfer of ownership and is therefore less expensive for the parties.  More fundamentally, TRSs are off-balance sheet transactions which creates tremendous opportunities for leverage.  For example, TRSs enable investors to gain off-balance sheet exposure to desired assets and fill credit gaps in their portfolios.  The off-balance sheet nature of TRS transactions, however, also creates risk for prime brokers who may not realize when a hedge fund is under-capitalized because its TRS assets are not reflected on its balance sheet.  If the value of the underlying asset depreciates and the hedge fund is underleveraged, it may be unable to meet its obligations in the event of a margin call.

### C.    Block Trading

62.    Put simply, a block trade is as a "large, privately negotiated securities transaction."[1] Per NASDAQ and NYSE, a block trade is a trade of at least 10,000 shares or of over $200,000. Block trading is not uncommon, and large banks frequently buy and sell large blocks of shares. However, block trading is dangerous because of its market moving potential.  When a small number of shares is traded, the market determines the price they are traded at.  In the case of block trading, however, the reverse is true: the trading itself impacts the market price, sometimes precipitously.  As a result, block trading negotiations are highly secretive and are confidential until final and executed so to avoid negatively impacting the value of the stock.

63.    In a typical block trading arrangement, banks acquire large amounts of a stock in a block and then discretely sell off pieces of the block to other large investors such as hedge funds or family offices.  Block trading is one of the few remaining areas wherein deals are still governed heavily by personal relationships, and the acquiring funds are oftentimes parties with whom the banks have preexisting relationships.   The intimate nature of these block negotiations and transactions can have negative effects.  On the buy side, less connected hedge funds complain that they are missing out on block transaction opportunities in IPOs and the like because these chances are being presented only to specific funds.  On the sell side, parties complain of price declines just prior to block sales, which suggests foreknowledge by favored sellers tipped off by bankers.

64.    Some instances of block trading occur when a seller in distress is forced to liquidate a large position.  If there is insufficient buyer interest, the sales can occur at significant discounts, thereby harming the sellers.  In general, block trading increases when the market is volatile.  A

---

[1]    *See* James Chen, *Block Trade*, Investopedia, Feb. 15, 2022, https://www.investopedia.com/terms/b/blocktrade.asp (last visited June 13, 2022).

tipoff regarding a forthcoming block sale under such circumstances can thus be very valuable to investors looking to buy, sell, or hedge the asset at issue since it notably allows investors to sell before a forthcoming transaction that will likely reduce the asset's price or to buy before a transaction that will likely raise the asset's price.

65.    As appears from the chart below, block trading is an ever-growing business on Wall Street:



66.    According to Dealogic, a financial markets platform, and as reported by the *Washington Post*, there were nearly $70 billion worth of block trades in the U.S. in 2021 – which represents a five-year high – and Defendant Morgan Stanley was the most active bank that year, leading more than a quarter of the deals by value and earning more than $300 million in fees. Defendant Goldman Sachs is also a very big player in the block trade arena.

67.    Since 2018, the SEC has been investigating block trading because of its potentially dangerous effects on markets.  The investigation is focused on whether banks improperly favor certain investors, alerting them of block trades in advance to the detriment of other clients and the public.  This advance notice allows clients in the know, *i.e.,* who were tipped as to the existence

of an impending block trade, to, for example, unload shares in advance of the block trades, thereby negatively affecting the returns on the blocks and driving down the value of other shareholders' assets. Probes into block trading have been sped up by the involvement of the same parties targeted by the investigation in the Archegos sell-off.

### D. Front Running And Tipping

68. "Front running" or "tailgating" refers to trading by a broker on inside knowledge of upcoming block transactions in order to benefit from the transactions' market impact. A front-running broker might, for example, purchase shares for their personal portfolio just before executing a large block-purchase order from a client and then sell their newly acquired personal shares immediately afterward, thereby profiting from the price bump caused by the block trade. Alternatively, the broker might hedge or sell before executing a block sale on behalf of a client.

69. Front running can impact asset price prior to a block transaction at the expense of both of other shareholders. If substantial, front-running activity will directly impact market price in much the same way as the block trade – by raising or lowering supply or demand and by increasing trading activity in the asset. Other market participants may imitate the front runner's trading, thus exacerbating the price effect. This intensification is particularly likely where the front-runner is a large and widely respected investing entity like Defendants Morgan Stanley and Goldman Sachs. Accordingly, FINRA Rule 5270 expressly prohibits a member or person associated with a member from "caus[ing] to be executed an order to buy or sell a security related financial instrument when such member or person associated with a member causing such order to be executed has material, non-public market information concerning an imminent block transaction in that security, a related financial instrument or a security underlying the related financial instrument prior to the time information concerning the block transaction has been made publicly available or has otherwise become stale or obsolete."

70.     One variation of front running occurs when a broker with knowledge of an upcoming block trade "tips" other clients or affiliates in advance of executing the trade.  The select clients made privy to the non-public information of the upcoming trade then trade on the information, thereby manipulating the market price of the asset.  This distributed form of front running is both advantageous to the broker's relationship with the clients it tips and less likely to be detected by the block-trading client than trades by the broker itself.  Like other forms of frontrunning, tipping is regulated and expressly prohibited under by FINRA Rule 5270(b).

**E.     The Morgan Stanley Fade**

71.     Defendants Morgan Stanley and Goldman Sachs – leaders in the block trading industry – have been alleged to regularly engage in front running and tipping, flagging impending confidential block sales to favored clients prior to those sales becoming public leading share prices to fall just before block trades are executed.  In fact, observers have reported a predictable pattern in Defendants Morgan Stanley and Goldman Sachs's frontrunning behavior – generally the stock – price decline begins in late morning or early afternoon, around the time sellers typically alert bankers to their plans. The decline of a stock price just before a large block sale has become so common and so closely associated with Defendant Morgan Stanley that it is often derided by industry insiders as "the Morgan Stanley Fade."

72.     On February 14, 2022, the *Wall Street Journal* reported that federal investigators were "probing the business of block trading on Wall Street, examining whether bankers might have improperly tipped hedge-fund clients in advance of large share sales."

73.     According to this *Wall Street Journal* article, regulators have been looking into irregularities involving block trades for the past few years and are now looking into whether investment banks "improperly alerted favored clients to the sales before they were publicly disclosed and whether the funds benefited from the information—for example by shorting the

shares in question." In that respect, the SEC sent subpoenas to various investment banks and hedge funds, including Goldman Sachs and Morgan Stanley – the latter having been "an early focus of the probe."

74.    While the investigation into block trades has been going on for years, it gained momentum following Archegos's catastrophic implosion. In an attempt to avoid, or at the very least minimize their losses during the unwinding of Archegos's multibillion-dollar swap positions, Defendant Morgan Stanley and Goldman Sachs raced to unload billions of dollars of stocks, ***before*** the Archegos story was made public, through a spree of sales of large blocks of stocks thereby breaking a backdoor agreement between at least half a dozen other major banks to try and parcel out Archegos's holdings ***slowly***. As a result of the above, Defendant Morgan Stanley became the center of a sprawling probe into how investment banks work with hedge funds and other buyers to privately carry out share sales big enough to negatively impact market prices – a booming practice in recent years – and more specifically, whether Defendant Morgan Stanley "tipped off" its hedge fund clients in advance of the trades of Archegos holdings. Authorities are also reportedly looking into Defendant Morgan Stanley's competitor, Defendant Goldman Sachs.

75.    On February 16, 2022, a *Bloomberg* article revealed that U.S. authorities were conducting a ***criminal*** probe into how Morgan Stanley executives, including Passi, handled block trades. Authorities examined recordings of phone calls between investing clients and Passi – who isn't the only Morgan Stanley executive drawing scrutiny from authorities. In fact, the DOJ also reportedly sought communications between investing clients and (1) Evan Damast, Defendant Morgan Stanley's global head of equity and fixed-income syndicate, (2) John Paci, a senior equity trading executive at Defendant Morgan Stanley, and (3) Charles Leisure, executive director on the Defendant Morgan Stanley syndicate desk.

76.    On February 17, 2022, *Bloomberg* provided further insight into the DOJ's investigation:

> ***Passi's frequent phone contacts and some of Morgan Stanley's key clients are among a roster of more than a dozen executives at other investment firms and banks whose communications are being scooped up by the Justice Department for scrutiny***, according to people with knowledge of the matter. In some cases, authorities are seeking access to online chats, mobile phone texts, emails and messages sent by apps, the people said, asking not to be named discussing the confidential demands.
>
> The list of people whose communications are being sought ranges from executives at prominent Wall Street hedge funds, such as Andrew Liebeskind at Citadel's Surveyor Capital and Jon Dorfman at Element Capital Management, to money managers at smaller firms focusing on block trades, including executives at CaaS Capital Management and Islet Management, and a former employee at Segantii Capital Management, the people said.
>
> Bankers include Felipe Portillo, a risk executive within Credit Suisse Group AG's equity capital markets group, Michael Daum, a partner at Goldman Sachs Group Inc., and Michael Lewis, the head of U.S. equities cash trading at Barclays Plc, the people said. Lewis worked at Morgan Stanley until 2018.
>
> [Emphasis added].

77.    A few days later, on February 24, 2022, Defendant Morgan Stanley published its Form 10-K for 2021 in which it confirmed that:

a.    "***Beginning in June of 2019,*** . . . [Defendant Morgan Stanley] has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of ***various aspects*** of the Firm's block trading business"; and

b.    "***Beginning in August of 2021***, . . . [Defendant Morgan Stanley] has been responding to requests for information from the U.S. Attorney's Office for the SDNY in connection with its investigation of the same subject matter. The Firm is cooperating with these investigations."

[Emphasis added].

78.     When Defendant Morgan Stanley acknowledged that U.S. regulators and prosecutors were investigating "various aspects" of its block-trading business, *Bloomberg* reported that competitors, who had long observed Defendant Morgan Stanley bidding for block trades at "tight discounts", swapped "I told you so's."

79.     Over the years, Defendants Morgan Stanley and Goldman Sachs's frontrunning behavior, has caused frustration among several leading global investment firms including Blackstone Inc., Carlyle Group Inc., and KKR & Co. ("KKR").    According to reports by *Bloomberg*, Defendants Morgan Stanley and Goldman Sachs's front running of block sales has become so widespread that many private equity firms have been forced to develop strategies to minimize its impact.  *Bloomberg* reported that KKR, for example, "seeks to partner with one bank early in the sale process, rather than auction the business to a number of banks and increase the number of people aware of an imminent deal … [t]he goal of that approach [being] to avoid surprise movements in a stock that can potentially occur if one of the banks bidding for business engages in misbehavior, and to facilitate better post-block trading in a stock. . . . [a]s a result, KKR has reduced the frequency of its interactions with banks including, among others, Morgan Stanley . . . ."

80.     Investment banks are supposed to carry out block trades with discretion and to keep such trades confidential until executed.  Yet, a *Wall Street Journal* analysis of 393 block trades executed between July 2018 and 2021 published on March 30, 2022, found that information about such sales "routinely leaks out ahead of time" by investment banks to their clients.  This is demonstrated in the charts below which were published as part of the *Wall Street Journal*'s analysis and indicate the share-price and index performance in the trading session immediately before a block trade was executed, minute by minute:



Source: DTN (historical intraday data)

81.    Notable recent examples of the Morgan Stanley Fade cited by *Bloomberg* and the *Wall Street Journal* include block trading in Kraft Heinz, Discovery, ZoomInfo and Iqvia Holdings Inc.:

a.    On August 7, 2018, Defendant Morgan Stanley agreed to buy a block of 20.6 million Kraft Heinz Co. shares from 3G Capital for $59.85 each, a discount of 2.4% from the $61.32 closing price of the stock. Prior to the sale, the stock declined 1.6% from the previous day's close. On that same day, August 7, 2018, the S&P 500 Consumer Staples Index closed down

0.60%, giving Kraft Heinz a market-adjusted return for the day of negative 1%. If Kraft Heinz's share price had mirrored the performance of the consumer-staples sector, falling 0.6% instead of 1.6%, it would have closed the day at $61.95. Assuming the same 2.4% discount, the 3G Capital shares would have executed at $60.50 per share. The difference between what Defendant Morgan Stanley paid and what it would have paid had Kraft Heinz's share price mirrored the performance of the sector is $0.65 or about $13.4 million more that 3G would have received.

  b. On March 24, 2021, the price of Discovery's shares dropped almost 14% to $61.94 just before a block trade priced at $54.54 was disclosed after market close on March 25, 2021. The phenomenon repeated before an additional sale handled by Defendant Morgan Stanley the next day. The stock dropped 7.2% from its intraday high to close at $57.75.

  c. On August 9, 2021, a group of investors tapped Defendant Morgan Stanley to unload shares of ZoomInfo Technologies Inc. On the Friday before the second sale, the stock sank 3.1%, the third-worst performance in the Dow Jones Internet Service Index. Then, early on Monday morning, the shares tumbled another 3.2% before the offering was announced.



**Fading Price**
Shares of ZoomInfo sagged ahead of a registered block trade last August

Source: Bloomberg, company releases
Note: Chart includes extended trading on Aug. 6 and pre-market data for Aug. 9. A press release announced the sale at 6:11 a.m. that day.

d.    Lastly, on November 29, 2021, Defendant Morgan Stanley was tapped to sell approximately 555,000 Iqvia Holdings Inc. shares for Bain Capital.  The stock started selling off from an intraday high around 2:00 p.m., losing approximately 1.5% from that peak to close at $266.69.  Defendant Morgan Stanley then formally offered shares of the stock at $263.

82.    Ultimately, the *Wall Street Journal* analysis found that:

58% of the time, the share price declined in the trading session immediately beforehand, controlling for the performance of peer companies. Of the 268 trades for which the Journal was able to determine how much the banks paid, the sellers would have received $382 million more if the stocks had performed in line with the benchmark, or about $1.4 million per trade.

A handful might be explained by a negative headline or chalked up to bad luck. But ***the persistent pattern of stocks falling in the run-up to big insider sales suggests a more widespread problem: Information that should be confidential is getting out.***

[Emphasis added].

83.    The *Wall Street Journal* also revealed that each of the 174 block trades executed by Defendant Morgan Stanley between June 2018 and July 2021 resulted in the stock it sold underperforming its benchmark index by 0.7 percentage points on a median basis.  That was the worst record of any of the biggest players in the block trading industry.  Defendant Goldman Sachs block trades also resulted in a slight underperformance of the stock's benchmark.  This is demonstrated in the chart below:



Note: Based on sales from July 2018 through June 2021 in which a single bank executed the trade. Performance is the median spread for all of a bank's block trades. Spread is the change in a stock's price on the day of the block trade minus the corresponding change in its sector index.
Sources: WSJ analysis of data from S&P Global Market Intelligence, IPO Boutique, Dealogic and regulatory filings

84.    On April 4, 2022, a *Wall Street Journal* article revealed that Disruptive Technology Solutions ("Disruptive"), an investment firm, filed a FINRA arbitration demand against Defendant Morgan Stanley accusing the latter of "front-running a block trade in Palantir [Technologies Inc.] stock." Disruptive further stated that "Morgan Stanley and a senior executive . . . leaked information ahead of the fund's sale of more than $300 million of Palantir shares in February 2021, resulting in 'tens of millions of dollars in damages.'"

85.    In its arbitration demand, Disruptive alleged that in February 2021, it approached Passi about selling a considerable amount of Palantir shares, further to which Passi (falsely) assured him that Defendant Morgan Stanley would keep this information within a closed circle. On February 17, 2021, Disruptive provided Passi with the exact number of shares it planned to sell

before the market opened on the following day. Immediately after this discussion, Palantir's share price plummeted. Ultimately, Disruptive sold its block of Palantir shares to Defendant Morgan Stanley at $26.05/share for a total of $343 million. According to Disruptive, Defendant Morgan Stanley either tipped off its clients or its own proprietary-trading desk, or both, about the upcoming trade.

86.     For these reasons, when Defendants Morgan Stanley and Goldman Sachs avoided billions in losses by offloading securities held by Archegos the night before large block sales of those securities became known, this was not an anomaly. Rather, this was part of a long-standing pattern of behavior by Defendants. The leak of confidential information of large block sales has caused selling shareholders millions in losses, and sellers offloading blocks of securities have long expressed frustrations when prices that slip just before the trade is executed, as this significantly reduces their proceeds.

87.     In the present case, in late March 2021, Defendants Morgan Stanley and Goldman Sachs sold risky positions to hedge fund clients knowing that the shares were poised for an enormous drop when the truth about Archegos was disclosed. This was just another example of the Morgan Stanley Fade phenomenon but at an unprecedented scale: Defendants Morgan Stanley and Goldman Sachs had knowledge of Archegos's intent to offload blocks of the Issuers' securities and caused the price of those stocks to fall just prior to block sales, to the detriment of other shareholders.

88.     Of note, on May 17, 2022, *Bloomberg* reported that after having revealed the investigation into block trading, Archegos alerted the U.S. authorities to a potential "Morgan Stanley Fade" incident in relation to Futu Holdings Ltd. ("Futu"), a Chinese online broker.

89.     Indeed, months earlier, Archegos wanted to exit a massive short bet on Futu using swaps and sought the help of Passi, the allegedly loose-lipped Morgan Stanley executive.  Since Archegos wanted to close out its position around the end of 2020, it told Defendant Morgan Stanley that it needed to buy a large block of shares to unwind the position.  However, before Archegos managed to defuse the bet, the price of Futu's shares skyrocketed, gaining more than 400% in the following months.  This increase in value cost Archegos nearly $4 billion.



90.     While the block trade in Futu did not initially receive much attention from U.S. authorities – the unsealed indictment (discussed *infra*, at ¶¶266-74) merely containing two references to Futu – this incident adds a new line of inquiry to an already vast probe.

## II.    ARCHEGOS'S MARKET MANIPULATION SCHEME

### A.    Archegos Rises out of Tiger Asia Fund's Ashes

91.     In December of 2012, Archegos's predecessor, Tiger Asia, and Hwang entered into a settlement with the SEC. In the settlement, the SEC alleges that Tiger Asia and Hwang (1)

committed insider trading by entering into "wall-crossing" agreements for three private placements of Chinese bank stocks, and later violating those agreements by short selling those stocks and covering the short positions with private placement shares purchased at a discount and (2) attempted to manipulate the prices of publicly traded Chinese bank stocks in which Tiger Asia held substantial short positions by placing losing trades in an attempt to lower the price of the stocks and increase the value of the short positions, enabling Tiger Asia to illicitly collect higher management fees from investors.

92.    Pursuant to the settlement, Tiger Asia paid $44 million in disgorgement and penalties and the SEC banned Hwang from managing money on behalf of clients for at least five years. Complaint, *SEC v. Tiger Asia Mgmt.*, No. 12-cv-7601 (D.N.J. Dec. 12, 2012), ECF1; Consent of Tiger Asia Management, LLC, *SEC v. Tiger Asia Mgmt.*, No. 12-cv-7601 (D.N.J. Dec. 12, 2012), ECFs 3-1.

93.    In parallel, and also in December of 2012, Tiger Asia pleaded guilty to one count of criminal wire fraud and admitted the same or similar facts set forth in the SEC settlement pertaining to insider trading in an action brought by the DOJ.  Tiger Asia was sentenced to one year of probation and agreed to forfeit more than $16 million in illegal profits.  Information, *United States v. Tiger Asia Mgmt.*, No. 12-cr-808 (D.N.J. Dec. 12, 2012), ECF; Plea Agreement, *United States v. Tiger Asia Mgmt.*, No. 12-cr-808 (D.N.J. Dec. 12, 2012), ECF 3.

94.    Further to and in connection with the guilty plea and settlements, Tiger Asia returned all outside investor capital which resulted in its closure. By approximately 2013, Hwang converted Tiger Asia into Archegos.

95.    Because (1) Archegos was owned and controlled by Hwang, its founder and Chief Executive Officer, (2) only invested the personal wealth of Hwang, his family and the deferred

36

compensation of employees, and (3) did not hold itself out as an investment adviser, it was able to operate as a "family office" under the Family Office Rule of the SEC (the "Rule"). The Rule effectively exempts "family office" investment funds from regulatory oversight pursuant to the Investment Advisers Act of 1940 on the theory that a "family office" manages its own wealth and thus the investor protections of the Investment Advisers Act are unnecessary. This meant that contrary to typical hedge funds, Archegos was ***not*** subject to examination or inspection by the SEC and was not required to report information regarding its holdings and borrowing to the SEC and the Financial Stability Oversight Council.

96.     While Archegos was technically classified as a "family office," it nonetheless operated as a sophisticated investment firm. By in or about 2021, Archegos employed more than fifty employees, paid consultants, engaged various outside vendors and held numerous banking and brokerages accounts. Its employees received compliance trainings and Archegos maintained a compliance manual which notably warns that "[i]t is essential that no employee or principal of Archegos engages in any activity the purpose of which is to interfere with the integrity of the marketplace" and that "intentionally manipulating the market . . . is a violation of the securities laws and of Archegos's policies and standards of conduct."

### B.    Archegos's Initial "Vanilla" Investment Strategy

97.     Between 2013 and early 2020, Archegos, through Hwang, took positions predominantly in large companies – especially technology companies – with highly liquid stock. Every now and again, Archegos also took significant short positions. During that same period, Archegos generally did not engage heavily in day-trading strategies.

