**MANDATE**

**UNITED STATES COURT OF APPEALS**
**FOR THE**
**SECOND CIRCUIT**

1:21-cv-08413-JSR;
1:21-cv-08618-JSR;
l:21-cv-08752-JSR;
1:21-cv-08897-JSR;
1:21-cv-10286-JSR;
1:21-cv-10791-JSR;
1:22-cv-00169-JSR.

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 16th day of September, two thousand twenty-five.

Before:     Eunice C. Lee,
            Sarah A. L. Merriam,
            Maria Araújo Kahn,
                *Circuit Judges*.

_____

In Re: Archegos 20A Litigation

_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jan 23 2026

**JUDGMENT**

Docket Nos. 24-1162(L), 24-1159(Con),
24-1161(Con), 24-1166(Con), 24-1173(Con),
24-1177(Con), 24-1178(Con)

The appeals in the above captioned cases from an order of the United States District Court for the Southern District of New York were argued on the district court's record and the parties' briefs.

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

*[signature]*

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

*[signature]*

**MANDATE ISSUED ON 10/08/2025**

24-1162-cv(L)
*In Re: Archegos 20A Litigation*

# In the
# United States Court of Appeals
# For the Second Circuit

————

August Term 2024

Nos. 24-1162-cv(L), 24-1159 (CON), 24-1161 (CON), 24-1166 (CON), 24-1173 (CON), 24-1177 (CON), 24-1178 (CON)

IN RE: ARCHEGOS 20A LITIGATION[*]

————

ARGUED: MAY 28, 2025
DECIDED: SEPTEMBER 16, 2025

————

Before: LEE, MERRIAM, and KAHN, *Circuit Judges*.

————

Alexander Shapovalov is the lead plaintiff in one of seven putative class actions brought on behalf of shareholders (collectively, "Appellants") in seven small-to-mid cap companies (the "Issuers"). They appeal from a judgment of the United States District Court for the Southern District of New York (Rakoff, *J.*) dismissing their claims. Appellants allege that Defendants Morgan Stanley & Co. LLC and Goldman Sachs Group (collectively, "Appellees") provided prime brokerage services through margin lending and the execution of total return swaps with Archegos Capital Management, L.P. ("Archegos"), enabling Archegos to obtain nonpublic and highly leveraged positions in the Issuers' stocks. But when the value of the Issuers' stocks declined and Archegos was on the brink of collapse, Appellees traded their Archegos-related positions. In doing so, Appellees emerged from Archegos' collapse virtually unscathed at the expense of ordinary retail investors. Appellants argue that Appellees' conduct was insider trading.

---

[*] The Clerk of Court is respectfully directed to amend the caption accordingly.

Appellants contend that the district court erred by dismissing their claims arising under both the classical and misappropriation theories of insider trading, as well as their claims under Sections 20A and 20(a) of the Securities Exchange Act of 1934.  We disagree and hold that Appellants have failed to plausibly allege that Appellees engaged in insider trading.  Appellants' claim under the classical theory fails because Archegos did not owe a fiduciary or fiduciary-like duty to the Issuers and, thus, Appellees are not liable as Archegos' tippees.  Under the misappropriation theory, Appellants' allegations also fall short because, as brokers dealing at arm's length, Appellees did not owe a fiduciary or fiduciary-like duty to Archegos.  Appellants' alternative misappropriation claim, based on the theory that Appellees tipped their preferred clients that Archegos was about to collapse, also fails for lack of sufficient factual allegations.  Finally, Appellants' Section 20A and 20(a) claims fail because the amended complaint does not adequately allege an underlying violation of securities law.

We therefore **AFFIRM** the judgment of the district court.