98.     In or about spring 2020, restrictions related to the pandemic caused Archegos to move to a remote work environment. Hwang began working from an apartment in Manhattan and communicated with Archegos employees, both within and outside the Southern District of

New York by phone, email, *Bloomberg* message, and video conferencing software. Due to COVID-related market losses, around that same time, Archegos had to reduce and/or sell many of its previous positions.

99.    Thereafter, Archegos began building extraordinarily large positions in a scattering of securities. In fact, by in or about mid-July 2020, Archegos had economic exposure in excess of $1 billion in Baidu, Gaotu, IQIYI, and ViacomCBS. By the end of 2020, Archegos amassed more than $1 billion of exposure to each of those four stocks as well as in Discovery (Class A), Tencent, Vipshop and Farfetch Ltd. ("Farfetch"). Between mid-November 2020 and late March 2021, Archegos established positions exceeding $5 billion in eight different securities, including more than $10 billion in Gaotu, Baidu, and Tencent stock, respectively, and more than $20 billion in ViacomCBS.

100.    Archegos's positions became so large that they significantly altered the shareholder composition of the companies in which it most heavily invested, including the Issuers.

101.    Archegos predominantly used TRSs to obtain its long exposures (and leverage). These security-based swaps would reference a single issuer and generally carry a two-year term (*i.e.,* they would not reset periodically over the term of the security-based swap).

102.    Archegos's TRSs caused its Counterparties, including Defendants Morgan Stanley and Goldman Sachs to acquire the underlying share for each stock swapped with Archegos in order to hedge against market risk on the position. Consequently, as Archegos's swap positions grew, so too did the Counterparties' purchases of the corresponding stock. Since these Counterparties often held, respectively, more than 5% of the publicly trading shares of the issuer's stock, they were required to, and did, file the corresponding public disclosures of such ownership.

103.    Archegos continued to rapidly grow it positions as such that by 2021, its total positions in certain securities amounted to more 30%, 40%, and 50% of the outstanding shares that are freely available for public trading, or "float", of those companies.  For instance, in or about February 2021, Archegos held a position equal to more than 50% of Gaotu's float. Archegos had similar large positions in other issuers.  For instance, by March 24, 2021, Archegos held a position equal to more than 50% of ViacomCBS's float, as reflected in the following chart depicting approximate float percentages of ViacomCBS stock effectively controlled by Archegos:



104.    Since substantial portions of some of the above-mentioned securities' floats were held by index funds, the size and significance to the market of Archegos's positions were magnified.  By design, those index funds would not sell holdings of stocks included in the relevant index regardless of market performance, as a result of which Archegos's positions affected even larger percentages of the freely trading shares.

105.    In order to avoid complying with public disclosure requirements under Section 13(d) of the Exchange Act,[2] Archegos ostensibly avoided crossing the 5% ownership threshold for its stock purchases.  Typically, Archegos would initially establish its investments in cash equities, until it approached 5% ownership of all outstanding stock of the security.  Since ownership in excess of that amount could trigger certain public disclosure requirements, when Archegos approached the 5% mark, it generally shifted from purchasing cash equity positions in that issuer to purchasing additional synthetic exposure to the issuer through a TRS.  In fact, each day, Becker would circulate a daily report to Hwang and others internally tracking Archegos's cash equity positions in each issuer it held relative to the issuer's outstanding shares to ensure that Archegos never exceeded the 5% beneficial ownership disclosure threshold.

106.    As Archegos placed its orders through Defendants Morgan Stanley, Goldman Sachs, and its other Counterparties, making it appear that different parties were buying the companies' stock when, in fact, that buying was all dictated by Archegos, ordinary market participants had no way of knowing that Archegos had come to dominate the marketplace for these securities.

---

[2]    Section 13(d)(1) of the Exchange Act states that: "Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78*l* of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78*l*(g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940 or any equity security issued by a Native Corporation pursuant to section 1629c(d)(6) of Title 43, or otherwise becomes or is deemed to become a beneficial owner of any of the foregoing upon the purchase or sale of a security-based swap that the Commission may define by rule, and is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition or within such shorter time as the Commission may establish by rule, file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors."

### C.      Archegos's Confidential Counterparty Relationships

107.     Archegos's largest trading positions related to common stocks and American Depositary Receipts, or ADRs, traded on United States securities exchanges, including the New York Stock Exchange and NASDAQ.  To engage in this trading, Archegos entered into various prime brokerage agreements with its Counterparties.  While the terms of those agreements varied, in general, the Defendants Morgan Stanley, Goldman Sachs, and each other Counterparty facilitated trading and provided Archegos with access to credit to enable Archegos to trade using leverage.  As such, Archegos not only invested its own cash, but also money functionally loaned to it by Defendants Morgan Stanley, Goldman Sachs, and its other Counterparties.

108.     Archegos executed prime brokerage agreements with about a dozen Counterparties, including Defendants Morgan Stanley and Goldman Sachs, to facilitate its security-based swap executions, retaining some of them as prime brokers.  Each Counterparty established the risk, margin, and capacity parameters that defined the extent of its trading relationship with Archegos.

109.     Pursuant to these agreements, Archegos and the Counterparties, including the Defendants Morgan Stanley and Goldman Sachs, agreed to exchange cash flows dependent on the price of the referenced security: if the price of the referenced security depreciated, the Counterparties were entitled to call on Archegos to post variation margin to cover the mark-to-market loss; if, however, the price of the referenced security appreciated, Archegos was entitled to call on the Counterparties to post variation margin to cover its mark-to-market gain.

110.     While Archegos was entitled to call any variation margin achieved through price gains in the underlying shares at any time, it was not obligated to do so.  In fact, Archegos often chose to leave uncalled variation margin ("excess margin") at Defendants Morgan Stanley, Goldman Sachs, and its other Counterparties – for instance, as a buffer to cover margin calls from subsequent price declines.

111.    The Counterparties generally executed TRSs through risk-neutral financing desks, often referred to as Delta One[3] or Delta Neutral desks.

112.    In adherence with industry standards, Defendants Morgan Stanley, Goldman Sachs, and the Counterparties ensured that any corollary synthetic exposure created by its execution of Archegos's TRSs was fully hedged.  Consequently, as Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties filled Archegos's orders, they contemporaneously purchased shares of the referenced issuers in the market to the extent necessary to hedge any synthetic exposure created by the TRSs.  Given the numerosity of Counterparties, Archegos was able to spread its position across them.

113.    Through their respective prime brokerage agreement and contractual relationship with Archegos, Defendants Morgan Stanley and Goldman Sachs had access to MNPI from Archegos, including for example, the fund's net asset value (NAV) and cash reserves.  At all relevant times, Defendants Morgan Stanley and Goldman Sachs had a duty to keep all MNPI obtained from Archegos confidential.

---

[3]    The name "Delta One desk" is derived from the financial term "Delta," which refers to the change of the price of a derivative to a change in the value of the underlying asset. A Delta of one implies a one-for-one change in relation to the value of the underlying asset. Thus, a Delta One desk, as the term implies, trades linear (sometimes referred to a "vanilla") derivative instruments, including, for example, TRSs, where the value of the trade is a linear function of changes in value to the referenced asset.

**D.     Archegos Dramatically Changes Its Investment Strategy**

**i.     The COVID-19 Pandemic: A Turning Point for Archegos**

114.    Before March 2020, Archegos adhered to a long-term strategy that prioritized liquid stocks and infrequent trading.

115.    In early 2020, at the onset of the Covid-19 pandemic, Archegos's capital was down substantially.  Archegos then implemented a 180-degree change in its trading strategy as it began to build massive, highly concentrated, illiquid positions in a small number of single securities – including the Issuers – through long TRSs.  Archegos's positions were also highly leveraged.

116.    The results were staggering.  At the beginning of March 2020, Archegos's aggregate gross exposure was $19 billion, and its net exposure was $7 billion long, consisting of $13 billion in aggregate long exposure and $6 billion in aggregate short exposure.  A little over a year later, as of March 19, 2021, its exposure had grown to, approximately, $160 billion in aggregate gross exposure and $52 billion long in net exposure, consisting of $106 billion in aggregate long exposure and $54 billion in aggregate short exposure.  During the same time period, the assets under Archegos's management grew fifteen-fold, from about $1.5 billion to $35 billion.  As of March 19, 2021, a little over half of Archegos's gross portfolio – about $86 billion – consisted of long TRS positions referencing single securities.  At the same time, about 20% of Archegos's gross portfolio – $32 billion – consisted of custom basket swaps ("Custom Basket Swaps") which were designed to closely mimic the same broad-based securities indexes as the exchange-traded funds ("ETF") swaps ("ETF Swaps"; collectively with the Custom Basket Swaps, "Broad-Based Security Index Swaps").  Archegos also held about $14 billion in ETF Swaps. The remainder of Archegos's portfolio consisted predominantly of long cash securities and short swaps referencing single securities.

117.    As Archegos underwent rapid and exponential growth, its long positions became heavily concentrated in swaps referencing very few securities.  Archegos's positions in these companies were so large in comparison to their average daily trading volumes that its positions could ***not*** easily be liquidated.

118.    In or around fall of 2020, Archegos also entered into large long TRS trades in Gaotu stock (NYSE: GSX).  Its position in GSX was so significant that Archegos knew that the price of the share affected its margin requirements with Defendants Morgan Stanley, Goldman Sachs, and its other Counterparties, as the margin was determined based on the daily closing price of its positions.  Thus, if the price of GSX increased at close of the market, Defendants Morgan Stanley, Goldman Sachs, and its other Counterparties, would be required to post margin to Archegos's accounts based upon the daily appreciation in Archegos's long GSX swap positions.  Indeed, as Archegos added to its long GSX positions and the price of GSX stock rose, Archegos received margin payments from its Counterparties, and would typically use this additional margin to further enlarge its GSX position.

119.    As indicated in the TRV risk analysis published by the European Securities and Markets Authority ("ESMA"), by early 2021:

> Archegos' gross exposures to EU counterparties were 2.5 time larger than end-2020 levels and its net exposures were seven time larger than end-2020. Its portfolio of swaps was mainly concentrated in five stocks . . . .
>
> *        *        *
>
> Chart 6 [below] shows the evolution of trades on stock A. In August 2020, Archegos entered into a TRS with stock A as underlying. Archegos steadily increased its exposure to this stock until end-January 2021, where its exposure was 10 times higher than in August. Then, Archegos' exposures to stock A increased very substantially, reaching on 17 March up to 4 times its end-January levels (35 times August levels). At the same time, the price of Stock A shares increased by 80% in approximately one month and a half. The surge in equity prices was likely driven by Archegos'[s] increased exposure to stock A, which resulted from an

increasing exposure by its counterparties (SEC, 2022b; USDoJ, 2022). One week before its default, Archegos positions on stock A reported in [European Markets Infrastructure Regulation ("EMIR")] amounted to more than 3% of the floating and almost twice the average daily trading volume. This is visible from EMIR data even though these only offer a partial view of Archegos positions. Similar increases in positions can also be seen in other stock.

*      *      *



EMIR data can also be used to analyse the mark-to-market value of the portfolio of swaps held by Archegos. Since counterparties update the value of the swaps daily, it is possible to monitor changes in the valuation of the swaps. Chart 7 [below] shows the value of the swaps for Archegos. Between September 2020 and January 2021, the value of the swaps increased relatively smoothly, with positive values for the long positions and negative values on the short positions. The value of the portfolio of swaps then surged to a peak on 23 March, at more than ten times its end-January level, driven almost exclusively by profits on long positions. Between early February and 23 March the value of the swaps grew by 250%, reflecting the increase in the value of the underlying stocks and higher exposures taken by Archegos. Starting on 24 March, the value of the swaps collapsed, falling to a negative value of by 26 March, the day of the default of Archegos.



In addition, the changes in the value of the swaps were almost entirely driven by long positions on four stocks, which together accounted for more than 80% of the mark-to-market value of the portfolio in March (Chart 8 [below]). The data show clearly that Archegos had a highly concentrated portfolio and that any negative change in the price of the underlying stocks could trigger large mark-to-market losses and substantial variation margins.



120.     As the size of Archegos's portfolio expanded from at least March 2020 through March 2021 (the "Relevant Period"), it inevitably began to approach the limits of Defendants Morgan Stanley, Goldman Sachs, and its other Counterparties' risk management tolerances.  As a result, certain Counterparties refused to allow Archegos to execute additional long TRS positions in concentrated names, while others refused to allow such transactions without the positing of additional margin.  For these reasons, Archegos engaged in an unrelenting search for additional trade capacity in its concentrated positions.  To that end, Archegos spoke *daily* with Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties about increasing its notional limits in securities such as ViacomCBS and Gaotu. Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties frequently agreed to grant Archegos additional capacity to enter into long TRS positions, but not before requiring it to agree to additional risk-reducing measures, often in the form of additional short Broad-Based Security Index Swap positions.

121.     Another way to obtain additional trade capacity and continue to rapidly grow its concentrated and illiquid positions without triggering the risk management controls of its existing Counterparties and without paying higher margin was for Archegos to enlist new Counterparties. So began Archegos's quest to execute agreements with new Counterparties, thereby effectively allowing it to start from scratch with new position limits and lower margin rates, unload high-margin positions to the new Counterparty at lower margin rates and retain other existing positions with its other Counterparties.  In fact, in November 2020, Archegos entered into a new Counterparty relationship.  By March 22, 2021, Archegos had over $15 billion in long swap exposure at that new Counterparty and almost $10 billion in short TRS exposure (much of this in

the form of Broad- Based Security Index Swaps). Thus, in or around March 2021, Archegos was already in the process of seeking additional relationships with four additional counterparties.[4]

### ii. Archegos Changes the Composition of Its Top 10 Holdings Away from Blue Chip Technology Companies to Smaller Chinese Companies

122.    In March 2020, Archegos's top 10 holdings included mega-cap blue chip technology compagnies such as Amazon.com, Inc. ("Amazon") and Microsoft Corporation ("Microsoft").

123.    By March 2021, Archegos had shifted from highly-liquid, larger cap issuers toward less liquid, China-based issuers, as well as relatively smaller cap U.S. media and technology companies. Archegos's holdings in Amazon and Microsoft were therefore replaced by a number of China-based issuers, as well as ViacomCBS and two Discovery share classes, with the following distribution of exposure over time:

| Ticker | Number of Shares[5] (Market Value) | | | |
|---|---|---|---|---|
| | July 1, 2020 | October 1, 2020 | January 1, 2021 | March 22, 2021 |
| VIAC | 49.3M ($1.2B) | 123.0M ($3.4B) | 185M ($6.7B) | 286M ($28.6B) |
| BIDU-ADR | 11.2M ($1.4B) | 22.3M ($2.8B) | 31.6M ($6.6B) | 55M ($14.6B) |
| TME-ADR | 59.0M ($788M) | 118.0M ($1.8B) | 210M ($4B) | 326M ($10.0B) |
| GSX-ADR | 19.3M ($1.1B) | 38.8M ($3.6B) | 70M ($3.4B) | 101M ($8.5B) |
| VIPS-ADR | 36.4M ($759M) | 79.0M ($1.3B) | 115M ($3.2B) | 169M ($7.6B) |
| DISCA | 3.0M ($63M) | 3.0M ($65M) | 60M ($1.8B) | 100M ($7.5B) |
| IQ-ADR | 67.2M ($1.6B) | 105.3M ($2.4B) | 155M ($2.8B) | 225M ($6.3B) |
| DISCK | 1.3M ($25M) | 1.3M ($27M) | 1.3M ($34M) | 91M ($6.0B) |
| FTCH-ADR | 6.4M ($116M) | 18.4M ($500M) | 37M ($2.2B) | 92M ($5.7B) |
| SHOP-ADR | N/A | N/A | 970 ($1M) | 1.7M ($1.9B) |

124.    This increase of the values of Archegos's portfolio and top 10 holdings was driven by Archegos's build-up of exposures, which was intended to artificially inflate the share prices of its top 10 holdings.

---

[4]      None of these came to fruition as Archegos collapsed shortly thereafter.

[5]      Share count includes cash equity and derivative SBS positions cumulatively.

### E.    Archegos Exerted Dominance over Its Top 10 Holdings

125.    The increase in size of Archegos's exposures to its top 10 holdings also allowed it to assert a dominant market position over these securities.

126.    By late March 2021, Archegos's cumulative cash equity and derivative security-based swap exposures equated to the following percentages of outstanding shares, based on Archegos's estimate of those issuers' floats:

| Ticker | % of Outstanding Shares |
|--------|-------------------------|
| GSX-ADR | Over 70% |
| DISCA | Over 60% |
| IQ-ADR | Over 50% |
| VIAC | Over 50% |
| TME-ADR | Over 45% |
| DISCK | Over 30% |

127.    Prior to March 2020, Archegos historically instructed its traders to trade deliberately and discretely to avoid market impact, typically going days without adding to existing exposures and studiously avoiding trading volumes that could cause ripples in the market.

128.    However, during the Relevant Period, and particularly from January through March 2021, Archegos adopted a diametrically opposed trading strategy, often trading the equities of and TRSs referencing its top 10 holdings on numerous days and sometimes week-after-week, typically at large volumes. Archegos also frequently directed its traders, including Tomita, to get "aggressive," which meant for them to add exposures quickly and at large volumes. This approach was a marked departure from Archegos's typical manner of trading.

129.    When entering TRS orders, Archegos could often select the trading volume as a parameter for purposes of executing its TRS or otherwise select an algorithm that generally aligned with certain trading volumes.

130.    During the Relevant Period, and particularly from January through March 2021, Archegos's trading of the equities and TRSs referencing its top 10 holdings regularly exceeded 20%, often reached 30%, and even surpassed 40% of the daily trading volume of certain companies. For instance:

        a.    Between November 16, 2020 to January 4, 2021, Archegos's trading of the stock and TRSs referencing Discovery Class A shares reached or breached approximately 25% of Discovery Class A shares' daily trading volume on 17 of 33 trading days. From November 24, 2020 to January 4, 2021, Archegos's trading only dropped below 20% of Discovery Class A shares' daily trading volume on 7 of 27 trading days and was greater than 30% ten times, including a high of 40%.

        b.    Between January 6, 2021 to March 24, 2021, Archegos's trading of the stock and TRSs referencing Discovery Class C shares reached or breached approximately 25% of Discovery Class C shares' daily trading volume on 29 of 54 trading days. From January 29, 2021 to March 11, 2021, Archegos's trading only dropped below approximately 20% of Discovery Class C shares' daily trading volume on 2 of 29 trading days and was greater than approximately 30% fourteen times, including a high of approximately 40%.

        c.    Between March 2, 2021 to March 23, 2021, Archegos' trading of the stock and TRSs referencing Farfetch reached or breached approximately 20% of Farfetch's daily trading volume on 14 of 16 trading days, including three days where trading surpassed approximately 40% of daily trading volume, including a high of over 50% on March 18.

131.    The percentages of an issuer's daily trading volume, *supra*, unequivocally applied upward pressure on those issuers' share prices. Archegos knew that trading in large volumes on a given day – at percentages of more than 10% to 15% of the daily trading volume of a specific

issuer – would create upward pressure on the share price and result in the share price increasing. For example:

a.    Between October 2020 and March 2021, Archegos routinely accounted for more than 10% of the entire daily traded volume of ViacomCBS stock.  In February and March 2021, Archegos averaged more than 10% of the trading volume on a daily basis.  During that period, Archegos exceeded 15% of daily volume on approximately 10 of 40 trading days and exceeded 25% on approximately four days.

b.    Between December 2020 and March 2021, Archegos averaged more than 15% of the trading volume on a daily basis of Gaotu stock.  During that period, Archegos exceeded 30% of daily volume on approximately 11 days and exceeded 35% on approximately five days.

c.    Between November 2020 and March 2021, Archegos averaged more than 10% of the trading volume on a daily basis of Tencent stock.  Between on or about February 22 and March 26, 2021, Archegos exceeded 15% of daily trading volume on approximately 19 of 25 trading days and exceeded 20% on approximately 14 days.  Between October 2020 and March 2021, Archegos trading exceeded 35% of trading volume on approximately eight days.

132.    To be sure, the share prices of a number of Archegos's top 10 holdings experienced price spikes during the Relevant Period, increasing these prices to artificial levels which crashed after Archegos's collapse in late March 2021.  For instance, in early January 2021, the price of ViacomCBS stock increased to around $40.  It rose to around $55 in late January 2021 to around $70 in early March 2021.  On March 10, 2021, the share price was increased to over $80 and just two days later, to over $94, spiking all the way to $100 on March 22.  In total, the price of ViacomCBS stock increased approximately 150% in less than three months, with a lack of publicly

available information that would support such a share price increase.  About one month later, on

April 23, 2021, the share price for ViacomCBS suddenly closed at $41.71.



133.    Other of Archegos's top 10 holdings experienced similar share price spikes (and

ultimately crashes), including for example:

- Discovery Class A



- Discovery Class C



- Vipshop Holdings Ltd.



134.    Of note, these price movements were antithetical to general market movements over the same period.  Indeed, the share price spikes of Discovery Class A and C shares and ViacomCBS are not correlated with the price of the NASDAQ-100 index (as reflected in Invesco

QQQ Trust, an exchange-traded fund that tracks that index), as illustrated below, with the y-axis reflecting the value of one dollar invested from the start of period:



135.    As illustrated above, the stock price of ViacomCBS and Discovery Class A rose more than 250%, respectively, between October 1, 2020, and March 23, 2021 – as compared to the Nasdaq-100 index (represented in the below chart with the ticker name QQQ), which appreciated approximately 20% during the same period.