————————————

> DAVID W. HALL, The Hall Firm, LTD, San Francisco, CA (Michael, I Fistel, Jr., Johnson Fistel, LLP, Marietta, GA, *on the brief*), *for Plaintiff-Appellant*.
>
> CHARLES S. DUGGAN (Daniel J. Schwartz, *on the brief*), Davis Polk & Wardwell LLP, New York, NY, *for Defendant-Appellee Morgan Stanley*.
>
> Carmine D. Boccuzi, Jr., Cleary Gottlieb Steen & Hamilton LLP, New York, NY, *for Defendant-Appellee Goldman Sachs Group, Inc.*

————————————

2

MARIA ARAÚJO KAHN, *CIRCUIT JUDGE*:

This appeal stems from seven coordinated putative securities class actions arising from the March 2021 collapse of Archegos Capital Management, LP ("Archegos"). Archegos engaged in a type of financing known as total return swaps ("TRS") with various counterparties, including Appellees Morgan Stanley & Co. LLC ("Morgan Stanley") and Goldman Sachs Group, Inc. ("Goldman Sachs").[1] As a result, Archegos amassed controlling, nonpublic positions in the stock of seven issuers: Gaotu Techedu Inc. ("Gaotu"), Vipshop Holdings Ltd. ("Vipshop"), Tencent Music Entertainment Group ("Tencent"), ViacomCBS, Inc. ("ViacomCBS"), IQIYI, Inc. ("IQIYI"), Baidu, Inc. ("Baidu"), and Discovery, Inc. ("Discovery") (collectively, the "Issuers"). In turn, Appellees, in an effort to limit their market exposure, purchased, on their own, the same volume of Issuers' shares as "proprietary hedged shares." But when the Issuers' stock prices fell in March 2021, Archegos found itself overexposed and without the liquidity necessary to meet Appellees' increasing margin calls. Once Appellees learned that

---

[1] Although Archegos primarily relied upon the TRS contracts to obtain its position in each Issuer's stock, Appellees also provided some financing to Archegos known as margin lending. In this arrangement, Appellees loaned money to Archegos to purchase stock at a specified percentage of the stock's cost, while Appellees held the remainder of the stock—the margin—in their own accounts.

Archegos could not pay its debt—and before the public was aware of Archegos'

imminent collapse—Appellees divested themselves of the Issuers' stocks, thereby

drastically decreasing the share prices at the expense of the remaining

shareholders, including Appellants.

Appellants sought to represent a class of the Issuers' shareholders as a part

of seven coordinated cases. They contend that, by selling their Archegos-related

positions before Archegos' collapse became public, Appellees engaged in insider

trading in violation of Sections 10(b), 20A, and 20(a) of the Exchange Act, 15 U.S.C.

§§ 78j(b), 78t-1, & 78t(a), and 17 C.F.R. § 240.10b-5. For the following reasons, we

disagree and affirm the judgment of the district court.

## BACKGROUND

### I.   FACTS

The following facts are taken from Appellants' Second Amended Complaint

("SAC"). As is required when reviewing a motion to dismiss under Rule 12(b)(6),

we accept all well-pleaded facts as true and draw all reasonable inferences in

Appellants' favor. *See Fink v. Time Warner Cable*, 714 F.3d 739, 740–41 (2d Cir. 2013).

## A. ARCHEGOS' INVESTMENT STRATEGY

In 2001, Sung Kook Hwang founded Tiger Asia Management, LLC, and Tiger Asia Partners, LLC (collectively, "Tiger Asia"), a hedge fund that was valued at "over $5 billion at its peak." App'x 299. In 2012, however, the SEC investigated and subsequently entered into a settlement with Hwang and Tiger Asia based on their "insider trading and market manipulation." *Id.* As part of the settlement with the SEC, Tiger Asia paid $44 million in disgorgement and civil penalties and Hwang was banned "from managing money on behalf of clients for at least five years." *Id.* In a separate criminal action, "Tiger Asia pleaded guilty to one count of criminal wire fraud . . . and agreed to forfeit more than $16 million in illegal profits." *Id.*

In 2013, Hwang created Archegos, which he classified as "a family office to manage his own wealth." *Id.* at 300. Under the SEC Family Office Rule, Archegos was exempt from much regulatory oversight; as a result, Archegos "was not required to regularly report information regarding its holdings and borrowing to the SEC and the Financial Stability Oversight Council." *Id.*