136.    Following the collapse of Archegos and the sale of its positions, the stock prices fell precipitously, as illustrated in the chart below:



137.    As it became increasingly important for Archegos to prevent the artificial prices from tumbling, it continued to grow its largest positions at increasing economic cost.  For example, many Counterparties increased margin requirements as Archegos's positions grew, including up to 100% collateral for certain swaps.  That made it far more expensive for Archegos to add to those positions.  Nevertheless, and notwithstanding its own prior focus on low-cost margining, Archegos continued to trade in the same securities.

**F.    Archegos Engaged in Manipulative Trading**

138.    During the Relevant Period, and particularly from January to March 2021, Archegos artificially impacted the share prices of its top 10 holdings through a variety of tactics such as:

a.    Archegos traded every day in the same stocks in large quantities and consistently directed its traders to limit prices, or the highest price they would pay for the stock, as the prices of the stocks rose, knowing that these transactions would drive the price of the stocks upwards.

b.    Archegos also bought heavily to "defend" the price of securities facing negative press or market movements.  This notably happened with respect to Gaotu as the stock was volatile due in part to active short sellers, regulatory inquiries, and public accusations of fraud. As Archegos's portfolio became more and more concentrated, it traded with the further purpose of propping up the stock price in order to avoid margin calls which, due to the extraordinary concentration of Archegos's portfolio, could trigger the collapse of its positions.  This also happened with respect to ViacomCBS, whose price Archegos "defended" against downward market pressure on June 11, 2020.  Specifically, Hwang went from a $25 million order for ViacomCBS with a "[$]22.40 limit without impacting," meaning without causing price disruption, to a limit of $22.60, followed by a limit of $22.70, of $23.00, of $23.50, and finally at 3:55 p.m., five minutes before market close, of $23.60.  By the end of the day, Archegos had purchased approximately 82.1 million shares of ViacomCBS, which represented approximately more than 17% of the day's trading volume.  Although ViacomCBS stock still closed down on the day, it avoided the kind of major sell-off experienced by others in the market, including comparable peer companies.  Archegos knew this trading tactic would impact the price of ViacomCBS stock and acknowledged this influence – after an analyst texted Hwang "VIAC held up pretty well today relative to market [. . .] Would you say that is a sign of strength?" Hwang simply replied, "No. It is a sign of me buying," followed by a laughing emoji.

c.    Archegos traded in amounts far exceeding volumes known within the securities industry with the objective of affecting market prices.  Specifically, Archegos understood that buying or selling more than approximately 10-15% of a day's total trading volume of a given stock would likely affect the market price in the stock. As a result, Archegos routinely directed trading in excess of these volumes.

139.    None of these trading tactics were based on a principled view of the true value of a particular issuer.  On the contrary, they were intended to artificially inflate share prices.

140.    In doing so, Archegos sidelined its research operation.  Prior to 2020, Hwang would commonly spend significant time with Archegos's research analysts, evaluating potential investments and holding weekly investment strategy meetings where analysts presented their recommendations.  However, beginning in or about March 2020, and accelerating in or about fall 2020, Hwang frequently spent almost all of his workday with the traders, primarily via all-day, open-line videoconferences, or, when the Archegos offices were open, with them in a trading room.

141.    Hwang all but stopped holding investment strategy meetings and ignored analyst recommendations about (1) price targets and (2) purchasing different stocks in any significant size in favor of his own outsized stock price targets, which were often orders of magnitude larger than what his research operation had determined on its own and which were based on little or no analytical support.

142.    During the Relevant Period, and particularly from January to March 2021, Archegos also timed some of its trading to maximize market impact, engaging in both pre-open trading, as well as trading during the last 30 minutes of the trading day.

143.    On one hand, Archegos would enter into a series of transactions prior to market open with manipulative intent and for the purpose of "setting the tone" for the trading day, which

is to push the share prices of issuers, in which Archegos held long exposures, upward. Archegos's objective, executed by Tomita, was to induce other traders to observe active trading in and upward price movement of the share prices of certain issuers and, as a result, purchase those issuers' securities during the day.

144.    From January to March 2021, the top 10 holding in which Archegos did the largest amount of pre-open trading was ViacomCBS. Specifically, Archegos traded ViacomCBS pre-open 19 times, including two days when orders exceeded the equivalent of 1 million shares, and on every trading day but one, from March 5th to 19th, 2021.

145.    On the other hand, Archegos would engage in substantial trading during the last 30 minutes of the trading day – *i.e.,* "marking the close" – to push the stock prices of certain issuers, in which Archegos held long exposures, upward. Since Archegos margin was based on end of day valuations, its goal, among others, was that the upward movement in stock prices would lead to an increase in its margin, thereby providing it with even more leverage to purchase exposure to the same issuers the next day.

146.    For instance, from January to March 2021, Archegos did substantial trading in Baidu during the last 30 minutes of the trading day. Specifically, from January 25, 2021 to March 23, 2021, Archegos traded Baidu during the last 30 minutes during the majority of trading days, including 22 days when orders exceeded the equivalent of over 100,000 shares (in dollars exceeding $29 million on each of those days), and four days when orders exceeded the equivalent of over 500,000 shares (in dollars exceeding $136 million on each of those days).

147.    During that same period, Archegos also did substantial trading in Tencent during the last 30 minutes of the trading day. Specifically, from January 6, 2021 to March 23, 2021, Archegos traded Tencent during the last 30 minutes during the majority of trading days, including

34 days when orders exceeded the equivalent of over 100,000 shares (in dollars exceeding $2 million on all of those days), 15 days when orders exceeded the equivalent of over 500,000 shares (in dollars exceeding $12 million on all of those days), and five days when orders exceeded the equivalent of over 1,000,000 shares (in dollars exceeding $30 million on all of those days), including a high of over 1.76 million shares.

148.    Archegos also traded throughout the day in a manner that served to increase the share prices of its top 10 holdings.  To do so, Archegos would direct its traders to enter limit order instructions, incrementally increasing the limit throughout the trading day as TRSs were filled, both in an attempt to increase the stock price and to induce others to purchase the stock.

149.    Additionally, in an attempt to counteract selling pressure or to otherwise maintain share prices, Archegos, at times, traded in non-economic ways.  One example of this type of trading occurred in December 2020 when Farfetch shares were down $0.50 to $55.00.   Tomita immediately took action and "stepped it up" as he told Hwang.  At the end of that trading day, Archegos had exposures equivalent to over 27 million shares of Farfetch, and given the leverage of the position, a price decrease of $0.50 could have significantly increased the amount of margin that Archegos needed to post with the Counterparties.

150.    Another example of non-economic trading tactics taking place was in March of 2021.  An Archegos trader messaged Hwang stating that after Discovery Class C shares opened at $61.68, Archegos should enter orders of "60.00-61.00 and be aggressive below 60.00 because some short term people see whether the stock can keep 60.00 floor as psychological level."  Within seconds, Hwang responded "I LIKE THAT PLEASE GO AHEAD WITH $50 MIL."  Subsequently, Hwang periodically sought status updates on trading to gain greater exposure to Discovery Class C shares, often increasing the size of the exposure to be added and incrementally

walking up the limit orders. Later that same day, Hwang messaged "FIRM LIMIT TO 63" to the trader and included instructions to "BE AGGRESSIVE." Discovery Class C shares closed at $62.99 that day.

### G. In 2020, Defendants Morgan Stanley and Goldman Sachs, and the Other Counterparties, See Red Flags Alerting Them to Archegos's Misconduct

151.   As Archegos's positions grew exponentially, Defendants Morgan Stanley and Goldman Sachs, and the other Counterparties, began imposing increasing costs and restrictions on further enlargement of Archegos's concentrated positions. This constrained Archegos's ability to pursue its rapid growth as a result of which it began to engage in open-market trading to further influence the prices of the top stocks in its portfolio and to maximize its capacity to conduct further trading.

### i. Defendants Morgan Stanley and Goldman Sachs, and the Other Counterparties, Had Full Visibility of Archegos's Manipulative Trading Patterns in Each of Their Respective Margin Account

152.   In order to manage their risk exposure, Counterparties impose restrictions on positions their clients can take. With regard to Archegos, the restrictions imposed by Defendants Morgan Stanley, Goldman Sachs, and each Counterparty varied from (1) limits on the total dollar amount of Archegos's positions with the Counterparty, (2) limits based on the percentage amount of company stock they were willing to hold as a hedge, which thereby limited the amounts Archegos could buy on swap, and (3) limits based on individual stocks, or on the amount of economic exposure to certain business sectors or geographic. Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties also used margin rates to reduce their risk, increasing the amount of collateral Archegos was required to post in order to trade on a particular stock. Such margin requirements functionally reduced the capital Defendants Morgan Stanley, Goldman Sachs, and the Counterparties would lend Archegos.

153.    Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties regularly made risk assessments to determine whether to transact with Archegos, continue to transact with Archegos, impose or raise limits on trading with Archegos, and raise or lower their margin lending rates.  Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties notably conducted a due diligence about Archegos before onboarding it as a client as well as engaged in periodic credit reviews with Archegos personnel to track its risk profile.  Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties also sought additional information from Archegos on an ad hoc basis, for instance, in response to shifts in Archegos's positions at that Counterparty or to requests by Archegos to engage in additional trading.

154.    For these reasons, at all relevant times, any given Counterparty, including Defendants Morgan Stanley and Goldman Sachs, had *full* visibility into the portion of Archegos's portfolio that it held and thus had reason to know about Archegos's manipulative conduct.

155.    Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties also sought frequently sought information regarding the position Archegos held at other Counterparties. In that regard, Halligan, Tomita, and Becker provided the Counterparties with quantitative information, including the relative size of Archegos's largest positions and the time it would take to liquidate portions of the portfolio.

### ii.    Archegos Often Reached and Surpassed Counterparties', including Defendants Morgan Stanley and Goldman Sachs's, Imposed Limits

156.    The only way for Archegos to continue to engage in its manipulative trading scheme throughout the Relevant Period was for it to continue adding to its already concentrated position.

157.    However, as Archegos's positions grew, it began to regularly reach, and often surpass Counterparties', including Defendants Morgan Stanley and Goldman Sachs's, trading

capacity limits regarding the amount of TRSs that each Counterparty would allow Archegos to hold in a particular stock. These limits hampered the constant trading activity that was necessary to continue to perpetrate Archegos's fraudulent scheme (described *supra*).

158. Furthermore, as Archegos's positions grew and became more concentrated, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties periodically increased the amount of margin required of Archegos to add to existing positions (or to put on new positions).

159. While Counterparties', including Defendants Morgan Stanley and Goldman Sachs's, restrictions, *i.e.,* the trading capacity limits and margin requirements, made it more difficult and expensive for Archegos to add to its positions, Archegos was determined to obtain more exposure to his concentrated positions no matter the cost. For example, when one of Archegos's Counterparties reached its internal cap on how much exposure it was willing to have in Gaotu stock, Hwang personally reached out to Li to request he close his Gaotu positions at the Counterparty and then reestablish its GSX exposure at another Counterparty in order to free up capacity for Archegos at the first Counterparty. Li agreed and Hwang was able to add to Archegos's GSX position.

160. Generally, in response to these restrictions, Archegos would engage the Counterparties, including Defendants Morgan Stanley and Goldman Sachs, in discussions and negotiations in an attempt to increase trading capacity limits and decrease the margin requirements (or at the very least, forestall margin increases).

### iii. Defendants Morgan Stanley and Goldman Sachs, and the other Counterparties, Increase Required Long/Short Ratio to 50%

161. In the context of Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties' risk assessment, the latter notably analyzed the size, composition, and liquidity of Archegos's portfolio, both within that Counterparty's own portfolio and across all other financial

institutions. Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties also paid particular attention to Archegos's cash reserves that could be used to satisfy further margin requirements, if needed.

162.    Furthermore, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties imposed informal credit- and risk-related limitations on Archegos's ability to transact swaps, such as requiring that Archegos maintain a certain ratio of long to short positions ("long/short ratio") in its portfolio at that Counterparty which Archegos met on the short side primarily by maintaining short Broad-Based Security Index Swaps.  If Archegos failed to satisfy this requirement, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties would typically consider limiting further trading and/or requiring Archegos to post additional margin to reduce their risk.

163.    The Broad-Based Security Index Swaps played a critical role in Counterparties', including Defendants Morgan Stanley and Goldman Sachs's, assessment and management of Archegos's risk.  These swaps were generally placed as short positions and therefore served as a general market hedge and risk-reducing measure.  Since Archegos's largest positions were long TRS positions in single securities, there was a risk that market-wide factors would negatively impact those positions.  In order to hedge against the risk of a market decline impacting the long TRS positions, Counterparties required that Archegos short a large section of the market by maintaining Broad-Based Security Index Swaps.  Because the Broad-Based Security Index Swaps were less volatile, more diverse, and more liquid, they could more easily and quickly be unwound. Additionally, the short Broad-Based Security Index Swaps would not necessarily be subject to the same losses suffered by the long TRS positions in the event of a market decline.

164.    During the Relevant Period, Archegos held significant short Broad-Based Security Index Swap positions.  In light of their risk-reducing properties, these positions were instrumental to Archegos's ability to obtain additional capacity and favorable margin rates.  For similar reasons, some Counterparties requested that Archegos place new short Broad-Based Security Index Swap positions concurrently with new long single name positions in order to meet required long/short ratios.  For example, in connection with a potential agreement with a Counterparty regarding a new margin and risk management framework, Archegos "agreed to hedge 50% of any new long exposure," thereby agreeing that for every $100 of new long exposure, it would also add $50 worth of short exposure, typically in the form of Broad-Based Security Index Swaps.

165.    Counterparties also required that Archegos add short Broad-Based Security Index Swap positions to its account to maintain specific margin rates or in connection with specific requests by Archegos to increase the size of its concentrated long positions.  This namely occurred on February 2, 2021, when Archegos, through Tomita, asked a Counterparty for an increase in its capacity to trade Gaotu stock. Simultaneously to this request, Tomita stated that Archegos would "keep adding index shorts [*i.e.,* Broad-Based Security Index Swaps] . . . as [it] buy[s] long [Gaotu stock]."  The Counterparty responded, "That would be great."  Similarly, on February 24, 2021, in a communication with Tomita, the Counterparty approved an increase in Archegos's capacity to trade Gaotu stock.  At the same time, the Counterparty told Tomita that it remained "very focused on the shorts [*i.e.,* the Broad-Based Security Index Swaps]" and Archegos's ability to maintain a "balanced" long/short ratio by adding Custom Basket Swaps.

### iv.    Defendants Morgan Stanley and Goldman Sachs, and the other Counterparties, Regularly Interact with Archegos

166.    As Archegos's portfolio and risk profile grew, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties regularly engaged with Archegos personnel, for risk management purposes.

167.    Archegos understood, based on conversations between its personnel and the Counterparties, that it needed to maintain and/or increase its short exposure in order to preserve favorable margin rates and/or enlarge its long single-name TRS positions.   In that respect, beginning mid-2020, Tomita began preparing daily "capacity notes," which calculated Archegos's current capacity limitations at each Counterparty.  Tomita sent the capacity notes to Halligan and Becker, among others, and prepared written summaries of the reports for Hwang.

168.    Moreover, Hwang routinely directed Tomita and others to acquire additional trade capacity that would allow Archegos to continue to grow its concentrated positions.  Although Tomita informed Hwang that it was becoming increasingly difficult to obtain additional trade capacity due to the Counterparties', including Defendants Morgan Stanley and Goldman Sachs's, risk models and assessments, Hwang nonetheless demanded additional capacity.  At the same time, Hwang directed Tomita and others to obtain and maintain more favorable margin rates.

169.    For these reasons, Archegos's personnel frequently engaged in discussions with Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties during which they discussed the (1) concentration, (2) liquidity, and (3) composition of Archegos's position in order to evaluate whether and how much to increase Archegos's capacity limits, or to change margin levels.  Certain Counterparties' credit teams even implemented monthly due diligence check-ins to obtain updates on the portfolio's composition and performance.

### a.    Discussions Regarding the Concentration of Archegos's Portfolio

170.    Firstly, as part of their risk assessment, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties routinely sought to better understand the concentration of Archegos's *overall* portfolio, including but not limited to the relative size of its largest position, and how much of its portfolio consisted of exposure to a small number of stocks.  Such metrics were crucial to Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties' decision-making process since a more concentrated portfolio is more susceptible to a market downturn than a diversified portfolio.  Indeed, from a credit perspective, a highly concentrated portfolio therefore can be a greater risk.

171.    For these reasons, and as illustrated in the examples below, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties regularly scheduled calls, meetings and other communications with Archegos in order to obtain information about the concentration of Archegos's *overall* portfolio and ultimately, determine whether Archegos's positions at other Counterparties were similar:

a.    On October 21, 2020, during a due diligence call between Archegos and a Counterparty's risk personnel, the call participants discussed the size of Archegos's largest position.

b.    On January 25, 2021, a due diligence call took place between Archegos and one of its Counterparties.  The participants on the call discussed the size of Archegos's largest position at the time (ViacomCBS) as well as Archegos's overall portfolio concentration.  As of that date, Archegos had six positions that were greater than 35% of Archegos's own capital, including ViacomCBS (approximately 96%), Baidu (approximately 67%), Gaotu (approximately 55%), Tencent (approximately 48%), IQIYI (approximately 45%), and Vipshop (approximately

43%).[6]   Additionally, at the time of the representation in January 2021, Archegos had four positions greater than 35% of capital, ranging from 39% to 60%.

     c.     On January 28, 2021, as a result of significant single-day losses in Archegos's portfolio, a Counterparty's risk management team reached out to Becker to get a better understanding of Archegos's risk profile and overall portfolio positioning. Becker and the Counterparty discussed the concentration of Archegos's top holdings.

     d.     In or about February 2021, Archegos and one of its Counterparties discussed the former's concentration levels.  At that time, the Counterparty had imposed an absolute limit on the total value of Archegos's positions with it.  Archegos, however, wanted to increase that absolute limit.  Accordingly, Archegos informed the Counterparty that the ten largest investments in its overall portfolio were generally evenly weighted at approximately 30-35% of capital each, with Archegos's largest single position representing approximately 35% of capital. The Counterparty approved an increase in Archegos's total trading limit in excess of $1.5 billion, including with revised margin rules.  Archegos quickly used up the additional capacity, including by entering new, leveraged swap positions.

     e.     Although by mid-February 2021, Archegos's cumulative long exposure to Gaotu stock (NYSE: GSX) totaled approximately 86 million shares – or about 59% of Gaotu's outstanding shares – spread across its various Counterparties – Archegos nonetheless sought additional trading capacity in Gaotu stock.  Based on the size of its position in Gaotu held with one of its Counterparties, an employee from said Counterparty grew concerned about Archegos's overall concentration levels in the issuer, and on February 18, 2021, reached out to Tomita and

---

[6]     The cumulated percentages greatly exceed 100% of Archegos's own capital. This is due to the fact that most of Archegos's trading was on margin.

asked for detail regarding the extent of Archegos's Gaotu exposure *across* its Counterparties. Tomita initially attempted to deflect the question by noting that Archegos was not a "disclosed holder" of Gaotu stock (*i.e.,* it did not file Section 13(d) filings on that name). The Counterparty employee found that that response did not account for any derivative security-base swap positions Archegos might have with other Counterparties and noted in particular that the disclosed holders in Gaotu stock were principally banks and other financial institutions – precisely the type of institutions that would be buying the underlying shares as a hedge if Archegos had executed SBSs with them. The Counterparty employee expressed concern that if Archegos held similarly sized positions in Gaotu stock across its Counterparties as it did with that Counterparty, then Archegos might cumulatively be the beneficial owner of almost 20% of Gaotu's outstanding shares. The Counterparty subsequently extended additional trading capacity in Gaotu to Archegos.

f.    In or about March 2021, Archegos sought an additional increase of one of its Counterparties' gross trading limit. Following a call between Becker and the Counterparty, the latter approved an increase in Archegos's total trading limit of approximately $2 billion. Within days, Archegos had used up the entirety of that additional capacity, including by entering into new, leveraged swap positions.

g.    In early March 2021, in connection with a routine due diligence credit call regarding Archegos's portfolio concentration, a Counterparty's credit risk department asked Becker for updated information regarding Archegos's largest holdings. Becker informed the Counterparty that its largest holding was approximately 35% of its capital (the number previously provided by Halligan) and that its other top 10 holdings were approximately 30% of capital each.

172.    Similar conversations regarding the concentration of Archegos's largest positions took place on additional occasions and with additional Counterparties during the Relevant Period, including in or about October and December 2020 as well as January, February, March 2021.

**b.    Discussions Regarding the Liquidity of Archegos's Portfolio**

173.    Secondly, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties often sought to understand the liquidity of Archegos's overall portfolio, *i.e.,* how quickly the positions in Archegos's portfolio could be sold in the market.

174.    Metrics reflecting liquidity were important to the Counterparties' decision-making process because if Archegos's position decreased in value by a certain amount the underlying stocks would have to be sold in order for Archegos to pay the Counterparties what they were owed under the swap agreements.  Should Archegos's positions be illiquid, it would be difficult – perhaps impossible – to sell the shares in any way that would avoid further depreciation of the share prices.