Despite its classification as a family office, Archegos "still operated as a sophisticated investment firm." *Id.* Beginning in early 2020, Archegos engaged in

5

a market manipulation scheme by acquiring non-public, highly-leveraged positions in the Issuers, which were predominantly mid-to-small cap companies. Archegos was able to finance these vast quantities of the Issuers' stock through TRS contracts with Appellees and other counterparties. A TRS contract is a derivative contract that permits the client (Archegos) to receive the benefits of owning stock without actually purchasing the underlying stock. Under a TRS contract, the broker (Appellees) purchases an asset and pays the client the appreciation of the stock's price and dividends in exchange for a certain amount of fees. If the value of the stock increases, the client receives the corresponding increase in value from the broker. But if the stock value decreases, the broker issues a margin call where the client must compensate the broker for the stock's decline. Because the broker owns the stock in a TRS contract, the client is not subject to SEC reporting requirements for the underlying asset.

In a TRS contract, brokers bear the risk that a stock increases in value and that they will be required to make payments to the client. Brokers may hedge against this possibility by purchasing their own shares in addition to the shares purchased through the TRS contract. Appellees did so here, purchasing the Issuers' stocks both under the TRS contracts and in their own proprietary accounts

6

"so the amount they would owe Archegos if the price rose would be covered by the increased value of the stock that they held as a hedge." Resp. at 8. If, however, the stock price declined in value, the broker's loss would be offset by the payments the client owed to the broker.

Through the liquidity afforded by TRS contracts, Archegos beneficially owned anywhere from 30–70% of each Issuer's stock. From March 2020 to March 2021, Archegos' assets under management "grew from about $1.5 billion to $35 billion." App'x 316.

The TRS contracts had the additional benefit of allowing Archegos to conceal its highly-leveraged positions through control of massive amounts of stock in these small Issuers' companies. This also allowed Archegos to "evade SEC reporting requirements" and oversight from the market or regulators. *Id.* at 303. Appellants allege that through these machinations, Archegos was able to quietly increase the share prices of the Issuers' stocks and reap great profits without anyone's knowledge, including the Issuers themselves.

**B. The Fall of Archegos**

During the week of March 22, 2021, Archegos' scheme began to crumble. After the market closed on Monday, March 22, one of the Issuers, ViacomCBS,

"announced a $2 billion secondary public stock offering." *Id.* at 340.  The next day,

ViacomCBS's stock price plummeted.  At the same time, "the adoption of interim

amendments implementing the Holding Foreign Companies Accountable Act"

caused the stock price of some "China-based [I]ssuers like Gaotu, [IQIYI], Baidu,

and Tencent" to decline.  *Id.* at 341.  Consequently, Archegos' position in these

Issuers rapidly deteriorated, leaving it vulnerable to Appellees' margin calls.

On March 23, 2021, Archegos unsuccessfully attempted to stymie the decline

in ViacomCBS's stock price, and thus lessen its own liability to Appellees, by

executing "hundreds of millions of dollars" in trades.  *Id.*  From March 22, 2021,

until the end of the day on March 24, 2021, Archegos' capital declined from $36.2

billion to $16.9 billion.  Despite Archegos' trading activity, ViacomCBS's stock

price continued to decline, further exacerbating Archegos' losses.

As Archegos' positions in the Issuers sharply decreased in value, Appellees

began to issue margin calls that increased in volume over the next two days.  After

the market closed on March 24, 2021, Archegos informed Appellees "that it would

not be able to meet the margin calls due the next day" and that its gross exposure

was "$120 billion" while it had only "$9-10 . . . billion in equity."  *Id.* at 342, 343.

To prevent a fire sale, "Archegos organized a group call" with Appellees and other

8

counterparties to request that they "enter into a standstill agreement" under which Appellees "would agree not to declare Archegos in default while it wound down its positions in an orderly manner." *Id.* at 343.