175.     For these reasons, and as illustrated in the examples below, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties, frequently asked Archegos to provide them with information regarding its overall portfolio liquidity:

a.    In or around November 11, 2020, one of Archegos's Counterparties expressed concern to Archegos that the amount of margin that is had posted was insufficient to account for the risk associated with its positions.  As a result, the Counterparty asked Tomita for Archegos to reduce its risk by (1) transferring more liquid (and hence less risky) positions from other Counterparties to that Counterparty and (2) transferring concentrated and illiquid positions – in particular Gaotu – from that Counterparty to other Counterparties.  Tomita conferred with Hwang and conveyed the urgency of the situation to the latter, noting that the Counterparty's risk management profile of Archegos had considerably worsened.  Tomita knew that Archegos was

unable to move its concentrated illiquid positions from that Counterparty to other Counterparties because Archegos had exhausted all of its available capacity at other dealers and/or increasing those positions at other Counterparties would result in higher margin rates. Tomita also knew that Archegos could not transfer liquid positions from other dealers to that Counterparty because other Counterparties required Archegos to maintain those liquid positions as a risk-reducing measure and failing to maintain those liquid risk-reducing positions would also have resulted in higher margin rates. Ultimately, Tomita informed the Counterparty that Archegos could not move the positions due to year-end tax planning concerns. Thereafter, on multiple occasions between December 2020 and March 2021, the Counterparty imposed increased margin requirements on Archegos's positions.

b.      In or around December 2020 or January 2021, Becker participated in a due diligence call with a Counterparty during which they discussed the time it would take to liquidate Archegos's positions as well as the size of its largest holdings.

c.      In or about February 2021, Archegos sought to raise its existing trading limit at one of its Counterparties. In that regard, Becker told the Counterparty that Archegos could liquidate its entire portfolio in approximately two weeks, or ten trading days, selling at approximately 15% of average daily trading volume ("ATV"), measuring from the prior 20 days. The metric of 15% of ATV was significant because selling or buying at volumes exceeding this amount would be expected to impact the price of the security. The Counterparty subsequently approved an increase in Archegos's total trading limit in excess of $1.5 billion, including with revised margin rules.

d.     During a February 2021 monthly due diligence check-in, a Counterparty and Archegos's personnel discussed Archegos's portfolio as of month-end for January 2021, including its largest position and the time it would take Archegos to fully liquidate its portfolio.

e.     On February 3, 2021, during a due diligence call with a Counterparty's risk division, Archegos's personnel addressed its largest position as well as the liquidity of the top positions it held at other Counterparties.

f.     On March 8, 2021, in response to inquiries from a Counterparty following Archegos's request for an additional $2 billion in trading capacity, Becker notably stated that (1) Archegos's single largest positions at other Counterparties were in different, larger, and more liquid names than the largest positions it held at that Counterparty and (2) Archegos's single largest position totaled approximately 35% of Archegos's capital.  Following this conversation, and before approving the request for increased trading capacity, the Counterparty requested additional information regarding how quickly Archegos would be able to close out its entire book in a distressed situation.  Becker relayed the information to the Counterparty who subsequently approved the $2 billion request for increased capacity.  Archegos immediately used the additional capacity, executing more TRSs with the Counterparty in the same concentrated names, which, in turn, resulted in the Counterparty purchasing additional shares of the referenced security to hedge its exposures.

176.     Similar discussions regarding the liquidity of Archegos's positions took place with other Counterparties during the Relevant Period, including in or about December 2020 as well as January, February, and March 2021.

### c.    Discussions Regarding the Composition of Archegos's Portfolio

177.    Lastly, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties frequently asked questions regarding the composition of Archegos's portfolio since this information helped them understand, or at the very least make inferences about, the concentration, liquidity, and general risk profile associated with Archegos's **overall** portfolio.

178.    Over time, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties generally became particularly concerned with Archegos's portfolio since its positions became dramatically larger and more concentrated at each Counterparty.

179.    In fact, at the end of November 2020, Tomita and Hwang held analogous discussions with Defendant Morgan Stanley since the latter had grown concerned about the concentration of Archegos's **overall** portfolio as well as its position in Gaotu.  Defendant Morgan Stanley asked Tomita if Archegos could transfer some of its position in Gaotu to another counterparty and replace it with the more diversified and liquid stocks, such as Apple and Amazon, that Defendant Morgan Stanley believed Archegos had invested in through other financial institutions.  Tomita communicated to Defendant Morgan Stanley that Archegos's margin was optimized at the time, and that Hwang did not want to make any changes to it before the year's end.

180.    Similarly, on or around January 29, 2021, Tomita and Becker had a telephone call with another Counterparty to discuss Gaotu.  Prior to that call, the Counterparty had **learned from public filings that several other swap dealers were among Gaotu's largest shareholders**.  During the call, the Counterparty inquired about why so many other swap dealers were large shareholders of Gaotu stock.  In order to maintain existing trading capacity, secure additional capacity and/or obtain or maintain favorable margin rates, Tomita stated that the other swap dealer shareholders related to other hedge funds that invested in Gaotu stock through swap transactions.

181.    The content of Archegos's portfolio was discussed as early as when it decided to consider a business relationship with a counterparty.  For instance, when considering such a relationship with Defendant Goldman Sachs, the parties discussed Archegos's portfolio and investment interests.  Similar discussions took place between Archegos and other Counterparties – for instance, during due diligence calls with one of its Counterparties in October 2020 and during the onboarding process with one of its other Counterparties in spring and summer 2020 as well as in March 2021.

182.    Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties also required that Archegos certify that its exposure to individual positions was below particular thresholds.

183.    For instance, Archegos obtained TRSs pursuant to an International Swaps and Derivatives Association ("ISDA") Master Agreement as amended and supplemented by other documents, including a Portfolio Swaps Annex ("PSA").  In 2015, Archegos's PSA with one of its Counterparties included a provision representing that "on the date the parties enter into any Transaction, the aggregate amount of all such Shares beneficially owned by it for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of shares underlying any long derivative position, is less than 5% of the outstanding Shares."  In December 2020, the PSA was amended to increase the percentage of ownership from 5% to 20% of the outstanding shares.

184.    Although during 2020, Archegos owned more than 5% of the outstanding shares of numerous issuers when including underlying long derivative security-based swap positions, it, through Hwang, nonetheless signed both the 2015 and 2020 PSAs.  Moreover, when Hwang signed the 2020 PSA, Archegos's combined exposure to several companies far exceeded 20% of those

companies' outstanding shares. Yet, despite knowing that its cumulative cash equity and derivative security-based swap positions in these names were well in excess of 20% of their outstanding shares, Archegos nonetheless continued to direct its traders to add long TRSs with that Counterparty in its most concentrated names, including but not limited to Gaotu, ViacomCBS, and Discovery (Class A) shares.

185.    In December 2020, Archegos also entered into an ISDA master agreement with another Counterparty. The agreement contained a representation that Archegos beneficially owned less than 20% of the outstanding shares of any issuer's stock, including both cash and swap positions. However, once again, when Archegos executed the agreement, it owned equities and swaps equivalent to (1) more than 25% of the Discovery (Class A) float, a $1.2 billion position at the time, (2) more than 30% of the ViacomCBS float, a $6 billion position, and (3) more than 35% of the Gaotu float, a $3.5 billion position. Additionally, Archegos owned equities and swaps constituting more than 18% of the IQIY float and topped 20% approximately two weeks later.

186.    The discussions between Archegos and its Counterparties, including Defendants Morgan Stanley and Goldman Sachs (*supra*, ¶¶177-80) should have alerted the Defendants to the fact that Archegos's ***overall*** portfolio was highly leveraged and concentrated in a handful of shares. To be sure, even if Defendants Morgan Stanley and Goldman Sachs may not have known the exact amount of Archegos's aggregate exposure, they knew or should have known that Archegos had massive, highly leveraged beneficial ownership positions in each of the Issuers, and that these positions were similar across all of Archegos's Counterparties, and that these exposure were compounded by Defendants Morgan Stanley and Goldman Sachs's own proprietary "market-neutral" hedge holdings in the same underlying securities.

### H.    In the Week of March 22, 2021, Archegos Told Defendants Morgan Stanley and Goldman Sachs That Its Scheme Was Going to Collapse, Which Would Inevitably Cause the Price of Affected Stocks to Plummet

#### i.    ViacomCBS's Secondary Public Offering

187.    During the week of March 22, 2021, the prices of securities underlying Archegos's concentrated long single-name TRS positions declined, triggering a deluge of margin calls in the following days which, ultimately, led to the collapse of the firm.

188.    On March 22, 2021, after market close, ViacomCBS announced a $2 billion secondary public stock offering.  The next day, on March 23, 2021, the price of ViacomCBS's stock dropped considerably, and along with it, the value of Archegos's portfolio and other holdings.

#### ii.    Archegos Scrambles to Cover Margin Calls and Desperately Spends Remaining Cash and Excess Margin Trying to Prop Up Positions

189.    In response to this substantial drop, Archegos attempted to defend the price of ViacomCBS stock by executing an extraordinary amount of trading.  Essentially, Archegos's strategy was to attempt to overpower the market to prevent the collapse of artificially inflated prices and ultimately, avoid margin calls.  Because such considerable trading required a significant amount of free cash, should Archegos's strategy fail, it would necessarily be left with margin calls across Defendants Morgan Stanley, Goldman Sachs, and its Counterparties, and insufficient funds to meet them.

190.    Archegos's personnel was also aware of the peril of the above trading strategy – much of which was occurring at 100% margin.  In fact, on March 23, 2021, Halligan asked Hwang "Are we going to be able to pay for these trades today? I don't see how we can[.]"  Later that same day, Tomita attempted to raise the issue to Hwang, and reported back to others that he "spoke to Bill and he said to just keep work[ing] the orders."

191.    Unsurprisingly, Archegos's strategy failed. ViacomCBS's share price continued to fall as a result of which Archegos's portfolio suffered billions of dollars in market losses. Archegos spent more than approximately $2 billion on additional buying, including more than approximately $900 million in ViacomCBS stock, and in doing so, severely depleted its available cash.  As appears from Tomita's internal message to Hwang, Halligan, and others, in the evening of March 23rd, Tomita forecasted margin calls for the following day, predicting "cash shortfalls for after tomorrow" and identifying particular sets of swaps that could be unwound to generate cash.

192.    In the end, on March 23, 2021, Archegos saw its ending capital plummet from $36.2 billion to $32.7 billion. The next day, it would face margin calls of $2.5 billion due the following day. By market open on March 24th, Archegos had virtually exhausted its cash reserves.

### iii.    By March 24, 2021, Archegos Begins Notifying Its Counterparties that It Would Not Be Able to Meet Margins Calls of Over $10 Billion Due Next Day

193.    Archegos's most concentrated positions saw their prices continue to fall precipitously on March 24, 2021.  ViacomCBS's announcement that it had priced its offering at $85 per share – below the prior day's $100.34 closing price – triggered further losses in ViacomCBS as well as in Discovery.

194.    Archegos's holdings in China-based issuers like Gaotu, IQIY, Baidu, and Tencent also declined following the announcement of the adoption of interim amendments implementing the Holding Foreign Companies Accountable Act.  This announcement put pressure on the price of ADRs of Chinese issuers which comprised the balance of Archegos's concentrated positions.

195.    And yet, Archegos refused to unwind its concentrated positions to generate cash. On the contrary, it directed hundreds of millions of dollars of additional trading in those same

positions and in a desperate effort to prevent the scheme's collapse, encouraged its trading team to use manipulative strategies.

196.    In parallel, Halligan, Becker, and other members of Archegos's operations group worked to respond to margin calls.  More specifically, because Archegos did not have sufficient cash on hand to cover its margin calls, Halligan and the operations team attempted to withdraw excess margin from the Counterparties.  For instance, in an attempt to meet its margin call with one of its Counterparties, Halligan and the operations team reached out to that Counterparty and asked to call back excess margin that Archegos held with it.  Around 2:00 pm on March 24, 2021, a credit officer from that Counterparty spoke with Becker and asked the latter why Archegos was calling back excess margin, especially in light of the day's market movements and the likelihood that the Counterparty would issue a margin call the following day.  Becker told the credit offer that Archegos held more excess margin at that Counterparty than it did at its other Counterparties and that Archegos's withdrawal request was merely part of a rebalancing effort.  Becker also stated that Archegos's request was not the result of a "distress situation" or a "liquidity issue" and that Archegos currently had $9 billion in cash reserves.  That same afternoon, the Counterparty approved the withdrawal request and wired Archegos $248 million, thereby enabling Archegos to meet its margin call.

197.    These manipulative schemes were insufficient to stop the heavy bleeding.  By the end of the day on March 24, 2021, the value of Archegos's capital declined to $16.9 billion – a one-day loss of 48%.

198.    Having exhausted nearly all its excess cash, that same evening, Archegos began informing Defendants Morgan Stanley, Goldman Sachs, and its other Counterparties, that it would not be able to meet its anticipated margin calls of $10.7 billion the next day and during a series of

calls, attempted to work out a proposed course of action to attempt to satisfy its margin obligations. In the evening of March 24, 2021, a call took place between Archegos, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties to discuss the performance of Archegos's portfolio during the day and the progress of its portfolio liquidation.

### iv.    Archegos Reaches Out to Defendants Morgan Stanley and Goldman Sachs in an Attempt to Prevent Large Scale Liquidation

199.    Archegos's position further deteriorated on March 25, 2021.

200.    In an effort to meet its margin calls, Archegos unwound its positions with multiple Counterparties on March 25, 2021. In doing so, Archegos continued to face ongoing inquiries from the Counterparties.  In fact, at least one Counterparty issued a notice of default, another issued a notice to Archegos exercising its early termination rights and three Counterparties issued margin failure notices.

201.    In an attempt to obtain enough liquidity to satisfy outstanding margin calls, after market close on March 25, 2021, Archegos reached out to Defendant Goldman Sachs to execute a block trade.[7]  However, Defendant Goldman Sachs block trading discount further added to Archegos's losses. By the end of the day, Archegos's capital was reduced to $9.2 billion, an additional 46% loss from the previous day, triggering a flood of additional margin calls.  Left with no alternative, and in an attempt to thwart a large scale liquidation that might exacerbate stock price declines, Archegos organized a group call with its largest Counterparties, including Defendants Morgan Stanley and Goldman Sachs.  During that call, Archegos informed Defendants

---

[7]    Bloomberg Originals: Quicktake, *How to Lose $20 billion in Two Days*, YOUTUBE (Aug. 10, 2021), https://www.youtube.com/watch?v=MhMhg97fmzE,  at 2:16 : "Very early on, Goldman emerged as a seller of almost $10 billion of securities on a Friday, dumping stock into the market in a way that was exceedingly rare, almost unprecedented. And any time I see the name Goldman Sachs I'm always curious. And so, I went down the Goldman Sachs rabbit hole and found out some interesting details about Goldman's relationship with this firm Archegos and the man behind it, Bill Hwang."

Morgan Stanley, Goldman Sachs, and the other Counterparties that while it had $9-$10 million billion in equity, it also had $120 billion in gross exposure, more specifically $70 billion in long exposure and $50 billion in short exposure. This information constituted MNPI which Defendants Morgan Stanley, Goldman Sachs, and other Counterparties were made privy to during a confidential call in the context of their contractual relationship with Archegos. In other words, had Defendants Morgan Stanley and Goldman Sachs not entered into prime brokerage agreements with Archegos, they would never have obtained such MNPI from Archegos. Accordingly, Defendants Morgan Stanley and Goldman Sachs had a fiduciary duty towards Archegos to keep this MNPI confidential.

202.    During that same call, Archegos also asked Defendants Morgan Stanley, Goldman Sachs, and other Counterparties to enter into a standstill agreement whereby they would agree not to declare Archegos in default while the latter wound down its positions.

203.    The discussions between Archegos, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties persisted through March 26, 2021, and well into the weekend. Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties namely discussed the possibility of a managed liquidation of Archegos. Considering the highly confidential, material, and non-public nature of these discussions, internal counsel for the Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties were present and read a script making clear that Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties were not permitted to disclose their respective Archegos related position.

204.    These discussions ultimately proved fruitless as Defendants Morgan Stanley, Goldman Sachs, and at least one other Counterparty, determined that they were not interested in participating in a managed liquidation of Archegos.

205.    Instead, it was later revealed that in an attempt to avoid billions in losses, Defendants Morgan Stanley and Goldman Sachs misappropriated MNPI for securities trading purposes in breach of duties owed to Archegos. In fact, according to media reports, Defendant Morgan Stanley, for example, sold *about $5 billion* in shares of Archegos's doomed bets late Thursday, March 25, 2021 *before* the Archegos story reached the public. This revelation was captured in an article published on *CNBC.com*, on April 6, 2021, which stated in relevant part:

> The night before the Archegos Capital story burst into public view late last month, the fund's biggest prime broker *quietly unloaded some of its risky positions* to hedge funds, people with knowledge of the trades told CNBC.

> Morgan Stanley sold about $5 billion in shares from Archegos's doomed bets on U.S. media and Chinese tech names to a small group of hedge funds late Thursday, March 25, according to the people, who requested anonymity to speak frankly about the transaction.

> *It's a previously unreported detail that shows the extraordinary steps some banks took to protect themselves from incurring losses from a client's meltdown. The moves benefited Morgan Stanley*, the world's biggest equities trading shop, and its shareholders. While the bank escaped from the episode without material losses, other firms were less fortunate. Credit Suisse said Tuesday that it took a $4.7 billion hit after unwinding losing Archegos positions; the firm also cut its dividend and halted share buybacks.

> Morgan Stanley had the consent of Archegos, run by former Tiger Management analyst Bill Hwang, to shop around its stock late Thursday, these people said. The bank offered the shares at a discount, telling the hedge funds that they were part of a margin call that could prevent the collapse of an unnamed client.

> *But the investment bank had information it didn't share with the stock buyers*: The basket of shares it was selling, comprised of eight or so names including Baidu and Tencent Music, *was merely the opening salvo of an unprecedented wave of tens of billions of dollars in sales by Morgan Stanley and other investment banks starting the very next day*.

> Some of the clients felt betrayed by Morgan Stanley because they didn't receive that crucial context, according to one of the people familiar with the trades. *The hedge funds learned later in press reports that Hwang and his prime brokers convened Thursday night* to attempt an orderly unwind of his positions, a difficult task considering the risk that word would get out.

*That means that at least some bankers at Morgan Stanley knew the extent of the selling that was likely and that Hwang's firm was unlikely to be saved,* these people contend. *That knowledge helped Morgan Stanley and rival Goldman Sachs avoid losses because the firms quickly disposed of shares tied to Archegos*. Morgan Stanley and Goldman declined to comment for this article.

Morgan Stanley was the biggest holder of the top ten stocks traded by Archegos at the end of 2020 with about $18 billion in positions overall, according to an analysis of filings by market participants. Credit Suisse was the second most exposed with about $10 billion, these sources noted. *That means that Morgan Stanley could've faced roughly $10 billion in losses had it not acted quickly*.

"I think it was an 'oh s---' moment where Morgan was looking at potentially $10 billion in losses on their book alone, and they had to move risk fast," the person with knowledge said.

While Goldman's sale of $10.5 billion in Archegos-related stock on Friday, March 26 was widely reported after the bank blasted emails to a broad list of clients, Morgan Stanley's move the night before went unreported until now because the bank dealt with fewer than a half-dozen hedge funds, allowing the transactions to remain hidden.

The clients, a subgenre of hedge funds sometimes dubbed "equity capital markets strategies," typically don't have views on the merits of individual stocks. Instead, they'll purchase blocks of stock from big prime brokers like Morgan Stanley and others when the discount is deep enough, usually to unwind the trades over time.

[Emphasis added].

206.    A similar article was published by *Bloomberg News* that same day which stated in

relevant part:

Morgan Stanley sold $5 billion of shares owned by Archegos Capital Management *a day before a deluge of block trades sent shockwaves across capital markets*.

The sale of the basket of shares on March 25 was completed at a fixed discount, according to a person with knowledge of the matter, who asked not to be identified discussing private transactions.

The Wall Street bank sold shares held by Bill Hwang's family office in about 10 companies after the market close, mainly to hedge funds, the person said. CNBC reported earlier Tuesday on the size of the stock sale.

Morgan Stanley's early bid for the exits *helped the firm emerge largely unscathed from a fund flameout that's inflicted billions in losses at other banks*. Credit Suisse Group AG on Tuesday announced a $4.7 billion write-down tied to its

exposure to Archegos, and Nomura Holdings Inc. has said it could take a hit of as much as $2 billion.

Morgan Stanley was one of the early backers of the family office despite the legal taint tied to Hwang. He was accused of insider trading by authorities and in 2012 pleaded guilty to wire fraud on behalf of his hedge fund, Tiger Asia Management.

[Emphasis added].

207.    On March 26, 2021, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties issued default notices and/or exercised early termination rights. Thereafter, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties began unwinding Archegos's swaps as the latter had failed to timely reduce his positions, generate sufficient cash, or meet outstanding margin calls. This meant that Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties notably terminated the swaps and exited the associated hedges by selling the same securities referenced in the swaps into the market. In doing so, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties flooded the market with large volumes of shares and on March 26, 2021, and the prices of these shares rapidly declined.[8]

208.    While Defendants Morgan Stanley and Goldman Sachs emerged largely unscathed, the same cannot be said of other Counterparties. Credit Suisse, for example, began liquidating billions of dollars' worth of shares that Archegos had swap positions on, at fire sale prices. By the time Credit Suisse tried to liquidate its own holdings of stocks underlying Archegos's swap contracts over the ensuing weekend, prices had already collapsed, and Credit Suisse quickly racked up billions of dollars in losses.