Appellees rejected Archegos' request to enter into a standstill agreement. After the group call, Appellees began to trigger events of default and exercised their early termination rights as to their Archegos-related positions.[2]  By the end of the day on March 26, 2021, Appellees had sold nearly $20 billion of the Issuers' stock, including both their proprietary hedged shares and the shares they owned on Archegos' behalf.  Ultimately, in the days after March 25, 2021, Goldman Sachs and Morgan Stanley rapidly liquidated 80% and 90% of their proprietary shares in the Issuers, respectively.  By rushing to sell their Archegos-related positions, Appellees avoided billions of dollars in losses at the expense of ordinary investors who were unaware of Archegos' impending collapse.

## II.   PROCEDURAL HISTORY

On October 12, 2021, Appellants filed ten virtually identical complaints alleging that Appellees engaged in insider trading.  The district court issued an

---

[2] Appellants contend that Appellees began selling their Archegos-related positions before they declared Archegos in default.  *See* Appellants' Br. at 51–52.  As explained in further detail below, whether Appellees indeed did so is irrelevant to our analysis.

order coordinating the adjudication of the actions, consolidating the actions brought by the shareholders of the same Issuers into seven cases, and instructing the parties to file an amended complaint on behalf of all the Issuers' shareholders. Thereafter, on June 13, 2022, Appellants filed the First Amended Complaint ("FAC"), alleging that Appellees engaged in insider trading in violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Based on these insider trading claims, Appellants also brought derivative causes of action under Section 20A and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78t-1, 78t(a), alleging that they traded in the Issuers' stocks at the same time the Appellees were selling their Archegos-related positions, thus entitling Appellants to further relief.

Appellees filed an omnibus motion to dismiss, which the district court (Crotty, *J.*) granted on March 31, 2023. *See Tan v. Goldman Sachs Grp. Inc.*, No. 21-cv-8413, 2023 WL 2753238 (S.D.N.Y. Mar. 31, 2023). As to Appellants' tipper-tippee claims asserted under the classical theory, the district court acknowledged the plausibility that Archegos could be considered a corporate insider that owes a fiduciary-like duty to the Issuers but found that the FAC contained "deficient factual allegations" to demonstrate that Appellees breached any such duty. *Id.* at

10

*8. Specifically, the district court explained that "[Appellants] do not even attempt to allege that Archegos shared this information to seek a personal benefit," thus foreclosing their theory of tipper-tippee liability. *Id.* The district court also rejected Appellants' misappropriation theory of insider trading because the FAC "fail[ed] to adequately allege that [Appellees] breached any duty [they] may have had towards Archegos." *Id.* at *6. The district court's dismissal was without prejudice and granted Appellants leave to file a second amended complaint to address the identified deficiencies.

Shortly thereafter, Appellants filed the SAC. Appellees renewed their motion to dismiss.[3] On March 28, 2024, the district court dismissed the SAC with prejudice. *See Tan v. Goldman Sachs Grp. Inc.*, No. 21-cv-8413, 2024 WL 1357354 (S.D.N.Y. Apr. 1, 2024).

In dismissing the SAC, the district court noted that "[Appellants'] basic allegations . . . have not changed." *Id.* at *4. Rejecting Appellants' tipper-tippee claim asserted under the classical theory, the district court dismissed the claim because the SAC did not plausibly allege that Archegos (1) was a corporate insider

---

[3] The coordinated cases were initially assigned to the Honorable Judge Crotty. After Appellees filed their second motion to dismiss, the cases were reassigned to the Honorable Judge Rakoff.

11

of any Issuer; (2) received confidential information from any Issuer; and (3) shared

any Issuer's confidential information with Appellees.  *See id.* at *6–7.  As to the

misappropriation theory, the district court found that the SAC failed to allege that

Appellees (1) received material non-public information from Archegos and (2)

breached a duty to Archegos by selling the Issuers' shares.  *See id.* at *7–8.

Regarding Appellants' alternative argument that Appellees were liable for tipping

preferred clients under the misappropriation theory, the district court found the

SAC lacked factual support.  *See id.* at *8–9.  The district court dismissed

Appellants' Section 20A and 20(a) claims because they required an underlying

insider trading violation. *See id.* at *9.  This appeal followed.