---

[8]    Bloomberg Quicktake: Originals, *How to Lose $20 billion in Two Days*, YOUTUBE (Aug. 10, 2021), https://www.youtube.com/watch?v=MhMhg97fmzE, at 2:47 : "It really goes back to the final days of March where you had this frenzy of block trades hitting the market. There were a bunch of big Chinese tech names, U.S. media conglomerates, and across the board we were seeing the stocks falling. Everyone in the market was trying to figure out what the heck was going on."

209.    In the space of a single week, (1) the companies at the center of Archegos's trading scheme lost more than $100 billion in market capitalization, (2) Archegos owed billions of dollars more than it had on hand, (3) Archegos collapsed, and (4) investors who purchased the relevant stocks, including those of the Issuers', at artificial prices lost the value they believed their investments held.

## III.    THE FALLOUT

210.    Archegos's fallout received wide media coverage in the days and weeks following the firm's remarkable liquidation for a number of reasons, including the fact that it dragged some of the world's most esteemed financial institutions into the mud alongside it.

211.    On April 7, 2021, the *Wall Street Journal* announced that "Credit Suisse Group AG reported a $4.7 billion hit from the meltdown of Archegos Capital Management, slashed its dividend and said its investment banking and risk chiefs would leave the bank." According to the article, "Chief Executive Thomas Gottstein will stay in his job, but Chief Risk Officer Lara Warner is leaving the bank Tuesday and head of investment banking Brian Chin will depart at the end of April."

212.    Parshu Shah, the Credit Suisse point salesman to Archegos who had previously been given the new responsibility of overseeing risk-taking in the broader prime-brokerage unit was also forced to step down. Paul Galietto, Credit Suisse's head of equities sales – a key contact on the Archegos account – also left the bank before the end of the month.

213.    In order to "shore up capital", Credit Suisse announced that (1) it would suspend a share buyback program, (2) it would pay a reduced dividend through a mix of capital and retained earnings, (3) Mr. Gottstein and the rest of the executive board wouldn't receive any 2020 bonuses, and (4) Urs Rohner, the bank's longtime chairman who was set to retire, was giving up part of his pay.

214.     By April 8, 2021, Senator Sherrod Brown, Democratic chair of the U.S. Senate Banking Committee had written to several large banks, including Credit Suisse and Japan's Nomura – another of Archegos's Counterparties – asking them for information on their relationship with Archegos after the fund imploded the month before.  Senator Brown asked the banks' chiefs to detail how their institutions came to do business with Archegos.  Just a few days later, Federal Reserve Chairman Jerome Powell gave an interview with 60 Minutes where he commented on the Archegos collapse, stating "I think what really happened is that [Goldman Sachs, Morgan Stanley, Credit Suisse and Nomura] did understand the risks that they were running," and that the collapse was the result of a "risk management breakdown."  Chairman Powell also commented that the Federal Reserve was taking a close look at the situation to prevent it from happening again.

215.     The following day, on April 9, 2021, the *Wall Street Journal* reported that Credit Suisse "is now in full crisis mode" and that the bank's supervisory board "launched investigations into executives involved in decision making" and how "the bank pushed into risky trades that it couldn't easily exit."

216.     On April 12, 2021, a *New York Times* article disclosed that "[t]he S.E.C. has opened an informal inquiry into Archegos and the spillover effects of its collapse, which caused billions of dollars in losses at banks around the globe."

217.     On or around April 16, 2021, Defendant Morgan Stanley published its quarterly earnings report in which it acknowledged having taken a $911 million hit following Archegos's collapse. Facing questions from analysts during a conference call following the publication of the report, James P. Gorman ("Gorman"), Defendant Morgan Stanley's Chief Executive Officer, simply stated that the size of the loss was not material to the bank:

84

"[W]e were having a record quarter. The business was having a record quarter…The equities business where this resided was having a record quarter. So you've got to be at a level where it's material to the overall quarter . . . ."

218.    Gorman's nonchalance regarding Defendant Morgan Stanley's $911 million loss is perhaps less shocking when placed face to face with the revenues Defendant Morgan Stanley generated that same year – nearly $40 billion. In fact, even a nearly $1 billion loss didn't make Gorman doubt Defendant Morgan Stanley's role as the No. 1 prime broker in the world, stating "This is a gem of a business," "It's a core part and backbone of the equities business."

219.    In a letter dated April 17, 2021, hedge fund manager David Einhorn slammed the SEC for not noticing what he called the "real story" of the Archegos collapse, where the SEC should have noticed the unusual trading activity in Gaotu stock in its ongoing investigation of the company.

220.    Around April 21, 2021, Japan's finance minister indicated that the government was looking into the financial losses incurred by Nomura and Mitsubishi UFJ – both Archegos Counterparties – and that it would share information on the matter with the Bank of Japan and overseas authorities.

221.    On or around April 22, 2021, it was announced that Switzerland's financial regulator, the Financial Market Supervisory Authority, would "'investigate in particular [Credit Suisse's] possible shortcomings in risk management'" and that it would "'continue to exchange information with the competent authorities in the U.K. and the U.S.A.'"

222.    On May 6, 2021, the *Wall Street Journal* reported that the SEC "[wa]s studying potential new rules" notably related to Archegos's implosion.

223.    Archegos's meltdown was also raised by United States Senator Elizabeth Warren (D-Mass.) during the *Semiannual Testimony on the Federal Reserve's Supervision and Regulation of the Financial System* – U.S. Senate Committee on Banking, Housing and Urban Affairs, during

which she stated that "some of [the U.S.'s] biggest banks had loaned Archegos the money to make those bets – even though the hedge fund was managed by a guy who had already been charged with insider trading and banned by regulators from handling clients' money."

224.     On May 26, 2021, the DOJ announced that it was launching an investigation into the collapse of Archegos, sending requests for information to some banks that had worked with Archegos:

> Banks raced to sell off Archegos'[s] holdings in March after the family office made massive, highly leveraged bets on companies including ViacomCBS Inc. and was unable to meet margin calls as the positions soured. The episode contributed to losses for banks including Credit Suisse Group AG, Nomura Holdings Inc. and Morgan Stanley that had helped to finance the wagers through prime brokerage units, which lend money to hedge funds and other private investment firms.

> While authorities haven't accused Archegos or its banks of breaking any laws in their dealings, the episode has drawn public criticism from regulators, as well as some inquiries behind the scenes from watchdogs around the world.

*     *     *

> The Securities and Exchange Commission launched a preliminary investigation into Hwang in March, a person familiar with the matter said at the time. The agency has since explored how to increase transparency for the types of derivative bets that sank the firm.

> And in the U.K., the Prudential Regulation Authority has been asking firms including Credit Suisse, Nomura and UBS Group AG to hand over information related to their lending to Archegos, people familiar with the matter have said.

225.     By June 24, 2021, a *Bloomberg* article reported that the DOJ was specifically examining how global banks handled multibillion-dollar trades with Archegos:

> The Justice Department's antitrust division is handling at least part of the probe into the collapse of Bill Hwang's firm **after lenders rushed to liquidate souring positions in March**, according to people familiar with the matter. The debacle also erased much of the billionaire owner's fortune and saddled banks with more than $10 billion in losses.

> The division has been seeking information from Hwang's biggest backers on Wall Street, who had discussed the possibility of moving in concert to unwind the

portfolio and sever ties with his busted family office, the people said, asking not to be identified because they aren't authorized to discuss the inquiries.

[Emphasis added].

226.    On July 29, 2021, Credit Suisse announced that it "ousted nine executives and recouped about $70 million in pay, including bonus claw-backs, as it punished 23 people in all for their role in the scandal."

227.    Also on July 29, 2021, the Special Committee of Credit Suisse's' Board of Directors published the *Report on Archegos Capital Management* (the "Report") which "seeks to explain *what* happened with Archegos, *why* and *how* it happened." [Emphasis in original].

228.    The Report concludes that the losses sustained by Credit Suisse "are the result of a fundamental failure of management and control in [Credit Suisse's] Investment Bank and, specifically, in its Primes Services business." Nonetheless:

> ***There were numerous warning signals***—including large, persistent limit breaches— indicating that Archegos's concentrated, volatile, and severely under-margined swap positions posed potentially catastrophic risk to [Credit Suisse].
>
> \*        \*        \*
>
> The Archegos default exposed several significant deficiencies in [Credit Suisse's] risk culture, revealing a Prime Services business with a lackadaisical attitude towards risk and risk discipline; a lack of accountability for risk failures; risk systems that identified acute risks, which were systematically ignored by business and risk personnel; and a cultural unwillingness to engage in challenging discussions or to escalate matters posing grave economic and reputational risk.

[Emphasis added].

229.    The Report notes the presence of "numerous red flags" notably "relating to the size, concentration, and liquidity of Archegos's portfolio" and states that concerns had escalated within Credit Suisse's Credit Risk Management as to the fact that "Archegos's concentrated positions with [Credit Suisse] were ***likely also spread across its other prime brokers***", namely Defendant

Morgan Stanley, Defendant Goldman Sachs, Deutsche Bank (BNP Paribas), Jefferies, Nomura,

Wells Fargo, and UBS. In fact:

> **[T]he business was "keenly aware" that Archegos was also doing business with other prime brokers across the Street** and that a "sudden" margin increase could "result in irreversible damage to the client relationship."
>
> *    *    *
>
> Throughout 2020, as discussed below, Archegos's trading bias inverted and the fund became substantially long-biased; it persistently breached its [potential exposure] and scenario limits; its leverage increased substantially (from 3-4x to 6x); its concentration increased; and **it confirmed to [Credit Risk Management] (as it had represented over the years) that its positions with its other prime brokers largely mirrored the positions it held with [Credit Suisse]** —which compounded the concentration risk of Archegos's portfolio with [Credit Suisse].

[Emphasis added].

230.    The Report also details Archegos's portfolio collapses during the week of

March 22, 2021, and describes the discussions that ensued between Archegos's Counterparties,

including Defendants Morgan Stanley and Goldman Sachs:

> On the evening of March 25, Archegos held a call with its prime brokers, including [Credit Suisse]. On the call, Archegos informed its brokers that, while it still had $9 to $10 billion in equity (a decrease of approximately $10 billion from its reported equity the day before), it had $120 billion in gross exposure ($70 billion in long exposure and $50 billion in short exposure). Archegos asked the prime brokers to enter into a standstill agreement, whereby all of the brokers would agree not to default Archegos, while Archegos wound down its positions. […]
>
> On the morning of March 26, [Credit Suisse] was approached by Archegos and told that **Goldman was organizing block sales of certain ADR positions** and invited [Credit Suisse] to participate. [Credit Suisse] ultimately participated in three such Goldman-led block trades, selling shares in Baidu, Tencent, and Vipshop Holdings. **In these trades, Goldman did not disclose to [Credit Suisse] the number of shares it was putting up in the block**, and there was no agreement with Goldman as to which broker's shares were being sold first and/or how the sales would be distributed. Apart from the block, [Credit Suisse]engaged in algorithmic trading that day, aiming to stay within 2-3% of average daily volume. Ultimately, [Credit Suisse]sold just over $3 billion notional on March 26, approximately $1.27 billion of which was sold in the Goldman-led block sales.

***Archegos and its prime brokers, including [Credit Suisse], Morgan Stanley, Goldman, Nomura, UBS, Wells Fargo, and Deutsche Bank, had another call on Saturday, March 27.*** On the call, Archegos again tried to orchestrate a forbearance agreement with its lenders whereby Archegos would manage liquidating its positions rather than leaving each bank to do so individually.

Archegos then exited the call and its prime brokers remained on the line. The possibility of a managed liquidation without Archegos was discussed, whereby Archegos's prime brokers would send their positions for review to an independent counsel, government regulator, or other independent third-party, who would freeze holdings for the entire consortium when the aggregate concentration reached particular levels, and give the lenders a percentage range within which they would be permitted to liquidate their overlapping positions. General counsel of the various banks and outside legal counsel were engaged to work through any regulatory and legal challenges, and counsel attended all calls.[133]

Ultimately, several banks including Deutsche Bank, Morgan Stanley, and Goldman determined that they were not interested in participating in a managed liquidation, while [Credit Suisse], UBS, and Nomura remained interested.

On Sunday, March 28, [Credit Suisse] entered into a managed liquidation agreement with UBS and Nomura. Pursuant to this agreement, [Credit Suisse] participated in block sales of overlapping positions on April 5 and 14, 2021, liquidating approximately $3 billion and $2.2 billion, respectively, on those dates.[134] Otherwise, [Credit Suisse] liquidated its other historic Archegos positions through open-market, algorithmic trading. As of April 22, 2021, [Credit Suisse] had liquidated 97% of its Archegos exposure.

––––––––––––––––––––––––––––––

[133] Indeed, internal counsel from the various prime brokers held a call among themselves earlier that day, agreeing that lawyers would be present on any calls between the brokers, and that the lawyers would read a script on each call ***making clear that no broker was permitted to disclose its Archegos-related positions.***

[134] The stocks sold in these trades were Vipshop Holdings, ViacomCBS, Farfetch, Texas Capital Bancshares Inc., IQIYI, Discovery (Series A), and Discovery (Series C).

[Emphasis added].

231.    With regard to Archegos's "highly concentrated" swap positions, the Report states

the following:

> And while CRM had access to non-public information from Archegos that revealed that ***Archegos had additional concentrated exposure to the same single-name positions across the Street*** as it did at [Credit Suisse]— thus substantially increasing Archegos's counterparty risk—[Credit Risk Management] failed to insist on additional disclosure from Archegos to assess the extent of this risk or to escalate the information it did have,

including at the March 2021 [Credit Suisse Investment Bank Counterparty Oversight Committee] meeting.

\*      \*      \*

[Credit Suisse] was in such a rush to complete the migration [of Archegos to Credit Suisse International] before the end of the year, that the Head of [Prime Services Risk] agreed to give up multiple then-standard contractual terms, including one that would require Archegos to represent, in connection with any trade, that it did not hold beneficial ownership (whether in stock or through swaps) amounting to 10% of the outstanding shares of an issuer. Instead, the [Credit Suisse International] agreement carried over the term from the [Credit Suisse Securities (Europe) Ltd.] agreement *where the beneficial ownership representation was capped at 20%.*

\*      \*      \*

*The business knew that Archegos's portfolio was highly concentrated*. For instance, by April 2020, Archegos's top five long positions represented approximately 150% of its NAV.

\*      \*      \*

Nonetheless, also on February 19, the [Credit Risk Management] analyst covering Archegos escalated the same concern that the [Prime Services Risk] analyst had elevated to the [Prime Services Risk] Head the day before: namely, that *Archegos's concentrated positions with [Credit Suisse] were likely also spread across its other prime brokers*. The [Credit Risk Management] analyst told his supervisors that, while Archegos refused to answer specific questions about its holdings at other prime brokers, Archegos had told him that, "as they leg in to positions, they ideally prefer to do so pro rata across their core [prime brokerage] providers," including [Credit Suisse], although that was not always accomplished. The [Credit Risk Management] analyst noted that [Credit Suisse]*"should assume that [Archegos] potentially ha[d] additional exposure" on the same large, concentrated names "away from [Credit Suisse]."*

\*      \*      \*

Discussion [at the March Credit Suisse Investment Bank Counterparty Oversight Committee meeting] also highlighted Archegos's "[s]ingle issuer concentration," including a $3.3 billion position *representing "more than 8% outstanding float* (next five largest are in the range of USD 1.2bn to USD 1.5bn)."

[Emphasis added].

90

232.    In view of the foregoing, the Report concludes that there were warning signs that Archegos had significantly increased its exposures to a handful of stocks.  As *Barron's* reported in an article published a few months after the release of the Report:

> Risk managers at most prime brokers probe a fund's financials unsparingly, in the experience of the fund veteran. Trading credit is hard to get without documenting a fund's exposures, the manager says. Credit Suisse's investigation into its Archegos losses concluded that its **risk managers should have spotted clues of undue risk**.

> [Emphasis added].

233.    After having performed its own risk analysis of Archegos, the ESMA arrived at a similar conclusion, specifically that:

> [T]hat in early 2021 — two months before its demise — there were warning signs that Archegos had substantially increased its exposures to a handful of stocks, making it highly vulnerable to adverse market developments related to these shares.

234.    On August 9, 2021, a *Bloomberg News* article revealed that:

> The Department of Justice has been moving ahead with a probe into the blowup. At least one line of questioning has revolved around the communication between Hwang's top associate Andy Mills and the lenders, and whether he may have misled them in the week of the crash, according to a person interviewed by prosecutors.

> "The assertion that Andy Mills or anyone at Archegos misled the banks during the week of March 22 is untrue in every respect," a spokesman for Archegos said.

235.    In an article published on September 22, 2021, the *Wall Street Journal* described Archegos as "one of the biggest international financial disasters in a generation, unleashing sudden losses on banks in Switzerland, the U.S. and Japan."

236.    A few days later, in a September 24, 2021 speech, SEC Commissioner Caroline A. Crenshaw discussed the Archegos collapse as "a reminder of the potential damage such swaps could inflict when used for speculative purposes."

237.    By October 8, 2021, the SEC had served Archegos with a subpoena and announced its investigation of Archegos, probing the firm's trading activity, including whether it engaged in

market manipulation and/or concealed the size of its bets on public companies. The SEC also scrutinized whether Archegos bought multiple stakes in the same companies across several banks to avoid triggering public disclosure rules.

238.    On October 12, 2021, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired common stock of Vipshop, a leading online retailer for brands in China. The complaint alleges that Defendants Morgan Stanley and Goldman Sachs collectively avoided billions in losses by selling Vipshop shares while in possession of material non-public adverse information.

239.    On October 20, 2021, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired ADSs of Gaotu, a leading online discount retailer for brands in China. The complaint alleges that Defendants Goldman Sachs and Morgan Stanley collectively avoided billions in losses by selling Gaotu ADSs while in possession of material non-public adverse information.

240.    On October 26, 2021, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired ADSs of Tencent, a leading online music and audio entertainment platform in China. The complaint alleges that Defendants Goldman Sachs and Morgan Stanley collectively avoided billions in losses by selling Tencent ADSs while in possession of material non-public adverse information.

241.    On October 29, 2021, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired common stock of ViacomCBS, a leading global media and entertainment company. The complaint

alleges that Defendants Goldman Sachs and Morgan Stanley collectively avoided billions in losses by selling ViacomCBS shares while in possession of material non-public adverse information.

242.    On November 15, 2021, a *Bloomberg News* article announced that "French lender [BNP Paribas SA] last week agreed to take on the hedge fund clients of Credit Suisse Group AG after the Swiss bank decided to exit the so-called prime brokerage business in the wake of $5.5 billion in losses from a single relationship" and that "Nomura Holdings Inc. stopped offering cash prime brokerage services in the U.S. and Europe after also losing billions of dollars in the Archegos blowup."

243.    On November 24, 2021, the U.S. Federal Reserve Board announced that "it found weak practices in banks with exposure to the $10 billion default of Archegos Capital Management earlier this year."  Specifically:

> Providing a glimpse of its regulatory activities of major banks such as JPMorgan Chase & Co. (JPM), Wells Fargo & Co. (WFC), Goldman Sachs Group Inc. (GS) and Bank of America (BAC), the Fed[eral Reserve] said it would focus on trading and counterparty risk management, including areas such as concentrations, hedging and client leverage.

244.    Approximately a week later, on November 30, 2021, *Bloomberg* announced that Defendant Morgan Stanley had placed Passi on leave.  While Defendant Morgan Stanley did not at the time specify the reasons behind this decision, it acknowledged – a few months later – that Passi was put on leave "as U.S. authorities [were] examining [his] involvement . . . in block trades as part of an investigation into whether banks improperly alerted certain clients to market-moving transactions."

245.    On December 2, 2021, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired ADRs of IQIYI, a leading online discount retailer for brands in China.  The complaint alleges that

Defendants Goldman Sachs and Morgan Stanley collectively avoided billions in losses by selling

IQIYI ADRs while in possession of material non-public adverse information.

246.    On December 9, 2021, a *Bloomberg News* article announced:

The U.S. Securities and Exchange Commission plans next week to release its plan for scrutinizing the kinds of complex stock derivatives transactions that fueled the collapse of Bill Hwang's Archegos Capital Management.

The SEC will propose new rules that mark the agency's biggest policy response yet to the Archegos debacle that blindsided the regulator earlier this year. The blow-up exposed the lack of visibility the Wall Street regulator has into security-based swaps transactions despite being required by Congress in 2010 to oversee the asset class.

\*    \*    \*

According to a notice on the SEC's website, the agency on Dec. 15 will consider:

- Re-proposing a rule to prohibit fraud and manipulation tied to security-based swaps
- New rules focused on the conduct of chief compliance officers for security-based swaps dealers and major traders
- Requiring reporting of large security based swaps positions

\*    \*    \*

In addition to the new derivatives rules, the agency is also planning to consider a slate of rules focused on money markets, stock buyback disclosures and insider trading.

247.    The next day, on December 10, 2021, the Federal Reserve issued Supervision and

Regulation Letter ("SR") 21-19 reminding "firms of safe and sound practices for counterparty

credit risk management in light of the Archegos Capital Management Default," stating:

The Federal Reserve is concerned with practices where, both at the inception of a fund relationship and, on an ongoing basis during periodic credit reviews, firms accept incomplete and unverified information from the fund, particularly with regard to the fund's strategy, concentrations, and relationships with other market participants. These concerns are heightened where a fund client has a history of concentrated positions and losses. More generally, ***these practices represent insufficient due diligence and may be inconsistent with safe and sound banking practices***.