## DISCUSSION

Whether Appellants' insider trading claims are plausible largely turns on

the relationships between the relevant entities.  To overcome the motion to

dismiss, Appellants must allege facts showing that either (1) Archegos owed a

fiduciary or fiduciary-like duty to the Issuers' shareholders or (2) Appellees owed

a fiduciary or fiduciary-like duty to Archegos.  If neither duty exists, then

Appellees were not legally obliged to refrain from trading their Archegos-related

positions, or from sharing information about Archegos' financial state.  Because

12

we find that Appellants failed to adequately allege a breach of fiduciary duty or similar relationship, we affirm the district court's dismissal of their claims.

## I. STANDARD OF REVIEW

"We review the grant of a motion to dismiss *de novo,* accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Fink*, 714 F.3d at 740–41. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Allegations of fraud are held to a higher pleading standard. Under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1), and Federal Rule of Civil Procedure 9(b), the deceptive or fraudulent conduct must be pled "with particularity." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 463 (2d Cir. 2019); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

## II. APPLICABLE LAW

Insider trading consists of the unlawful trading in securities based on material non-public information and "is well established as a violation of section

10(b) of the Securities Exchange Act of 1934 and Rule 10b-5." *S.E.C. v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012).  We have recognized two theories of insider trading. "Under the classical theory . . ., a corporate insider is prohibited from trading shares of [a] corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders." *Id.* (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).  The second theory—misappropriation— "targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence and who breach a fiduciary duty to the source of the information to gain personal profit in the securities market." *Id.* (citing *United States v. O'Hagan*, 521 U.S. 642, 652 (1997)).  Under both theories, the person who owes a fiduciary duty of trust and confidence can be liable for using material non-public information to profit by trading on or "tipping" the confidential information to others.  *See Salman v. United States*, 580 U.S. 39, 42 (2016).

### A. Classical Theory

Appellants assert that Appellees are liable under a "tipper/tippee" claim arising under the classical theory of insider trading.

When considering a tipper-tippee claim under the classical theory, we assess whether a corporate insider breached a duty to a company by disclosing the company's confidential information to a third party—the tippee—who then uses that information for an improper purpose. *See Dirks v. S.E.C.*, 463 U.S. 646, 659 (1983)). To prevail under this theory, a plaintiff must show that:

> (1) the corporate insider was entrusted with a fiduciary duty; (2) the corporate insider breached his fiduciary duty by (a) disclosing confidential information to a tippee (b) in exchange for a personal benefit; (3) the tippee knew of the tipper's breach, that is, he knew the information was confidential and divulged for personal benefit; and (4) the tippee still used that information to trade in a security or tip another individual for personal benefit.

*United States v. Newman,* 773 F.3d 438, 450 (2d Cir. 2014), *abrogated on other grounds by Salman*, 580 U.S. 39.[4]

Appellants assert that Archegos "qualified as a controlling shareholder," thereby rendering it a "constructive insider" of each Issuer. Appellants' Br. at 43. Appellants argue that, as a "constructive insider," Archegos had a fiduciary duty not to disclose "any material nonpublic information about the security or issuer" to Appellees or other counterparties. *Id.* at 32 (internal quotation marks and

---

[4] Although *Newman* was decided in the context of a criminal prosecution, these same elements are required to prevail on a civil claim asserting tipper-tippee liability. *See, e.g., Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 456 (S.D.N.Y. 2015).

15

emphasis omitted) (alteration adopted).   Appellants contend that Archegos

breached its fiduciary duties to the Issuers when Archegos provided Appellees

with confidential information regarding its "impending collapse" during the week

of March 24, 2021.  *Id.* at 42.  According to Appellants, Appellees—as tippees—are

liable for front running the market and liquidating their Archegos-related

positions upon receiving this confidential information.  We disagree.