The Federal Reserve also is reminding firms that poor communication frameworks and inadequate risk management functions, as well as fragmented systems and ineffective governance, hamper their ability to identify and address risk.

Finally, the Federal Reserve is concerned that firms may agree to margin terms inappropriate to their investment fund clients, failing to provide for adequate margin levels or sufficient risk-sensitivity. Contractual terms that prevent a firm from improving its margin position or closing out positions quickly if a fund misses margin calls, even when presented with an increasing risk profile at the fund, may be inconsistent with safe and sound practices.

[Emphasis added].

248.   On December 12, 2021, the Bank of England wrote a letter discussing the Archegos default, detailing that the Prudential Regulation Authority ("PRA"), Financial Conduct Authority ("FCA"), and other global regulators had reviewed and assessed firm's equity finance business, including those who were counterparties to Archegos, focusing particularly on counterparty risk management.  The Bank of England required a systematic review of equity finance businesses for submission to the PRA and FCA together, with detailed plans for remediation by the end of the first quarter of 2022.

249.   On December 15, 2021, the SEC proposed a slate of new rules to "to prevent fraud, manipulation and deception in connection with security-based swaps, to prevent undue influence over the chief compliance officer (CCO) of security-based swap dealers and major security-based swap participants (SBS Entities), and to require any person with a large security-based swap position to publicly report certain information related to the position."

250.   As indicated in a *Bloomberg* article published that same day, "[t]he proposal represents the SEC's first major policy response to Archegos'[s] breakdown in March, which triggered the sales of billions of dollars in equities and steep losses for major Wall Street firms involved in Hwang's trades."

251.   On December 16, 2021, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired

common stock of Baidu, a Chinese multinational technology company specializing in Internet-related services and products and artificial intelligence. The complaint alleges that Defendants Goldman Sachs and Morgan Stanley collectively avoided billions in losses by selling Baidu shares while in possession of material non-public adverse information.

252.    On January 7, 2022, a securities class action was instituted against Defendants Goldman Sachs and Morgan Stanley on behalf of all those who purchased or otherwise acquired Class A or Class C common Stock of Discovery, a mass media factual television conglomerate based in New York City. The complaint alleges that Defendants Goldman Sachs and Morgan Stanley collectively avoided billions in losses by selling Discovery shares while in possession of material non-public adverse information.

253.    On January 17, 2022, Credit Suisse announced that Chairman Antonio Horta-Osario resigned after a mere nine months in this new role.

254.    A few days later, on January 25, 2022, Credit Suisse announced that it is expected to post a loss in 4Q2021. More specifically, Credit Suisse indicated that:

> [T]he reported profits for the fourth quarter 2021 will be negatively impacted by litigation provisions of approximately CHF 500 million, partly offset by gains on real estate sales of CHF 225 million. These litigation provisions have been incurred in respect of a number of cases where the Group has more proactively pursued settlements and primarily relate to legacy litigation matters from our investment banking business. Before deduction of the already announced approximately CHF 1.6 billion goodwill impairment for the Group, of which approximately CHF 1.5 billion in the Investment Bank division and approximately CHF 0.1 billion in the Asia Pacific division, this is expected to result in a reported pre-tax income/(loss) for the Group of approximately breakeven for the fourth quarter 2021

255.    Credit Suisse further reported "that it will post a loss in its investment bank as it exits the business with hedge funds and trading conditions normalize."

256.    On February 4, 2022, the Financial Stability Oversight Council, charged with "identifying risks to the financial stability of the United States; promoting market discipline; and responding to emerging risks to the stability of the United States' financial system," referred to

Archegos's meltdown as an example of why it "supports [its] Hedge Fund Working Group's efforts to establish an interagency risk monitoring system to identify potential emerging financial stability risks posed by hedge funds . . . and to consider options to mitigate the risks it has identified." While not in and of itself a hedge fund, Archegos employed leveraged strategies similar to those used by hedge funds.

257. On February 10, 2022, a *Finews* article announced that Credit Suisse "registered a pre-tax loss of 522 million Swiss francs ($565 million) in 2021" and "nearly quadrupled credit loss provisions with 4.3 billion Swiss francs attributable to Archegos."

> In its press release dated that same day, Credit Suisse reported that net revenue fell in its investment bank, by around 31%, from pulling back on risk and exiting prime service, the unit responsible for lending to Archegos: Our Investment Bank's reported net revenues of USD 1.6 bn were down 31% year on year, reflecting our strategy to reduce capital and risk across our businesses and more normalized trading conditions, particularly in Fixed Income. IB reported results included a charge of USD 1.7 bn relating to a goodwill impairment.

258. On February 14, 2022, the *Wall Street Journal* first reported that federal investigators "[were] probing the business of block trading on Wall Street, examining whether bankers might have ***improperly tipped*** hedge-fund clients in advance of large share sales." [Emphasis added].

259. By February 16, 2022, federal investigators began focusing on trades carried out a day before the wider sell-off wiped out $35 billion from the value of Archegos's holdings. That led to a wider inspection of multiple trades brought to market by Defendant Morgan Stanley, and whether its clients illegally profited from trading in advance of those transactions as well as scrutiny of Passi. This was part of a larger sweep of financial institutions, where subpoenas asked about particular block trades, including some going back to 2019.

260.    That same day, *Bloomberg* reported that Credit Suisse was trying to help the DOJ "build a case related to block trading against rivals Morgan Stanley and Goldman Sachs".  The article goes on to add:

> Bloomberg reported last year that Credit Suisse, facing significant exposure, pushed for an agreement to hold off on rapidly unwinding the family office's portfolio. But the effort failed, and Credit Suisse was caught flat-footed ***as Morgan Stanley and Goldman Sachs moved faster to extinguish their exposures, setting off further price declines that spelled pain for banks left behind***.

> [Emphasis added].

261.    Also on February 25, 2022, a *Financial Times* article revealed that the China Securities Regulatory Commission "ordered Morgan Stanley to provide it with information on a US investigation into its block trading business."  China's securities regulator said it "was aware the US Securities and Exchange Commission had issued subpoenas to [Defendant] Morgan Stanley 'and other institutions' requesting data on block transactions" and asked Defendant Morgan Stanley to "'explain' reports about the SEC investigation."

262.    On March 1, 2022, the *Financial Times* reported that Archegos and global banks were discussing a potential out-of-court settlement to avoid a legal battle that would expose details of the deals that led to Archegos's implosion a year ago:

> The talks to agree a truce come as financial watchdogs and the Department of Justice in the US have expanded a wide-ranging probe into apparent irregularities in Wall Street's lucrative practice of marketing large blocks of shares.

> Authorities are examining whether banks broke rules when they negotiated the 'block trades' — the private sale of large quantities of shares to hedge fund clients — including during the failure of Archegos last year.

> Morgan Stanley, which was heavily exposed to Archegos and was among the first to put large blocks of shares it held on behalf of the investor up for sale, disclosed last week that the Securities and Exchange Commission had been examining the bank's block trading business since 2019 and that the Department of Justice recently launched its own investigation.

Six banks that provided services through their prime brokerage or trading divisions to Archegos — Credit Suisse, Nomura, Morgan Stanley, UBS, MUFG and Mizuho — lost around $10bn when they liquidated the family office's positions in US-listed companies such as ViacomCBS after Archegos failed to meet margin calls.

Morgan Stanley and Goldman Sachs, which was a prime broker to Archegos but has said it incurred no material losses from the collapse, sold roughly $19bn in big block trades in one day. The banks had purchased and held those shares themselves as part of swap trades they executed for Archegos.

263.    The following day, on March 2, 2022, a *Bloomberg* article revealed that amid scrutiny from federal investigators on block trades, "Goldman Sachs Group Inc. is pulling back from at least one money manager [*i.e.*, Islet Management] whose communications have drawn interest from authorities."

264.    On March 24, 2022, a *Bloomberg* article announced that Arnaud Blanchard, Defendant Morgan Stanley's global capital markets business chief operating officer since 2018, would replace Passi as head of Americas equity syndicate.

265.    As reported by *Bloomberg*, by then, "all across Wall Street the knives [were] out for Morgan Stanley."

266.    On April 5, 2022, the *Wall Street Journal* revealed that "[i]nsiders at companies based in China but listed on a U.S. exchange avoided at least $10 billion in losses on trades made between 2016 and mid-2021 by selling stock ahead of significant price declines." Among these insiders are top executives at IQIYI and Vipshop, who respectively sold $125 million and more than $250 million worth of stock thereby avoiding market price drops over the next few months.

267.    On April 27, 2022, the DOJ announced the unsealing of an indictment charging Hwang and Halligan with racketeering, conspiracy, securities fraud, and wire fraud offenses in connection with interrelated schemes to unlawfully manipulate the prices of publicly traded securities in Archegos's portfolio.

268.    The DOJ also announced the unsealing of Becker's and Tomita's guilty pleas in connection with their participation in the conspiracy.

269.    Prior to describing Archegos's unlawful trading schemes, the indictment sets forth Archegos's deliberate efforts to avoid disclosure requirements under the Exchange Act:

> Typically, Archegos would initially establish its investments in cash equities, until it approached 5% ownership of all outstanding stock of the security. [Tomita and Becker] understood that ownership in excess of that amount could trigger certain public disclosure requirements. Accordingly, in order to avoid public disclosure of its positions, once Archegos neared 5% ownership of the outstanding shares of a stock, . . . [Hwang] . . . required that any additional exposure be through a financial agreement known as a total return swap.

270.    The indictment then alleges that in furtherance of Archegos's mission to "control the price and artificially increase the value of securities in [its] portfolio", Archegos employed various trading schemes.

271.    First, Archegos would establish "significant market influence" in the securities it held in its portfolio.   More specifically, around spring 2020, Archegos began amassing "extraordinary exposure" in the handful of securities it held in its portfolio "through billions of dollars in purchases made with money borrowed" from its Counterparties.  In fact:

> By in or about mid-July 2020, [Archegos] amassed economic exposure in excess of $1 billion to BIDU, GSX, IQ, and VIAC; by the end of 2020, [Archegos] had more than $1 billion of exposure to each of those four stocks as well as DISCA, FTCH, TME, and VIPS. Between mid-November 2020 and late March 2021, [Archegos] established positions exceeding $5 billion in eight different stocks, including more than $10 billion in GSX, BIDU, and TME, respectively, and more than $20 billion in VIAC.

272.    The indictment alleges that Hwang, and thereby Archegos, knew that its "positions became so large that they significantly altered the shareholder composition of the companies in which it most heavily invested."

273.    Second, Archegos "utilized trading strategies to affect market price" of the securities it held.  Archegos's "extraordinarily large positions" combined with repeated trades readily allowed it to manipulate the price of these securities. For example:

a.    During the course of its scheme, Archegos traded in the same stocks in large quantities day after day, and commonly and consistently directed its traders to raise limit prices, or the highest price they would pay for the stock, as the prices of the stocks rose – Archegos's objective being to drive up the price of these stocks.

b.    Archegos would also buy heavily to "defend" the price of securities facing negative press or market movements.  As its portfolio became more concentrated, Archegos traded with the further purpose of propping up the stock price to avoid margin calls – which due to the extraordinary concentration of Archegos's portfolio, might trigger the collapse of its positions.

c.    Archegos also traded securities in amounts far exceeding volumes known within the securities industry to affect market prices.  Specifically, Archegos, through Hwang and Tomita understood that buying or selling more than approximately 10-15% of a day's total trading volume of a given stock would likely affect the market price in the stock.  Archegos routinely directed its traders to execute trades in excess of these volumes.

274.    To illustrate the point above, the indictment notably provides the following examples:

- In [Discovery Class A], between November 2020 and March 2021, Archegos routinely accounted for more than 20% of the entire volume of the stock traded on the given day. In December 2020, Archegos averaged more than 20% of the trading volume on a daily basis. Between early November and early January 2021, Archegos exceeded 30% of daily

volume on approximately nine days, and exceeded 35% on approximately four days.

- In [ViacomCBS], between October 2020 and March 2021, Archegos routinely accounted for more than 10% of the entire daily traded volume of the stock. Indeed, in February and March 2021, Archegos averaged more than 10% of the trading volume on a daily basis. In that period, Archegos exceeded 15% of daily volume on approximately 10 of 40 trading days, and exceeded 25% on approximately four days.

275.    Third, Archegos "employed manipulative strategies to maximize price impact and market power."  In particular:

> [Hwang] influenced the prices of stocks by utilizing manipulative and deceptive trading techniques such as purchasing or selling securities at particular, strategic times of day; transacting in certain securities in large amounts or high volume; and timing or coordinating certain transactions to maximize impact on the market.

276.    Also on April 27, 2022, the SEC and the CFTC each filed parallel civil actions related to the Archegos collapse.  The SEC complaint asked the court for permanent injunctive relief, return of allegedly ill-gotten gains, and civil penalties against Archegos, while also seeking to bar the individual defendants in its complaint from serving as public company officers or directors.  The SEC stated that its investigation remained ongoing.  The CFTC, in addition to the requests made by the SEC, asked for restitution for the defrauded swap counterparties, permanent registration and trading bans, and permanent injunctions against further violations of the Commodity Exchange Act and CFTC regulations.

277.    As indicated in the SEC Complaint:

> 30. ***To avoid reporting thresholds under Section 13(d) of the Exchange Act***, when Archegos approached stock holdings representing 5% of the shares outstanding of any particular issuer, it would generally ***shift from purchasing cash equity positions in that issuer to purchasing synthetic exposure to the issuer through SBSs***.

> 31. Becker circulated to Hwang and others internally a daily report that tracked Archegos's cash equity positions in each issuer it held relative to the issuer's outstanding shares ***to ensure that Archegos never exceeded the 5% beneficial ownership disclosure threshold***.

102

[Emphasis added].

278.    The SEC Complaint further alleges that Archegos, "through Hwang's decisions and

Tomita's trading to execute on those decisions," engaged in manipulative trading:

> 43. Significantly, ***Archegos exercised domination over the market of certain issuers' securities***. When considering its cash equity and SBS positions cumulatively, Archegos held massive exposures to its Top 10 Holdings.
>
> 44. During the Relevant Period [*i.e.,* from at least September 2020 through March 2021], Archegos, at Hwang's direction, added ***staggering levels of exposure day-over-day***, equating to a substantial number of shares, while entering orders providing for trading at volumes that demonstrated the goal to artificially impact the market.
>
> 45. Archegos, at Hwang's direction, also traded in other ways with the intent to ***inject false information into and manipulate the market*** in its largest holdings.
>
> 46. It purposefully engaged in series of transactions and trading activity (1) in the pre- market, to "set the tone," where liquidity was low; (2) during the day, by bidding up prices; and (3) in the last 30 minutes of the trading day, when maximum impact could be achieved on closing price or to "mark the close." These efforts were intended to enhance the share price of the Top 10 Holdings at strategically important moments in order to induce others to purchase securities, to stave off price drops, or to enhance end of the day pricing including for margin purposes.
>
> 47. It also entered into other non-economic transactions, including among others transactions solely intended to maintain certain prices and to counteract selling pressure.
>
> [Emphasis added].

279.    With regard to Archegos's dominance over the market of its top 10 holdings, the

SEC Complaint states that:

> [B]y late March 2021, Archegos's cumulative cash equity and derivative SBS exposures to the following issuers equated to the following percentages of outstanding shares, based on Archegos's estimate of those issuers' floats:
>
> - GSX Techedu Inc. ("GSX") – Over 70% of outstanding shares;
> - Discovery Class A – Over 60% of outstanding shares;
> - IQIYI Inc. – Over 50% of outstanding shares;
> - ViacomCBS – Over 50% of outstanding shares;
> - Tencent Music Entertainment Group ("Tencent") – Over 45% of outstanding shares; and

- Discovery Class C – Over 30% of outstanding shares.

280.    Archegos would then trade "the equities of and [security-based swaps] referencing its [t]op 10 [h]oldings on numerous days and sometimes week-after-week, typically at large volumes." In fact:

> 63. During the Relevant Period, and particularly from January through March 2021, Archegos's trading of the equities of and SBSs referencing its Top 10 Holdings frequently exceeded 20%, often reached 30%, and even surpassed 40% of certain issuers' daily trading volume.
>
> *        *        *
>
> 67. Such percentages of an issuer's daily trading volume applied upward pressure on those issuers' share prices.
>
> 68. And, Hwang and Tomita knew that trading in large volumes on a given day –at percentages of more than 10% to 15% of the daily trading volume of a specific issuer – would create upward pressure on the share price and often result in the share price increasing.
>
> 69. In fact, the share prices of a number of the Top 10 Holdings experienced price spikes during the Relevant Period, increasing to artificial levels that were not sustained after Archegos's collapse in late March 2021.
>
> 70. For example, ViacomCBS's share price rose to around $40 in early January 2021, to around $55 in late January 2021, and to around $70 in early March 2021. Then, its share price rose to over $80 on March 10 and to over $94 just two days later on March 12, spiking all the way to $100 on March 22. That is, ViacomCBS's share price increased approximately 150% in less than three months, with a lack of publicly available information that would support such a share price increase.
>
> *        *        *
>
> 73. These price movements ran in dissimilar fashion to the general market at the time. For example, the share price spikes of Discovery Class A and C shares and ViacomCBS are not correlated with the price of the NASDAQ-100 index (as reflected in Invesco QQQ Trust, an exchange-traded fund that tracks that index).

281.    According to the SEC Complaint, Archegos also engaged in "other manipulative and non-economic ways to impact the markets of its Top 10 holdings":

> 76. Archegos, as directed by Hwang, timed some of its trading to maximize market impact, engaging in both pre-open trading, as well as trading during the last 30 minutes of the trading day, particularly from January to March 2021.

77. Archegos engaged in series of transactions prior to market open with manipulative intent and for the purpose of "setting the tone" for the trading day, that is, pushing the share prices of certain issuers, in which Archegos held long exposures, upward. Hwang's goal, executed by Tomita, was to induce other traders, such as short sellers or other market participants, to observe active trading in and upward price movement of the share prices of certain issuers and, as a result, purchase those issuers' securities during the day.

78. From January to March 2021, ViacomCBS was the issuer that was included in Archegos's Top 10 Holdings, in which Archegos did the largest amount of pre-open trading. Specifically, Archegos traded ViacomCBS pre-open nineteen times, including two days when orders exceeded the equivalent of 1 million shares, and on every trading day but one, from March 5 to 19.

79. Archegos also engaged in substantial trading during the last 30 minutes of the trading day – that is, "marking the close" – to again push the stock prices of certain issuers, in which Archegos held long exposures, upward. The goal was that the upward movement in stock prices would lead to an increase in margin on Archegos's SBSs, which was based on end of day valuations, thereby providing Archegos with even more leverage to purchase more exposure to the same issuers the next day, among other reasons.

80. From January to March 2021, Archegos did substantial trading in Baidu Inc. ("Baidu") during the last 30 minutes of the trading day. Specifically, from January 25, 2021 to March 23, 2021, Archegos traded Baidu during the last 30 minutes during the majority of trading days, including 22 days when orders exceeded the equivalent of over 100,000 shares (with dollars exceeding $29 million on each of those days), and four days when orders exceeded the equivalent of over 500,000 shares (with dollars exceeding $136 million on each of those days).

81. From January to March 2021, Archegos also did substantial trading in Tencent during the last 30 minutes of the trading day. Specifically, from January 6, 2021 to March 23, 2021, Archegos traded Tencent during the last 30 minutes during the majority of trading days, including 34 days when orders exceeded the equivalent of over 100,000 shares (with dollars exceeding $2 million on all of those days), 15 days when orders exceeded the equivalent of over 500,000 shares (with dollars exceeding $12 million on all of those days), and five days when orders exceeded the equivalent of over 1,000,000 shares (with dollars exceeding $30 million on all of those days), including a high of over 1.76 million shares.

*       *       *

83. In addition, Archegos traded in other non-economic ways, specifically, at times trading simply to counteract selling pressure or to otherwise maintain share prices.

84. One example of this sort of non-economic trading occurred in December 2020. Tomita messaged among others, Hwang, that "someone came and hit FTCH down

fifty cents to $55.00. Not huge volume but we stepped it up." At the end of that trading day, Archegos had exposures equivalent to over 27 million shares of Farfetch, and, given the leverage of the position, a price decrease could have significantly increased the amount of margin that Archegos needed to post with Counterparties.

282.    In light of the foregoing, it is not surprising that several hedge fund managers told a *Barron's* journalist that they wonder whether a trial against Hwang and Halligan would show "that Wall Street brokers were making so much money from Archegos that the brokers ignored the obvious risks until Hwang's concentrated bets crashed":

> "Good for the Justice department and the SEC in going after Hwang," says a longtime hedge fund manager who has done business with most of the prime desks named in the indictment. ***"But did the bankers know? They had to know."***

[Emphasis added].

## IV.    DEFENDANTS MORGAN STANLEY AND GOLDMAN SACHS'S ILLICIT INSIDER TRADING

283.    As alleged herein, Defendants Morgan Stanley and Goldman Sachs committed fraudulent insider trading in violation of Sections 10(b), 20(A), and 20(a) of the Exchange Act and U.S. Securities and Exchange Commission Rule 10b-5(a) and (c), promulgated thereunder. Specifically, Defendants Morgan Stanley and Goldman Sachs employed a manipulative and deceptive device, scheme, and artifice to defraud that operated as a fraud and deceit by means of directly trading, in the securities of the Issuers, while in possession of MNPI obtained from Archegos and in breach of duties owed both to Archegos and to the shareholders of the Issuers.