In general, a "corporate insider" is an individual or entity who "enter[s] into

a special confidential relationship in the conduct of the business of the enterprise

and [is] given access to information solely for corporate purposes."  *Dirks*, 463 U.S.

at 655 n.14.  This gives rise to "a relationship of trust and confidence between the

shareholders of a corporation and those insiders who have obtained confidential

information by reason of their position with that corporation."  *Chiarella*, 445 U.S.

at 228.  Corporate insiders include "officers, directors, and other permanent

insiders of a corporation" as well as "attorneys, accountants, consultants, and

others who temporarily become fiduciaries."  *O'Hagan*, 521 U.S. at 652.  In some

circumstances, controlling shareholders[5] may be considered corporate insiders

---

[5] A controlling shareholder is one who either by virtue of owning the majority of a company's shares, or through its role in the company, or both, exerts substantial influence over the company's affairs. *See, e.g., Tornetta v. Musk*, 310 A.3d 430, 498–99 (Del. Ch. 2024).

16

where "they have the same sort of access to information as a result of their position of power as the typical officer and director." *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 n.5 (2d Cir. 2014) (internal quotation marks and citation omitted).

Archegos was not a corporate insider of any of the Issuers, and thus, did not owe them a fiduciary or fiduciary-like duty. Appellants' only basis for claiming that Archegos was a corporate insider is the limited allegation that Archegos was the beneficial owner of large quantities of each Issuer's stock and the conclusory assertion that this beneficial ownership resulted in "massive control over the price of the stocks themselves." Appellants' Br. at 46 (internal quotation marks and citation omitted). Archegos, however, did not own a majority of shares in any one Issuer's stock. Indeed, Appellees, not Archegos, through the TRS contracts, actually owned the Issuers' shares. Appellants' own allegations support a conclusion that Archegos was *not* a controlling shareholder of any Issuer.

There is no allegation in the SAC that Archegos had access to any Issuer's internal corporate information or exercised control over any Issuer's corporate affairs so as to render it a corporate insider. Under Supreme Court precedent, an entity does not become a corporate insider based solely on its beneficial ownership

17

of stock.[6]  *See Chiarella*, 445 U.S. at 227 (holding that a fiduciary-like duty applies to corporate insiders based on their "access to inside information intended to be available only for a corporate purpose").  As we have explained, a corporate insider is one who, by virtue of their position within the corporation and access to the corporation's confidential information, obtains a fiduciary duty to safeguard that information on behalf of the shareholders.  *See Steginsky*, 741 F.3d at 370 n.5; *see also Sawant v. Ramsey*, 742 F. Supp. 2d 219, 238 (D. Conn. 2010) (finding that a "major shareholder" was not a corporate insider because he "did not participate in the development, marketing, or business planning" of the corporation).

Archegos' beneficial ownership of stock in the Issuers did not empower it to vote its shares, influence corporate decisions, or access internal corporate information.  *See Tan*, 2024 WL 1357354, at *7.  Archegos did not "obtain[] confidential information by reason of [its] position with [the Issuers]," in the way that an officer or director of a corporation would do.  *Chiarella*, 445 U.S. at 228.  Nor

---

[6] Appellants identify one case, in which the Southern District of New York recognized that individuals who "beneficially owned a significant portion" of a corporation could be considered corporate insiders.  *Gruber v. Gilbertson*, No. 16-cv-9727, 2021 WL 2482109, at *14 (S.D.N.Y. June 17, 2021).  But in so holding, the district court also relied upon the individuals' participation in "the day-to-day business," finding that they directed financial decisions and replaced corporate leadership.  *Id.*  Thus, Appellants cite to no authority, and we are aware of none, demonstrating that beneficial ownership may, on its own, be sufficient to render an individual or entity a corporate insider.

18

did Archegos act on the Issuers' behalf in a manner giving rise to a relationship of trust and confidence, such as when an attorney or consultant works for a corporation. *See O'Hagan*, 521 U.S. at 652. The only influence Archegos arguably exercised over the Issuers was its manipulation of their share prices through derivative contracts and margin lending. This activity, while undoubtedly able to shift the market, does not constitute the type of influence over internal corporate affairs or access to information that would give rise to a fiduciary relationship between Archegos, as a corporate insider, and the Issuers.