### A.    Defendants Morgan Stanley and Goldman Sachs Owed Duties to Archegos – Misappropriation

284.    Defendants Morgan Stanley and Goldman Sachs owed duties of confidence to Archegos pursuant to written and other express agreements governing the prime brokerage, margin lending, and other brokerage-client relationships entered into between each of Defendants Morgan Stanley and Goldman Sachs with Archegos.  Pursuant to these express agreements, Defendants

Morgan Stanley and Goldman Sachs agreed to keep the MNPI alleged herein confidential and non-public, and thus Defendants Morgan Stanley and Goldman Sachs owed a duty to Archegos both to keep that MNPI confidential and non-public and to refrain from trading in the securities of the Issuers while in possession of such MNPI obtained from Archegos.

285.    Defendants Morgan Stanley and Goldman Sachs also owed duties of confidence to Archegos based on the parties' history, pattern, practice, course of dealing, or relationship with regard to the prime brokerage, margin lending, and other brokerage-client relationships, services, and transaction between each of Defendants Morgan Stanley and Goldman Sachs and Archegos. Pursuant to their history, pattern, practice or relationship, Defendants Morgan Stanley and Goldman Sachs had historically kept confidential and non-public the type of MNPI herein alleged to have been obtained from Archegos.  Based on that history, pattern, practice, course of dealing, or relationship, Defendants Morgan Stanley and Goldman Sachs knew or reasonably should have known or that Archegos did and would expect that Defendants Morgan Stanley and Goldman Sachs would maintain the confidentiality of the MNPI obtained from Archegos as alleged herein. Thus, Defendants Morgan Stanley and Goldman Sachs owed a duty to Archegos both to keep such MNPI confidential and non-public and to refrain from trading in the securities of the Issuers while in possession of such MNPI obtained from Archegos.

286.    Defendants Morgan Stanley and Goldman Sachs also owed duties of confidence to Archegos based on their own corporate policies and practices with regard to the prime brokerage, margin lending, and other brokerage-client relationships, services, and transaction between each of Defendants Morgan Stanley and Goldman Sachs and Archegos.  Pursuant to their own prime brokerage, margin lending, and other corporate policies and practices, Defendants Morgan Stanley and Goldman Sachs were required and expected to keep confidential and non-public the type of

MNPI herein alleged to have been obtained from clients such as Archegos. Based on their own corporate policies and practices, Defendants Morgan Stanley and Goldman Sachs knew or reasonably should have known that Archegos did and would expect that Defendants Morgan Stanley and Goldman Sachs would maintain the confidentiality of the MNPI obtained from Archegos as alleged herein. Thus, Defendants Morgan Stanley and Goldman Sachs owed a duty to Archegos both to keep such MNPI confidential and non-public and to refrain from trading in the securities of the Issuers while in possession of such MNPI obtained from Archegos.

287.    Defendants Morgan Stanley and Goldman Sachs also owed duties of confidence to Archegos pursuant to express agreements entered into between each of Defendants Morgan Stanley and Goldman Sachs with Archegos (as well as with the other Counterparties) in connection with Archegos's March 2021 non-public efforts to coordinate a collective standstill, forbearance, managed liquidation, or similar agreement among Defendants Morgan Stanley, Goldman Sachs, and Archegos's other Counterparties. During a series of calls and meetings discussing the possibility of a managed liquidation of Archegos-related assets and position, Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties discussed sending their positions for review to an independent counsel, government regulator, or other independent third party, who would freeze holdings for the entire consortium when the aggregate concentration reached particular levels, and give the lenders a percentage range within which they would be permitted to liquidate their overlapping positions. Counsel for all Counterparties were engaged and attended these calls to work through regulatory and legal challenges, and legal counsel for Defendants Morgan Stanley, Goldman Sachs, and the other Counterparties further held calls among themselves. Across the calls and meetings, representatives of Defendants Morgan Stanley and Goldman Sachs acknowledged and agreed to maintain the confidentiality of, and not disclose, disclose Archegos-

related positions and other Archegos-related MNPI as alleged herein.  Pursuant to these express agreements, Defendants Morgan Stanley and Goldman Sachs agreed to keep the MNPI alleged herein confidential and non-public, and thus Defendants Morgan Stanley and Goldman Sachs owed a duty to Archegos both to keep that MNPI confidential and non-public and to refrain from trading in the securities of the Issuers while in possession of this MNPI.

### B.    Defendants Morgan Stanley and Goldman Sachs Owed Duties To Shareholders – Tipper/Tippee

288.    Defendants Morgan Stanley and Goldman Sachs owed fiduciary duties and obligations arising from similar relationships of trust and confidence to the shareholders of the Issuers.  These duties were derivative of and assumed by receiving the MNPI alleged herein from Archegos while Defendants Morgan Stanley and Goldman Sachs knew or should have known that Archegos constituted a statutory, temporary, or constructive insider of each of the Issuers by means of Archegos's massive undisclosed beneficial ownership and other outsized control over the outstanding share ownership of each Issuer.

289.    Defendants Morgan Stanley and Goldman Sachs knew or should have known that Archegos's positions by means of direct common stock or ADR holdings as well as total return swaps in each of the Issuers far exceeded both the 5% beneficial ownership thresholds of Section 13 and the 10% beneficial ownership thresholds of Section 16.

290.    Defendants Morgan Stanley and Goldman Sachs further knew or should have known that Archegos's positions and effective exposures were far greater as a result of Defendants Morgan Stanley and Goldman Sachs own hedging strategies by which Defendants Morgan Stanley and Goldman Sachs purchased corresponding holdings of common stock of ADR shares in the Issuers underlying Archegos's total return swap positions in order to establish a market-neutral (or "Delta-Neutral") exposure, but which multiplied the concentration, exposure, and market risk to

unsuspecting ordinary public shareholders who, unlike Defendants Morgan Stanley and Goldman Sachs, were completely unaware of Archegos's massive and highly leverage positions, consequent (yet undisclosed) status as a statutory, temporary, or constructive insider of each of the Issuers, and the outsized risk posed by Archegos's massive, undisclosed position (much less the rampant market manipulation scheme on which the whole house of cards was based).

291.     Defendants Morgan Stanley and Goldman Sachs further knew or should have known that Archegos had structured itself and its total return swap positions specifically as a plan or scheme to evade the beneficial ownership reporting requirements of Section 13 of the Exchange Act or otherwise.  Defendants Morgan Stanley and Goldman Sachs thus further knew that pursuant to controlling Second Circuit precedent as well as the express prescription of Rule 13d-3(b), Archegos was "deemed a beneficial owner" of well in excess of the percentage thresholds of Sections 13 and 16 of Exchange, which qualified Archegos as an insider of each of the Issuers.

292.     Defendants Morgan Stanley and Goldman Sachs knew or should have known that Archegos, as an undisclosed corporate insider of each of the Issuers, had relationships of trust and confidence with the corporations themselves and the shareholders of the Issuers, and thus owed a duty to abstain from trading shares of the Issuers based upon MNPI they obtained by reason of their positions with respect to these corporation.  Defendants Morgan Stanley and Goldman Sachs knew or should have known that Archegos was an undisclosed insider as to the Issuers, and thus owed to each such Issuer and its shareholders a duty to abstain from trading in the Issuer's securities unless first disclosing that MNPI to the public.

293.     Having obtained MNPI as alleged herein from Archegos, while Defendants Morgan Stanley and Goldman Sachs knew or should have known that Archegos qualified as an insider that had breached fiduciary, statutory, or other similar duties of confidence or loyalty owned to the

corporations and shareholders of the Issuers, Defendants Morgan Stanley and Goldman Sachs assumed fiduciary and similar duties to the corporations and shareholders of the Issuers to abstain and not trade while in possession of the alleged MNPI obtained from Archegos in breach of Archegos's duties as an insider.

### C.    Defendants Morgan Stanley and Goldman Sachs Obtained MNPI

294.    Defendants Morgan Stanley and Goldman Sachs obtained MNPI from  Archegos through and/or in connection with, among other things, (1) written and other express agreements governing the prime brokerage, margin lending, and other brokerage-client relationships entered into between each of Defendants Morgan Stanley and Goldman Sachs with Archegos, (2) the parties' history, pattern, practice or relationship with regard to the prime brokerage, margin lending, and other brokerage-client relationships, services, and transaction between each of Defendants Morgan Stanley and Goldman Sachs and Archegos, (3) corporate policies and practices with regard to the prime brokerage, margin lending, and other brokerage-client relationships, services, and transaction between each of Defendants Morgan Stanley and Goldman Sachs and Archegos, and (4) a series of confidential calls, meetings, and agreements between each of Defendants Morgan Stanley and Goldman Sachs with Archegos in connection with Archegos's March 2021 non-public efforts to coordinate a collective standstill, forbearance, managed liquidation, or similar agreement among Defendants Morgan Stanley, Goldman Sachs and the other Counterparties.

295.    In connection with these non-public, confidential communications, calls, meetings, and agreements, Defendants Morgan Stanley and Goldman Sachs misappropriated ***confidential MNPI for securities trading purposes in breach of duties owed to Archegos, the source of the information, and further received material and confidential information for securities trading***

111

*purposes from Archegos, a corporate insider, in breach of duties owed to the shareholders of the Issuers*.

296.    The MNPI that Defendants Morgan Stanley and Goldman Sachs possessed while trading in breach of their duties owed to Archegos and to ***the shareholders of*** the Issuers concerned Archegos's massive market manipulation scheme, its likely insolvency as a result of its enormous losses, its inability to satisfy its lenders' margin calls, and the imminent liquidation of massive amounts of securities underlying its holdings.   More specifically, the MNPI possessed by Defendants Morgan Stanley and Goldman Sachs includes but is not limited to:

- Archegos had massive, highly leveraged beneficial ownership positions in each of the Issuers, in excess of both the 5% beneficial ownership thresholds of Section 13 and the 10% beneficial ownership thresholds of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder;

- Archegos had built and structured its investments in these companies pursuant to a total return swap strategy specifically as a plan or scheme to evade the beneficial ownership reporting requirements of Sections 13 and 16 of the Exchange Act;

- By means of these non-public, massive, highly leveraged positions, Archegos had engaged rampant market manipulation to distort, inflate, and otherwise manipulate the market prices of shares issued by the Issuers;

- As a result of Archegos's market manipulation scheme, the public share prices of the Issuers had been massively distorted, inflated, and otherwise manipulated, such that the public prices for these shares did not reflect and were not the product of natural market forces of supply and demand, but rather were

the artificial product of Archegos's manipulative trading and deceptive conduct;

- The exposure and significant risk posed by Archegos's massive and highly leveraged, total return swap positions in each of the Issuers was exacerbated by Defendants Morgan Stanley and Goldman Sachs's hedging strategies, pursuant to which they purchased on their own behalf additional shares of the Issuers corresponding to Archegos's total return swap positions;

- The exposure and significant risk posed by Archegos's highly leveraged, non-public, positions in each of the Issuers had increased dramatically during the first quarter of calendar 2021;

- By early January 2021, after repeated breaches of exposure limits, the ballooning risk posed by Archegos's positions led Defendants Morgan Stanley and Goldman Sachs, and other Counterparties to issue a series of escalating margin calls, demanding hundreds of millions of dollars in additional collateral from Archegos;

- By the week of March 22, 2021, Archegos's ability to cover was all but exhausted when further declines across several of its significant long positions exacerbated its exposure, leading Defendants Morgan Stanley and Goldman Sachs, and its other Counterparties to demand billions of dollars in additional collateral from Archegos;

- Facing massive escalating margin calls it could not meet and a consequent and catastrophic liquidity crisis, Archegos informed Defendants Morgan Stanley and Goldman Sachs, and its other Counterparties that it did not have the

liquidity to meet any of their margin calls, and that its massive position (and the manipulation price distortion created thereby) was about to be abruptly unwound, thus posing severe risk to the public share prices of the Issuers;

- Archegos had convened a series of calls, at least from March 25, 2021 through March 26, 2021, with the Counterparties, including Defendants Morgan Stanley and Goldman Sachs, informing them that while its equity had declined to less than $10 billion its aggregate exposure had ballooned to over $120 billion, and proposing that its prime brokers enter into a collective standstill, forbearance, managed liquidation, or similar agreement; and

- Defendants Morgan Stanley and Goldman Sachs and Archegos's other Counterparties also held a series of calls and meetings to discuss the possibility of an orderly managed liquidation, whereby the prime brokers would send their positions for review to an independent counsel, government regulator, or other independent third party, who would freeze holdings for the entire consortium when the aggregate concentration reached particular levels, and provide the brokers with a percentage range within which they would be permitted to liquidate their overlapping positions.

### D.    Defendants Morgan Stanley and Goldman Sachs Traded On And Exploited MNPI In Breach of Duties Owed to Archegos and Shareholders of the Issuers

297.    Defendants Morgan Stanley and Goldman Sachs each breached duties of confidence and loyalty and similar obligations of trust and confidence owed to both to Archegos and to the shareholders of the Issuers by trading and otherwise exploiting the MNPI alleged herein.

298.    Specifically, while in possession of the MNPI alleged herein, Defendants Morgan Stanley and Goldman Sachs unloaded billions of dollars of their proprietary hedged holdings via

block trades and other transactions across the very same underlying Issuers, jeopardized by and contributing to the imminent collapse of Archegos's massive market manipulation house scheme.

299.    Goldman Sachs & Co LLC ("GSC") houses Defendant Goldman Sachs's prime brokerage operations, including prime broker services.  GSC "makes markets in and clears institutional client transactions on major stock, options and futures exchanges and provides prime brokerage and other equities financing activities, including *securities lending, margin lending and swaps*," and "provides financing to clients through securities purchased under agreements to resell."  [Emphasis added].  In other words, when a client like Archegos approached Defendant Goldman Sachs to purchase TRSs, it went to GSC.

300.    Entities like Defendant Goldman Sachs with at least $100 million in assets under management are required by Section 13(f) of the Exchange Act and Rule 13f-1 (17 C.F.R. 240.13f-1) thereunder to make quarterly reports on Form 13F disclosing their equity holdings. Since Defendant Goldman Sachs, through GSC, held the actual equities underlying its TRS with Archegos, Defendant Goldman Sachs's Form 13F's reflected GSC's massive holdings of shares of the Issuers just before Archegos collapsed.

301.    For example, the Form 13F Defendant Goldman Sachs filed on February 12, 2021 ("GS December 2020 13F") showed GSC's equity holdings as of December 31, 2020.  The GS December 2020 13F stated that GSC held at least:

- 13,194,452 shares of Vipshop worth $370,896,000;

- 24,167,616 shares of Tencent worth $464,985,000;

- 7,871,441 shares of ViacomCBS worth $293,290,000;

- 24,780,889 shares of IQIYI worth $433,170,000;

- 20,611,675 shares of Gaotu worth $1,065,830,000;

- 2,650,122 shares of Baidu worth $573,062,000; and

- 2,224,063 shares of Discovery worth $66,922,000.

302.    According to the Form 13F, Defendant Goldman Sachs filed on May 17, 2021, ("GS March 2021 13F"), GSC had liquated massive portions of these holdings.  The GS March 2021 13F stated that as of only two days after the end of the Class Period, *i.e.*, after Archegos's collapse:

- GSC had *sold 69%* of its shares in Vipshop, and now only held 4,139,630 shares worth only $123,609,000;

- GSC had *sold 92%* of its shares in Tencent, and now only held 1,908,864 shares worth $39,113,000;

- GSC had *sold 37%* of its shares in ViacomCBS, and now only held 4,959,058 shares worth $223,654,000;

- GSC had *sold 88%* of its shares in IQIYI, and now only held 3,000,000 shares worth $3,099,000;

- GSC had *sold 82%* of its shares in Gaotu and now only held 3,661,431 shares worth $124,049,000;

- GSC had *sold 74%* of its shares in Baidu, and now only held 688,878 shares worth $149,865,000; and

- GSC had *sold 78%* of its shares in Discovery, and now only held 482,441 shares worth $20,967,000.

303.    In short, just before Archegos collapsed, GSC had held 95,500,258 shares of the above-described entities, and as Archegos was collapsing, GSC sold 76,659,956 shares, or *over 80%* of its shares in these entities.

304.    Morgan Stanley Capital Services LLC ("MSCS") is Defendant Morgan Stanley's "*primary* OTC derivatives dealer and also centrally manages the market risk associated with a substantial amount of the Firm's OTC derivatives businesses, including transactions cleared by central clearinghouses. Significant products traded include equity swaps; interest rate derivatives; credit derivatives and FX derivatives."  [Emphasis added].  In other words, when a client like Archegos approached Defendant Morgan Stanley to purchase TRSs, it went to MSCS.

305.    The Form 13F Defendant Morgan Stanley filed on February 12, 2021 ("MS December 2020 13F") showed MSCS's equity holdings as of December 31, 2020.  The MS December 2020 13F stated that MSCS held at least:

- 43,323,357 shares of Vipshop worth $1,217,820,000;

- 45,398,723 shares of Tencent worth $873,471,000;

- 38,732,100 Class B shares of ViacomCBS worth $1,443,158,000;

- 30,902,313 shares of IQIYI worth $540,172,000;

- 13,684,143 shares of Gaotu worth $707,607,000;

- 4,378,854 "Rep A" shares of Baidu worth $946,883,000; and

- 7,831,986 "Series A" shares of Discovery worth $235,664,000.

306.    According to the Form 13F Defendant Morgan Stanley filed on May 17, 2021, ("MS March 2021 13F"), MSCS had liquated massive portions of these holdings.  The MS March 2021 13F stated that as of only two days after the end of the Class Period, *i.e.*, after Archegos's collapse:

- MSCS had *sold 86%* of its shares in Vipshop, and now only held 6,260,673 shares worth $186,944,000;

- MSCS had *sold 92%* of its shares in Tencent, and now only held 3,669,971 shares

worth $75,198,000;

- MSCS had *sold 99%* of its shares in ViacomCBS and now only held 249,305 shares worth $11,244,000;

- MSCS had *sold 90%* of its shares in IQIYI, and now only held 3,107,990 shares worth $51,655,000;

- MSCS had *sold 57*% of its shares in Gaotu, and now only held 5,904,932 shares worth $200,059,000;

- MSCS had *completely liquidated* – *i.e.,* sold 100% – of its holdings in Baidu and Discovery, and no longer held any Rep A shares of Baidu or Series A shares of Discovery.

307.    In short, just before Archegos collapsed, MSCS had held 184,251,476 shares of the above-described entities, and as Archegos was collapsing, MSCS sold 165,058,605 shares, or *90%* of its shares in these entities.

308.    Defendants Morgan Stanley and Goldman Sachs thereby traded on and exploited MNPI in breach of duties owed to Archegos and to the shareholders of the Issuers to avoid billions in losses.

## **SCIENTER**

309.    As described above, the Defendants Morgan Stanley and Goldman Sachs possessed MNPI at the time they engaged in the stock sales described herein.   Defendants Morgan Stanley and Goldman Sachs's possession of this knowledge while trading demonstrates their scienter.   Specifically, Defendants Morgan Stanley and Goldman Sachs knew (*i.e.,* possessed the information) that:

a.      Archegos had massive, highly leveraged beneficial ownership positions in Tencent and each of the other Issuers;

b.      those positions were in excess of both the 5% beneficial ownership thresholds of Section 13 and the 10% beneficial ownership thresholds of Section 16 of the Exchange Act and rules and regulations promulgated thereunder;

c.      Archegos had built and structured these positions pursuant to a total return swap strategy specifically as a way to evade the beneficial ownership reporting requirements of Sections 13 and 16 of the Exchange Act.

d.      Archegos had engaged rampant market manipulation to distort, inflate, and otherwise manipulate the market prices of shares issued by Tencent, as well as the other Issuers by means of these non-public, massive, highly leveraged positions;

e.      as a result, the public share prices of Tencent, and the other Issuers, had been massively distorted, inflated, and otherwise manipulated, such that the public prices for these shares did not reflect and were not the product of natural market forces of supply and demand, but rather were the artificial product of Archegos's manipulative trading and deceptive conduct;

f.      the exposure and risk posed by Archegos's already massive and highly leveraged, but non-public, total return swap positions in Tencent, and each of the other Issuers was exponentially exacerbated by the non-public market-neutral hedging strategy of Defendants Morgan Stanley and Goldman Sachs, by which they purchased on their own behalf additional common stock and ADR shares of Tencent, and the other Issuers corresponding to Archegos's total return swap positions;

g.      by early January 2021, after repeated breaches of exposure limits, the ballooning risk posed by Archegos's positions led Defendants Morgan Stanley, Goldman Sachs,

and other of its prime brokers to issue a series of escalating margin calls, demanding hundreds of millions of dollars in additional collateral from Archegos;

h.    by the week of March 22, 2021, Archegos's ability to cover was all but exhausted when further declines across several of its significant long positions exacerbated its exposure, leading Defendants Morgan Stanley, Goldman Sachs, and Archegos's other Counterparties to demand billions of dollars in additional collateral;

i.    Archegos was facing massive escalating margin calls it could not meet and a consequent and catastrophic liquidity crisis, and thus had informed Defendants Morgan Stanley, Goldman Sachs, and its other prime brokers that it did not have the liquidity to meet any of their margin calls, that its massive position (and the manipulation price distortion created thereby) was about to be abruptly unwound thus posing severe risk to the public share price of the securities of Tencent and the other Issuers;

j.    Archegos had committed to "liquidating assets to cover the shortfall," and had specifically warned Defendants Morgan Stanley, Goldman Sachs, and its other Counterparties, that Archegos would need to "carefully liquidate positions in order to 'not tip the market'".

k.    Archegos had convened a series of calls with its Counterparties, including Defendants Morgan Stanley and Goldman Sachs, informing them that while its equity had declined to less than $10 billion its aggregate exposure had ballooned to over $120 billion, and proposing that its prime brokers enter into a collective standstill, forbearance, managed liquidation, or similar agreement;

l.    Archegos's Counterparties, including Defendants Morgan Stanley and Goldman Sachs, also held a series of calls and meetings discussing the possibility of a managed liquidation, whereby the Counterparties would send their positions for review to an independent

counsel, government regulator, or other independent third party, who would freeze holdings for the entire consortium when the aggregate concentration reached particular levels, and give the lenders a percentage range within which they would be permitted to liquidate their overlapping positions; and

        m.    by unloading their proprietary hedged holdings via block trades and other transactions across the very same underlying Issuers, Defendants Morgan Stanley and Goldman Sachs were doing so on unsuspecting and unwitting investors.