Consequently, Appellants' allegations fall well short of demonstrating that Archegos possessed power or influence over any of the Issuers' day-to-day or long-term operations or had access to any of the Issuers' confidential information. The SAC does not plausibly allege that Archegos was a corporate insider, or otherwise owed a fiduciary or fiduciary-like duty to the Issuers' shareholders. Accordingly, the district court did not err in dismissing Appellants' claims asserted under the classical theory of insider trading.

## B. Misappropriation Theory

Appellants also assert that Appellees are liable for insider trading under the misappropriation theory. Unlike the classical theory, which "targets a corporate

19

insider's breach of duty to shareholders with whom the insider transacts[,] the misappropriation theory outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information." *O'Hagan*, 521 U.S. at 652–53. Put differently, the misappropriation theory targets persons who were entrusted with material non-public information, and in violation of their fiduciary duty to the source of that information, used the information for their own gain. *See Obus*, 693 F.3d at 284.

To state a claim under the misappropriation theory, a plaintiff must plausibly allege "(1) that the defendant possessed material, nonpublic information; (2) which he had a duty to keep confidential; and (3) that the defendant breached his duty by acting on or revealing the information in question." *S.E.C. v. Suman*, 684 F. Supp. 2d 378, 387 (S.D.N.Y. 2010) (quoting *S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 541 (S.D.N.Y. 2009)), *aff'd*, 421 F. App'x 86 (2d Cir. 2011). The defendant may also be liable if, with the requisite scienter and for his own benefit, he tipped the material non-public information to a third party. *See Obus*, 693 F.3d at 285.

Appellants contend that Appellees are liable under the misappropriation theory in two ways. First, they allege that Appellees received confidential

20

information regarding Archegos' imminent collapse, and Appellees, in breach of their fiduciary duty to Archegos, traded their Archegos-related positions in advance of issuing notices of default.  Second, Appellants argue that Appellees violated their duty of confidentiality to Archegos by tipping information regarding Archegos' financial predicament to their preferred clients, who, in turn, traded on that confidential information.  For the reasons explained below, the SAC fails to adequately allege a violation under either theory.

1. Misappropriation By Trading

Even assuming, without deciding, that the news of Archegos' collapse constituted material non-public information, Appellants' claim still fails because Appellees did not owe any fiduciary duties to Archegos.  "[A] fiduciary relationship, or its functional equivalent, exists only where there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties."  *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001).  The *acceptance* of such a duty is crucial because "a fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information."  *Id.* (internal quotation marks omitted).  Ultimately, the hallmark of a fiduciary relationship is that "the party in whom

21

confidence is reposed has entered into a relationship in which he or she acts to serve the interests of the party entrusting him or her with such information." *Id.* at 234–35.  Conversely, parties to a transaction who negotiate at arm's length are generally not considered to be fiduciaries of each other absent an agreement to the contrary.  *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 208 (2d Cir. 2018).

The SAC does not allege that Appellees entered into an agreement with Archegos to act in its best interest or that Appellees ever agreed to serve as Archegos' fiduciaries.  Rather, the SAC alleges only that Appellees offered Archegos various brokerage services.  More importantly, the SAC acknowledges that Appellees were contractually entitled to sell their Archegos-related positions upon Archegos' default.  This type of commercial arrangement between adverse parties indicates that Appellees negotiated with Archegos at arm's length.  *See In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) ("When parties deal at arm[']s length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances.") (internal quotation marks omitted) (alteration adopted).  Nor does the SAC contain allegations that would support the existence of an additional relationship of confidence or trust to Archegos from which a