310.    These allegations strongly support the conclusion that Defendants Morgan Stanley and Goldman Sachs knew of and possessed the MNPI at the time they traded.

311.    In addition, Defendants Morgan Stanley and Goldman Sachs possessed the motive and opportunity to trade on the proprietary MNPI conveyed to them by Archegos.

## V. DEFENDANTS MORGAN STANLEY AND GOLDMAN SACHS AND MANY OF THEIR HEDGE FUND CLIENTS HAD TREMENDOUS EXPOSURE TO ARCHEGOS'S PORTFOLIO

312.    As a result of their market-neutral hedging strategies, Defendants Morgan Stanley and Goldman Sachs were of the largest holders of the top 10 stocks owned by Archegos. Defendant Morgan Stanley was the largest holder, with approximately $18 billion in positions overall.

313.    Credit Suisse held the second largest position in Archegos's top 10 stocks and suffered a $4.7 billion loss following Archegos's meltdown. Defendants Morgan Stanley and Goldman Sachs knew that they had similar exposure and were likely to suffer similar losses. According to a *CNBC* estimate, Defendant Morgan Stanley would have suffered a $10 billion loss had it not acted quickly.

## VI.    DEFENDANTS MORGAN STANLEY AND GOLDMAN SACHS KNEW FROM EXPERIENCE THAT THEIR TRADING WOULD CAUSE THE PRICE OF THE STOCK TO "FADE" JUST PRIOR TO THE INFORMATION BECOMING PUBLIC

314.    As alleged in ¶70, the Morgan Stanley Fade is a widely known phenomenon. Defendants Morgan Stanley and Goldman Sachs routinely participated in transactions wherein observable price declines preceded block sales.  Thus, Defendants Morgan Stanley and Goldman Sachs – two highly sophisticated prime brokers - were aware that their losses would be *even greater* if they did not act quickly.

315.    As alleged in ¶¶ 202, 229, the information in connection with Archegos's March 2021 non-public efforts to coordinate a collective standstill, forbearance, managed liquidation, or similar agreement were MNPI, precisely because of the potential market moving effects of Archegos's impending margin call.

## VII.    ARCHEGOS EXPRESSLY INFORMED DEFENDANTS MORGAN STANLEY AND GOLDMAN SACHS OF ITS TROUBLED POSITION BEFORE THE INFORMATION WAS MADE PUBLIC

316.    As alleged in ¶197 above, Archegos expressly informed Defendants Morgan Stanley and Goldman Sachs of its likely inability to meet margin calls and the likelihood that it would need to unwind large positions:

  a.  during the week of March 22, 2021, Archegos convened a series of calls with Defendants Morgan Stanley and Goldman Sachs, informing them that (1) its equity had declined to less than $10 billion and (2) its aggregate exposure had ballooned to over $160 billion;

  b.  during the same series of calls, Archegos proposed that the Counterparties enter into a collective standstill, forbearance, managed liquidation, or similar agreement;

  c.  on the evening of March 24, 2021, Archegos informed Defendants Morgan Stanley and Goldman Sachs that it would not be able to meet anticipated margin calls of $10.7

billion the next day;

> d.      that same evening, a call took place between Archegos and Defendants Morgan Stanley and Goldman Sachs in which they discussed the performance of Archegos's portfolio during the day and the progress of its portfolio liquidation;

> e.      on March 25, 2021, Archegos unwound its positions with multiple counterparties.  Throughout the day, it faced ongoing inquiries from the Counterparties regarding its positions;

> f.      after market close on March 25, 2021, Archegos reached out to Defendant Goldman Sachs to execute block trades in an attempt to obtain enough liquidity to satisfy outstanding margin calls;

> g.      that same evening, Archegos organized a group call with its largest Counterparties, including Defendants Morgan Stanley and Goldman Sachs, in an effort to prevent a large scale liquidation that might exacerbate stock price declines; and

> h.      discussions between Archegos and Defendants Morgan Stanley and Goldman Sachs persisted throughout the day on March 26, 2021.

317.    Defendants Morgan Stanley and Goldman Sachs were also highly motivated to liquidate their positions ahead of Archegos's other prime brokers because they knew that the liquidation of the prime brokers' large positions in the Issuers would quickly drive down the share prices of these companies and cause them significant losses.  Defendants Morgan Stanley and Goldman Sachs were also highly motivated to sell their shares prior to the disclosure of Archegos's enormous positions in the Issuers and its impending collapse for these same reasons.  In fact, Defendants Morgan Stanley and Goldman Sachs successfully executed this strategy so as to avoid billions of dollars in losses.

## LOSS CAUSATION

318.    Defendants Morgan Stanley and Goldman Sachs traded while in possession of MNPI.  Later, when the information became publicly known, the price of the securities of Tencent and of the other Issuers' securities declined sharply as a result of such disclosure.

319.    As a result of their purchases of Tencent securities during the Class Period, Tencent Plaintiffs and other members of the Tencent Investor Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

## RELIANCE

320.    To the extent that reliance is an element of their claims, Tencent Plaintiffs and other members of the Tencent Investor Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact.  The allegations herein primarily allege omissions where there was an affirmative duty to disclose information.

321.    To the extent that reliance is an element of their claims, Tencent Plaintiffs and other members of the Tencent Investor Class are also entitled to a presumption of reliance on Defendants Morgan Stanley and Goldman Sachs's omissions pursuant to the fraud-on-the-market theory:

a.    Tencent stock was traded on the New York Stock Exchange, both an informationally efficient market, throughout the Class Period;

b.    Tencent stock traded at high volumes during the Class Period;

c.    Public investors learned of information about Tencent through established market communication mechanisms, including through regular dissemination of press releases on the major news wire services, and through other wide-ranging public revelations, such as communications with the financial press, securities analysts, and other similar reporting services;

d.    The market reacted promptly to public information about Defendants' involvement in, and exposure to, Archegos's collapse;

e.    Tencent stock was covered by numerous securities analysts employed by major brokerage firms who wrote reports that were publicly available and entered the public marketplace;

f.    The material omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Tencent stock; and

g.    Without knowledge of the omitted material facts alleged herein, Tencent Plaintiffs and the other members of the Tencent Investor Class purchased or otherwise acquired Tencent stock between the time Defendants Morgan Stanley and Goldman Sachs possessed and failed to reveal the material facts and the time the true facts began to reach the market.

## DEFENDANTS MORGAN STANLEY AND GOLDMAN SACHS'S UNLAWFUL GAINS

322.    As set forth above, Defendants Morgan Stanley and Goldman Sachs traded on and exploited MNPI in breach of duties owed to Archegos and the shareholders of the Issuers.

323.    As a result of these insider sales, Defendants Morgan Stanley and Goldman Sachs avoided billions in losses and/or had unlawful gains.

## CONTEMPORANEOUS PURCHASES AND SALES

324.    As set forth in previously filed certification, Tencent Plaintiffs traded Tencent ADS contemporaneously (within the meaning of Sections 10(b) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t-1) with and opposite to Defendants Morgan Stanley and Goldman Sachs's trades in of Tencent ADS during the Class Period.

## CLASS ACTION ALLEGATIONS

325.    Tencent Plaintiffs bring this action as a class action pursuant to Federal Rules of

Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the Tencent Investor Class) consisting of

all persons who purchased or otherwise acquired Tencent ADS contemporaneously with

Defendants Morgan Stanley and Goldman Sachs's unlawful trades during the Class Period.

Excluded from the Tencent Investor Class are Defendants herein, the employees, officers and

directors of Defendants Goldman Sachs and Morgan Stanley during the Class Period, members of

their immediate families and their legal representatives, heirs, successors or assigns, and any entity

in which Defendants have or had a controlling interest.

326.    The members of the Tencent Investor Class are so numerous that joinder of all

members is impracticable. During the Class Period, Tencent shares were actively traded on the

New York Stock Exchange and millions of shares were issued and outstanding.  While the exact

number of Tencent Investor Class members is unknown to Tencent Plaintiffs at this time and can

be ascertained only through appropriate discovery, Tencent Plaintiffs believes that there are likely

thousands of members in the proposed Tencent Investor Class.  Record owners and other members

of the Tencent Investor Class may be identified from records maintained by Tencent or its transfer

agent and may be notified of the pendency of this action by mail, using the form of notice similar

to that customarily used in securities class actions.

327.    Tencent Plaintiffs' claims are typical of the claims of the members of the Tencent

Investor Class, as all members of the Tencent Investor Class are similarly affected by Defendants

Morgan Stanley and Goldman Sachs's wrongful conduct in violation of federal law, as complained

of herein.

328.    Tencent Plaintiffs will fairly and adequately protect the interests of the members of

the Tencent Investor Class and have retained counsel competent and experienced in class and

126

securities litigation. Tencent Plaintiffs have no interests antagonistic to or in conflict with those of the Tencent Investor Class.

329.    Common questions of law and fact exist as to all members of the Tencent Investor Class and predominate over any questions solely affecting individual members of the Tencent Investor Class. Among the questions of law and fact common to the Tencent Investor Class are:

a.    whether the federal securities laws were violated by Defendants Morgan Stanley and Goldman Sachs's acts as alleged herein;

b.    whether Archegos supplied inside information to Defendants Morgan Stanley and Goldman Sachs, including information Defendants Morgan Stanley and Goldman Sachs had a duty not to act on, and whether Defendants Morgan Stanley and Goldman Sachs disregarded that duty and traded Tencent shares while in possession of MNPI concerning Tencent and/or Archegos;

c.    whether the inside information was material; and

d.    the amount by which Plaintiff and other members of the Tencent Investor Class were damaged as compared to the amount Defendants Morgan Stanley and Goldman Sachs avoided losing as a result of the securities law violations alleged herein.

330.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages recoverable by individual Tencent Investor Class members may be relatively small, the expense and burden of individual litigation make it impractical for members of the Tencent Investor Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

331.    Tencent Plaintiffs may rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.    Defendants Morgan Stanley and Goldman Sachs failed to disclose MNPI during the Class Period;

b.    the omissions were material;

c.    Tencent ADS is traded in an efficient market;

d.    Tencent shares were liquid and traded with moderate to heavy volume during the Class Period;

e.    Tencent shares were traded on the NYSE; and

f.    Tencent Plaintiffs and other members of the Tencent Investor Class purchased, acquired, and/or sold the applicable Tencent securities between the time Defendants Morgan Stanley and Goldman Sachs failed to disclose material facts and traded thereon and the time the true facts were disclosed, without knowledge of the omitted facts.

332.    Based upon the foregoing, Tencent Plaintiffs and the members of the Tencent Investor Class are entitled to a presumption of reliance upon the integrity of the market.

333.    Additionally, Tencent Plaintiffs and the members of the Tencent Investor Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants Morgan Stanley and Goldman Sachs breached a duty to disclose material information during the Tencent Class Period by trading while in possession of MNPI, as detailed above.

128

**CLAIMS FOR RELIEF**

**FIRST CLAIM**
**Violations of §10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

334.    Tencent Plaintiffs repeats and realleges each and every allegation contained above as if fully set forth herein.

335.    This Claim is brought against all Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

336.    The information provided to Defendants Goldman Sachs and Morgan Stanley, for example, about Archegos's likely insolvency as a result of its inability to satisfy its lenders' margin calls, and, therefore, the forthcoming liquidation of specific securities, including the Issuers' shares, was MNPI.  In addition, the information was, in each case, considered confidential by Archegos, which was the source of the information, and which provided said information for the purpose of obtaining assistance in liquidating its position in the Issuers, not the positions of either Defendants Morgan Stanley or Goldman Sachs.

337.    Defendants Morgan Stanley or Goldman Sachs obtained the MNPI pursuant to their prime brokerage agreements with Archegos and as a result of their serving as prime brokers of, and providing services to, Archegos.

338.    Defendants Morgan Stanley or Goldman Sachs knew, recklessly disregarded, or should have known that they owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to Archegos to keep the information confidential. Defendants Morgan Stanley or Goldman Sachs also knew, recklessly disregarded, or should have known that they owed similar fiduciary and other duties to the corporations and shareholders of the Issuers.

339.    Nevertheless, while in possession of material, non-public adverse information, Defendants Morgan Stanley or Goldman Sachs collectively sold billions of dollars' worth of the Issuers' shares.

340.    By virtue of the foregoing, all Defendants, and each of them, in connection with the purchase or sale of securities, by the use of the means of instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.    engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

341.    By virtue of the foregoing, all Defendants, and each of them, directly or indirectly, violated, and unless enjoined, will again violate, §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

342.    Tencent Plaintiffs contemporaneously purchased and/or sold securities of the same classes as those in which Defendants Morgan Stanley and Goldman Sachs traded.

343.    The measure of damages for trading while in possession of MNPI information under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, is the disgorgement of profits gained and losses avoided by such trading.

344.    During the Class Period, the Defendants Morgan Stanley and Goldman Sachs traded the Issuers' shares while in possession of MNPI and avoided losses on such transactions in amounts estimated at tens of millions of dollars.  Tencent Plaintiffs and the other members of the

Tencent Investor Class are entitled to disgorgement of such amounts, together with prejudgment interest thereon.

345.    By virtue of the foregoing, Defendants Morgan Stanley or Goldman Sachs are jointly and severally liable to Tencent Plaintiffs and the other members of the Tencent Investor Class pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM
### Violations of §20A of the Exchange Act
### (Against All Defendants)

346.    Tencent Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

347.    This Claim is brought against all Defendants under §20A of the Exchange Act, 15 U.S.C. §78t-1.

348.    Defendants Morgan Stanley or Goldman Sachs knew, recklessly disregarded, or should have known that they had received material, adverse non-public information and that they owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to Archegos to keep this information confidential. Defendants Morgan Stanley or Goldman Sachs also knew, recklessly disregarded, or should have known that they owed similar fiduciary and other duties to the corporations and shareholders of the Issuers.

349.    By virtue of the foregoing, all Defendants, and each of them, in connection with the purchase or sale of securities, by the use of the means of instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:

      a.    employed devices, schemes, or artifices to defraud;

b.      made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.      engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

350.    By virtue of the foregoing, all Defendants, and each of them, directly or indirectly, violated, and unless enjoined, will again violate, §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

351.    Tencent Plaintiffs contemporaneously purchased and sold securities of the same classes as those in which the Defendants Morgan Stanley or Goldman Sachs traded.

352.    When the material adverse information was eventually revealed, the Companies' stock price declined and investors suffered economic loss, *i.e.,* damages.

353.    The measure of damages for trading while in possession of MNPI under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, is the disgorgement of losses avoided by such trading.

354.    During the Class Period, the Defendants Morgan Stanley or Goldman Sachs traded shares of the Issuers while in possession of MNPI and avoided losses on such transactions in amounts estimated at tens of millions of dollars.  Tencent Plaintiffs and the other members of the Tencent Investor Class are entitled to disgorgement of such amounts, together with prejudgment interest thereon.

355.    By virtue of the foregoing, Defendants Morgan Stanley or Goldman Sachs are jointly and severally liable to Tencent Plaintiffs and the other members of the Tencent Investor Class pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

**THIRD CLAIM**
**Violations of §20(a) of the Exchange Act**
**(Against all Defendants)**

356.    Tencent Plaintiffs repeats and realleges each and every allegation contained above as if fully set forth herein.

357.    This Claim is brought against all Defendants for control person liability under §20(a) of the Exchange Act.

358.    Defendants Morgan Stanley and Goldman Sachs controlled each of their employees.

359.    Pursuant to §20(a) of the Exchange Act:

Every person who, directly or indirectly, controls any person liable under any provisions of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . ., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

360.    Defendants Morgan Stanley and Goldman Sachs did not act in good faith and directly and/or indirectly induced the wrongful acts complained of herein by:

a.    permitting the insider sales to occur with actual knowledge or reckless disregard for whether the entities trading possessed MNPI; or

b.    failing to adequately supervise their own actions in connection with the acquisition of the inside information and trading thereon.

361.    By virtue of the foregoing, the Defendants Morgan Stanley or Goldman Sachs named in this count are jointly and severally liable, pursuant to §20(a) of the Exchange Act, to Tencent Plaintiffs and the other members of the Tencent Investor Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Tencent Plaintiffs demand judgment against Defendants Morgan Stanley and Goldman Sachs as follows:

A.      Declaring that the instant action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying Tencent Plaintiffs as representative of the Tencent Investor Class;

B.      Requiring Defendants Morgan Stanley and Goldman Sachs to pay damages sustained by Tencent Plaintiffs and the other members of the Tencent Investor Class by reason of the act and transactions alleged herein;

C.      Ordering an accounting and disgorgement of the losses avoided by Defendants Morgan Stanley or Goldman Sachs by reason of the acts and transactions alleged herein;

D.      Awarding Tencent Plaintiffs and the other members of the Tencent Investor Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements;

E.      Awarding Tencent Plaintiffs and the other members of the Tencent Investor Class such other and further relief as the Court may deem just and proper; and

F.      Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Tencent Plaintiffs hereby demand trial by jury of all issues that may be so tried.

DATED:  June 13, 2022            **POMERANTZ LLP**

                                 */s/ Brian Calandra*
                                 Jeremy A. Lieberman
                                 Brian Calandra
                                 600 Third Avenue, 20th Floor
                                 New York, NY 10016
                                 Telephone: (212) 661-1100
                                 Facsimile: (212) 661-8655

jalieberman@pomlaw.com
bcalandra@pomlaw.com

*Lead Counsel for the ViacomCBS & Tencent Classes & Executive Committee Member*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Thomas L. Laughlin, IV
Max R. Schwartz
Jonathan M. Zimmerman (*pro hac vice* forthcoming)
Emilie B. Kokmanian (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
tlaughlin@scott-scott.com
mschwartz@scott-scott.com
jzimmerman@scott-scott.com
ekokmanian@scott-scott.com

*Lead Counsel for the IQIYI Class, Co-Lead Counsel for the Discovery Class & Co-Chair of the Executive Committee*

**HEDIN HALL LLP**
David W. Hall (*pro hac vice*)
Armen Zohrabian (*pro hac vice* forthcoming)
Arun Ravindran (*pro hac vice* forthcoming)
Four Embarcadero Center, Suite 1400
San Francisco, CA 94104
Telephone: 415-766-3534
Facsimile: 415-402-0058
dhall@hedinhall.com
azohrabian@hedinhall.com
aravindran@hedinhall.com

*Lead Counsel for the Baidu Class & Co-Chair of the Executive Committee*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296

135

peretz@bgandg.com

*Additional Counsel for Named Plaintiff Kai Chen*

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  213-519-5876
brian@schallfirm.com

*Executive Committee Member*

**BERGER MONTAGUE PC**
Michael Dell'Angelo
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net

*Co-Lead Counsel for the Gaotu Class &*
*Executive Committee Member*

**JOHNSON FISTEL, LLP**
Ralph M. Stone
1700 Broadway, 41st Floor
New York, NY 10019
Telephone: (212) 292-5960
Facsimile: (212) 292-5680
RalphS@johnsonfistel.com

Michael I. Fistel, Jr. (*pro hac vice*)
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

*Lead Counsel for the Vipshop Class & Executive Committee*
*Member*

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Daniel L. Berger
Caitlin M. Moyna
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
jeisenhofer@gelaw.com
dberger@gelaw.com
cmoyna@gelaw.com

*Co-Lead Counsel for the Discovery Class & Executive Committee Member*

**ROSCA & SCARLATO LLC**
Alan L. Rosca (*pro hac vice*)
23250 Chagrin Boulevard, Suite 100
Beachwood, OH 44122
Telephone: (216) 570-0097
arosca@rscounsel.law

Paul Scarlato (*pro hac vice* forthcoming)
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: 216-946-7070
pscarlato@rscounsel.law
*Co-Lead Counsel for the Gaotu Class*

**KIRBY McINERNEY LLP**
Ira M. Press
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: 212-371-6600
ipress@kmllp.com

*Local Counsel for the Gaotu Class*

**<u>CERTIFICATE OF SERVICE</u>**

I, Brian Calandra, hereby certify that I filed true and correct copy of the foregoing Amended Class Action Complaint with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: June 13, 2022

By:    *Brian Calandra*       

             Brian Calandra