22

fiduciary obligation could be implied. *Cf. United States v. Kosinski*, 976 F.3d 135, 148 (2d Cir. 2020) (finding that although "an arm's length relationship is not by itself a fiduciary relationship," such a fiduciary relationship existed where there was an express agreement to hold information confidential through an employment contract) (internal quotation marks omitted) (alteration adopted)). Viewing all the SAC allegations in Appellants' favor, the conclusory statements about the parties' "history, pattern, practice, course of dealing, [and] relationship with regard to the prime brokerage, margin lending, and other brokerage-client relationships" are insufficient to imply a fiduciary relationship and state a plausible claim. App'x 364. The SAC fails to plausibly allege a key element of insider trading: the existence of a fiduciary-like duty.[7]

### 2. Misappropriation By Tipping

Alternatively, Appellants argue that Appellees tipped their so-called "preferred clients" about Archegos' imminent collapse, thereby breaching their fiduciary duties to Archegos. In support of this theory, Appellants cite

---

[7] Given Appellants' failure to plausibly allege a fiduciary duty, we need not address whether (1) news of Archegos' impending collapse constituted material non-public information and (2) Appellees' trading of Archegos-related positions constituted a breach of Appellees' fiduciary duty through the use of a deceptive device. *See O'Hagan*, 521 U.S. at 654 ("Deception through nondisclosure is central to the theory of liability for which the Government seeks recognition."). Accordingly, Appellants' misappropriation theory premised on Appellees' trading of the Issuers' stocks in violation of a duty to Archegos fails.

23

circumstantial evidence that they claim indirectly demonstrates that Appellees must have encouraged their preferred clients to front-run the market and trade Archegos-related positions. *Id.* at 360–66. Specifically, Appellants state that (1) the trading volume in the Issuers' stocks "spiked" on March 24, 2021, *id.* at 360; (2) the stock price of Discovery dropped by 14% before Defendant Morgan Stanley executed a block trade of Archegos collateral; (3) the SEC and Department of Justice were investigating Morgan Stanley's sale and trading practices relating to block trades; and (4) two Morgan Stanley employees who were involved with these trades were terminated. Although we have already determined that Appellees owed no fiduciary-like duty to Archegos, these claims also fail for lack of particularity.

We recognize that "because insider tips are typically passed on in secret, it is often impractical to require plaintiffs to allege these details with particularity," and thus, "Rule 9(b) may be relaxed to allow a plaintiff to plead facts that imply the content and circumstances of an insider tip." *S.E.C. v. One or More Unknown Traders in Securities of Onyx Pharms., Inc.*, 296 F.R.D. 241, 248 (S.D.N.Y. 2013). Although Rule 9(b) "is relaxed as to matters peculiarly within the adverse parties'

24

knowledge, the allegations must then be accompanied by a statement of the facts upon which the belief is founded." *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972).

Even though Appellants allege that much of the information related to Appellees' alleged tipping of preferred clients would be in Appellees' exclusive possession, the SAC fails to plead sufficient facts to imply the content and circumstances of such tips. For example, the allegation that trading volume in the Issuers' stocks spiked on March 24, 2021, does not support a conclusion that Appellees tipped their clients about Archegos' financial state. Indeed, the SAC contradicts this allegation, asserting that on that date, Archegos "directed hundreds of millions of dollars of additional trading in the Issuers in a fleeting effort to defend these stock prices," App'x 341 (providing an alternative explanation for the spike in trading). As the district court aptly summarized: "Without particular factual allegations regarding the tips, it is an entirely conjectural leap to disregard Archegos's flurry of trading activity and instead to attribute the movement in the Issuers' stocks to improper unidentified trading by [Appellees'] unidentified tippees." *Tan*, 2024 WL 1357354, at *9. Accordingly, the SAC's allegation that Appellees engaged in insider trading by tipping preferred clients fails.

25

**C.  Section 20A and 20(a) Claims**

Appellants' Section 20A and 20(a) claims are likewise properly dismissed.

"To state a claim under Sections 20(a) and 20A of the Exchange Act, a plaintiff must

allege a primary violation, such as one under Section 10(b) and Rule 10b-5." *Ark.*

*Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 (2d Cir. 2022).

Because Appellants have failed to plausibly allege insider trading, they cannot

sustain their Section 20A and 20(a) claims.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district

court.